| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| 050168 | ST. JUDE HOSPITAL - FULLERTON | 101 EAST VALENCIA MESA DRIVE | FULLERTON | CA | 92835 |
| 180045 | ST. LUKE HOSPITAL - WEST | 7380 TURFWAY ROAD | FLORENCE | KY | 41042-1355 |
| 450193 | ST. LUKE S EPISCOPAL HOSPITAL | 6720 BERTNER | HOUSTON | TX | 77030 |
| 260179 | ST. LUKE S HOSPITAL | 232 S. WOODS MILL RD | CHESTERFIELD | MO | 63017 |
| 360090 | ST. LUKE S HOSPITAL | 5901 MONCLOVA RD | MAUMEE | OH | 43537 |
| 390049 | ST. LUKE S HOSPITAL | 801 OSTRUM STREET | BETHLEHEM | PA | 18015 |
| 100151 | ST. LUKE S HOSPITAL ASSOC | 4201 BELFORT ROAD | JACKSONVILLE | FL | 32216 |
| 240047 | ST. LUKE S HOSPITAL OF DULUTH | 915 EAST FIRST STREET | DULUTH | MN | 55805 |
| 030037 | ST. LUKE S MEDICAL CENTER | 1800 EAST VAN BUREN | PHOENIX | AZ | 85006 |
| 520138 | ST. LUKE S MEDICAL CENTER | 2900 WEST OKLAHOMA AVENUE | MILWAUKEE | WI | 53215 |
| 160045 | ST. LUKE S METHODIST HOSPITAL | 1026 A AVENUE N.E. | CEDAR RAPIDS | IA | 52406-3026 |
| 130006 | ST. LUKE S REGIONAL MEDICAL CENTER | 190 EAST BANNOCK | BOISE | ID | 83712 |
| 330046 | ST. LUKE S ROOSEVELT HOSPITAL CENTER | 1111 AMSTERDAM AVENUE | NEW YORK | NY | 10025 |
| 150004 | ST. MARGARET MERCY HEALTHCARE- NORTH | 5454 HOMAN AVENUE | HAMMOND | IN | 46320 |
| 150090 | ST. MARGARET MERCY HEALTHCARE-SOUTH | 24 JOLIET STREET | DYER | IN | 46311 |
| 460047 | ST. MARK S HOSPITAL | 3900 SOUTH 1200 EAST | SALT LAKE CITY | UT | 82124 |
| 450096 | ST. MARY HOSPITAL | 3600 GATES BLVD | PORT ARTHUR | TX | 77642 |
| 050191 | ST. MARY MEDICAL CENTER | 1050 LINDEN AVENUE | LONG BEACH | CA | 90813 |
| 390258 | ST. MARY MEDICAL CENTER | LANGHORNE-NEWTOWN ROAD | LANGHORNE | PA | 19047 |
| 150034 | ST. MARY MEDICAL CENTER INC. | 1500 SOUTH LAKE AVENUE | HOBART | IN | 46342 |
| 230002 | ST. MARY MERCY HOSPITAL | 36476 FIVE MILE ROAD | LIVONIA | MI | 48154 |
| 050300 | ST. MARY REGIONAL MEDICAL CENTER | 18300 HIGHWAY 18 | APPLE VALLEY | CA | 92307 |
| 260091 | ST. MARY S HEALTH CENTER | 6420 CLAYTON ROAD | ST LOUIS | MO | 63117 |
| 140034 | ST. MARY S HOSPITAL | 400 NORTH PLEASANT AVENUE | CENTRALIA | IL | 62801 |
| 490059 | ST. MARY S HOSPITAL | 5801 BREMO RD | RICHMOND | VA | 23226 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---------|----------------------|--------|------|----|----|
| 060023 | ST. MARY S HOSPITAL & MEDICAL CENTER | 7TH AND PATTERSON | GRAND JUNCTION | CO | 81502-1628 |
| 050457 | ST. MARY S MEDICAL CENTER | 450 STANYAN STREET | SAN FRANCISCO | CA | 94117- |
| 150100 | ST. MARY S MEDICAL CENTER | 3700 WASHINGTON AVENUE | EVANSVILLE | IN | 47750 |
| 240002 | ST. MARY S MEDICAL CENTER | 407 EAST THIRD STREET | DULUTH | MN | 55805 |
| 440120 | ST. MARY S MEDICAL CENTER | 900 OAK HILL AVENUE | KNOXVILLE | TN | 37917 |
| 510007 | ST. MARY S MEDICAL CENTER INC. | 2900 FIRST AVENUE | HUNTINGTON | WV | 25702- |
| 520083 | ST. MARYS HOSPITAL MED CTR MADISON | 707 SOUTH MILLS STREET | MADISON | WI | 53715-0450 |
| 290009 | ST. MARYS REGIONAL MEDICAL CENTER | 235 WEST SIXTH STREET | RENO | NV | 89503-4548 |
| 520040 | ST. MICHAEL HOSPITAL | 2400 WEST VILLARD AVENUE | MILWAUKEE | WI | 53209-4999 |
| 310096 | ST. MICHAELS MEDICAL CENTER | 268 DR. M.L. KING JR. BLVD | NEWARK | NJ | 07102 |
| 190027 | ST. PATRICK HOSPITAL | 524 S RYAN STREET | LAKE CHARLES | LA | 70602 |
| 270014 | ST. PATRICK HOSPITAL | 500 W. BROADWAY | MISSOULA | MT | 59802 |
| 450044 | ST. PAUL MEDICAL CENTER | 5909 HARRY HINES | DALLAS | TX | 75235 |
| 330057 | ST. PETER S HOSPITAL | 315 SO. MANNING BLVD | ALBANY | NY | 12208 |
| 360066 | ST. RITA S MEDICAL CENTER | 730 W. MARKET | LIMA | OH | 45801 |
| 190045 | ST. TAMMANY PARIS HOSPITAL | 1202 S. TYLER | COVINGTON | LA | 70433 |
| 520075 | ST. VINCENT HOSPITAL | 835 SOUTH VAN BUREN ST. | GREEN BAY | WI | 54307-3508 |
| 150084 | ST. VINCENT HOSPITAL & HCC | 2001 WEST 86TH STREET | INDIANAPOLIS | IN | 46260 |
| 380004 | ST. VINCENT HOSPITAL MED CTR | 9205 SW BARNES ROAD | PORTLAND | OR | 97225 |
| 050502 | ST. VINCENT MEDICAL CENTER | ] | LOS ANGELES | CA | 90057- |
| 360112 | ST. VINCENT MEDICAL CENTER | 2213 CHERRY STREET | TOLEDO | OH | 43608 |
| 010056 | ST. VINCENT S HOSPITAL | 810 ST. VINCENT S DRIVE | BIRMINGHAM | AL | 35205 |
| 070028 | ST. VINCENT S MEDICAL CENTER | 2800 MAIN STREET | BRIDGEPORT | CT | 06606 |
| 100040 | ST. VINCENT S MEDICAL | 1800 BARRS STREET | JACKSONVILLE | FL | 32204 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| | CENTER | | | | |
| 170016 | ST.FRANCIS HEALTH CENTER | 1700 S.W. 7TH | TOPEKA | KS | 66606-1690 |
| 050441 | STANFORD HOSPITAL & CLINICS | 300 PASTEUR DRIVE | PALO ALTO | CA | 94305 |
| | STANFORD HOSPITAL AND CLINICS | | STANFORD | CA | |
| 330160 | STATEN ISLAND UNIVERSITY HOSPITAL | 475 SEAVIEW AVENUE | STATEN ISLAND | NY | 10305 |
| 330393 | STONY BROOK UNIVERSITY HOSPITAL | NICHOLLS ROAD | STONY BROOK | NY | 11794-9112 |
| 170086 | STORMONT-VAIL REGIONAL HEALTH CENTER | 1500 SW 10TH AVE | TOPEKA | KS | 66604-1353 |
| 120022 | STRAUB CLINIC & HOSPITAL | 888 S. KING STREET | HONOLULU | HI | 96813 |
| 010038 | STRINGFELLOW MEMORIAL HOSPITAL | 301 EAST 18TH STREET | ANNISTON | AL | 36207 |
| | STRONG HEALTH | | ROCHESTER | NY | |
| 330285 | STRONG MEMORIAL HOSPITAL | 601 ELMWOOD AVENUE | ROCHESTER | NY | 14642 |
| 210022 | SUBURBAN HOSPITAL INC. | 8600 OLD GEORGETOWN ROAD | BETHESDA | MD | 20814 |
| 360020 | SUMMA HEALTH SYSTEM | 525 E. MARKET STREET | AKRON | OH | 44308 |
| | SUMMA HEALTH SYSTEM | | AKRON | OH | |
| 290041 | SUMMERLIN HOSPITAL MEDICAL CTR | 657 TOWN CENTER DRIVE | LAS VEGAS | NV | 89144 |
| 050043 | SUMMIT MEDICAL CENTER | 350 HAWTHORNE AVENUE | OAKLAND | CA | 94609- |
| | SUN HEALTH CORPORATION | | SUN CITY | AZ | |
| 290003 | SUNRISE HOSPITAL | 3186 MARYLAND PARKWAY | LAS VEGAS | NV | 89109 |
| | SUTTER HEALTH | | SACRAMENTO | CA | |
| 050291 | SUTTER MEDICAL CENTER OF SANTA ROSA | 3325 CHANATE ROAD | SANTA ROSA | CA | 95404 |
| 050108 | SUTTER MEDICAL CENTER-SACRAMENTO | 2801 L STREET | SACRAMENTO | CA | 95816-5680 |
| 050309 | SUTTER ROSEVILLE MEDICAL CENTER | ONE MEDICAL PLAZA | ROSEVILLE | CA | 95661- |
| 330290 | SVCMC-SAINT VINCENT S NEW YORK | 153 WEST 11 STREET | NEW YORK | NY | 10011 |
| 140114 | SWEDISH COVENANT HOSPITAL | 5145 NORTH CALIFORNIA AVENUE | CHICAGO | IL | 60625 |
| 060034 | SWEDISH MEDICAL CENTER | 501 EAST HAMPDEN | ENGLEWOOD | CO | 80113 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| | | AVENUE | | | |
| 500027 | SWEDISH MEDICAL CENTER | 747 BROADWAY | SEATTLE | WA | 98122-4307 |
| | SWEDISH MEDICAL CENTER | | SEATTLE | WA | |
| 500025 | SWEDISH MEDICAL CENTER / PROVIDENCE | 500 17TH AVENUE | SEATTLE | WA | 98124 |
| 140228 | SWEDISHAMERICAN HOSPITAL | 1401 EAST STATE ST. | ROCKFORD | IL | 61104 |
| 500129 | TACOMA GENERAL ALLENMORE HOSPITAL | 315 SOUTH MLK JR. WAY | TACOMA | WA | 98415-0299 |
| 100135 | TALLAHASSEE MEMORIAL HOSPITAL | MAGNOLIA DRIVE & MICCOSUKEE ROAD | TALLAHASSEE | FL | 32308 |
| 100128 | TAMPA GENERAL HOSPITAL | 2 COLUMBIA DR | TAMPA | FL | 33606-3508 |
| 050601 | TARZANA ENCINO REGIONAL MED CTR | 18321 CLARK STREET | TARZANA | CA | 91356 |
| 450039 | TCHD D/B/A JPS HEALTH NETWORK | 1500 SOUTH MAIN STREET | FORT WORTH | TX | 76104 |
| 390070 | TEMPLE LOWER BUCKS HOSPITAL | 501 BATH ROAD | BRISTOL | PA | 19007 |
| | TEMPLE UNIVERSITY HEALTH SYSTEM | | PHILADELPHIA | PA | |
| 390027 | TEMPLE UNIVERSITY HOSPITAL | 3401 N. BROAD STREET | PHILADELPHIA | PA | 19140 |
| | TENET HEALTHCARE | | DALLAS | TX | |
| 150046 | TERRE HAUTE REGIONAL HOSPITAL | 3901 HOSPITAL LANE | TERRE HAUTE | IN | 47802 |
| 190008 | TERREBONNE GENERAL MEDICAL CENTER | 8166 MAIN STREET | HOUMA | LA | 70360 |
| | TEXAS HEALTH RESOURCES | | ARLINGTON | TX | |
| 450324 | TEXOMA MEDICAL CENTER | 1000 MEMORIAL DRIVE | DENISON | TX | 75021 |
| 450878 | TEXSAN HEART HOSPITAL | 6700 1-H 10 WEST | SAN ANTONIO | TX | 78201 |
| 390139 | THE BRYN MAWR HOSPITAL | 130 SOUTH BRYN MAWR AVENUE | BRYN MAWR | PA | 19010-3160 |
| 390179 | THE CHESTER COUNTY HOSPITAL | 701 E. MARSHALL ST. | WEST CHESTER | PA | 19380- |
| 360163 | THE CHRIST HOSPITAL | 2139 AUBURN AVENUE | CINCINNATI | OH | 45219 |
| 210056 | THE GOOD SAMARITAN HOSPITAL | 5601 LOCH RAVEN BLVD. | BALTIMORE | MD | 21239 |
| 150153 | THE HEART CENTER OF INDIANA | 10580 N. MERIDIAN ST. | INDIANAPOLIS | IN | 46290 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| 210009 | THE JOHNS HOPKINS HOSPITAL | 600 N. WOLFE STREET | BALTIMORE | MD | 21287 |
|  | THE JOHNS HOPKINS HOSPITAL & HEALTH SYSTEM |  | BALTIMORE | MD |  |
| 390195 | THE LANKENAU HOSPITAL | 100 LANCASTER AVENUE WEST OF CITY L | WYNNEWOOD | PA | 19096 |
| 180013 | THE MEDICAL CENTER | 250 PARK STREET | BOWLING GREEN | KY | 42102-9010 |
| 060100 | THE MEDICAL CENTER OF AURORA | 1501 SOUTH POTOMAC | AURORA | CO | 80012 |
| 450518 | THE MEDICAL CENTER OF SOUTHEAST TEXA | 2555 JIMMY JOHNSON BLVD | PORT ARTHUR | TX | 77640 |
| 220066 | THE MERCY HOSPITAL | 271 CAREW STREET | SPRINGFIELD | MA | 01102 |
| 390028 | THE MERCY HOSPITAL OF PITTSBURGH | 1400 LOCUST STREET | PITTSBURGH | PA | 15219- |
| 450358 | THE METHODIST HOSPITAL | 6565 FANNIN STREET | HOUSTON | TX | 77030 |
|  | THE METHODIST HOSPITAL SYSTEM |  | HOUSTON | TX |  |
| 150002 | THE METHODIST HOSPITALS INC. | 600 GRANT STREET | GARY | IN | 46402 |
| 410012 | THE MIRIAM HOSPITAL | 164 SUMMIT AVENUE | PROVIDENCE | RI | 02906 |
| 340091 | THE MOSES H. CONE MEMORIAL HOSPITAL | 1200 NORTH ELM ST | GREENSBORO | NC | 27401-1020 |
| 330024 | THE MOUNT SINAI HOSPITAL CENTER | ONE GUSTAVE L. LEVY PLACE | NEW YORK | NY | 10029 |
| 360085 | THE OHIO STATE UNIVERSITY HOSPITAL | 1375 PERRY STREET 2ND FLOOR | COLUMBUS | OH | 43201 |
| 120001 | THE QUEEN S MEDICAL CENTER | 1301 PUNCHBOWL STREET | HONOLULU | HI | 96813 |
| 070006 | THE STAMFORD HOSPITAL | SHELBURNE RD @ W BROAD ST. | STAMFORD | CT | 06904 |
| 360068 | THE TOLEDO HOSPITAL | 2142 NORTH COVE BLVD. | TOLEDO | OH | 43606 |
| 450018 | THE UNIVERSITY OF TEXAS MEDICAL BR. | 301 UNIVERSITY BLVD | GALVESTON | TX | 77555 |
| 310012 | THE VALLEY HOSPITAL | 223 N. VAN DIEN AVENUE | RIDGEWOOD | NJ | 07450 |
| 520199 | THE WISCONSIN HEART HOSPITAL | 10000 WEST BLUEMOUND ROAD | WAUWATOSA | WI | 53226 |
|  | THEDACARE |  | APPLETON | WI |  |
|  | THOMAS HEALTH SYSTEM |  | CHARLESTON | WV |  |
| 390174 | THOMAS JEFFERSON UNIV. | 111 SOUTH 11TH | PHILADELPHIA | PA | 19107 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| | HOSPITAL | STREET | | | |
| 510029 | THOMAS MEMORIAL | 4605 MACCORKLE AVENUE SW | SOUTH CHARLESTON | WV | 25309- |
| 030089 | THUNDERBIRD SAMARITAN MEDICAL CNT | 5555 WEST THUNDERBIRD ROAD | GLENDALE | AZ | 85308 |
| 450670 | TOMBALL REGIONAL HOSPITAL | 605 HOLDERIETH | TOMBALL | TX | 77375 |
| 050351 | TORRANCE MEMORIAL MEDICAL CENTER | 3330 LOMITA BLVD. | TORRANCE | CA | 90509- |
| 190046 | TOURO INFIRMARY | 1401 FOUCHER STREET | NEW ORLEANS | LA | 70115 |
| 050128 | TRI-CITY MEDICAL CENTER | 4002 VISTA WAY | OCEANSIDE | CA | 92056 |
| 050575 | TRI-CITY REGIONAL MEDICAL CENTER | 21530 S. PIONEER BLV | HAWAIIAN GARDENS | CA | 90716 |
| 420079 | TRIDENT REGIONAL MEDICAL CENTER | 9330 MEDICAL PLAZA DRIVE | CHARLESTON | SC | 29418 |
| | TRIHEALTH | | CINCINNATI | OH | |
| | TRINITY HEALTH | | NOVI | MI | |
| 360211 | TRINITY HOSPITAL HOLDING COMPANY | 4000 JOHNSON ROAD | STEUBENVILLE | OH | 43952 |
| 350006 | TRINITY HOSPITALS | ONE BURDICK EXPY WEST | MINOT | ND | 58702-5020 |
| 140280 | TRINITY MED. CENTER ROCK ISLAND | 2701 17TH STREET | ROCK ISLAND | IL | 61201 |
| 010104 | TRINITY MEDICAL CENTER | 800 MONTCLAIR ROAD | BIRMINGHAM | AL | 35213- |
| | TRINITY MOTHER FRANCES HEALTH SYSTEM | | TYLER | TX | |
| | TRINITY REGIONAL HEALTH SYSTEM | | ROCK ISLAND | IL | |
| 030100 | TUCSON HEART HOSPITAL | 4888 NORTH STONE AVENUE | TUCSON | AZ | 85705 |
| 030006 | TUCSON MEDICAL CENTER | 5301 E. GRANT ROAD | TUCSON | AZ | 85712- |
| 190176 | TULANE UNIVERSITY HOSPITAL & CLINICS | 1415 TULANE AVENUE | NEW ORLEANS | LA | 70112 |
| 370078 | TULSA REGIONAL MEDICAL CENTER | 744 WEST 9TH STREET | TULSA | OK | 74127- |
| | UAB HEALTH SYSTEM | | BIRMINGHAM | AL | |
| 040016 | UAMS MEDICAL CENTER | 4301 WEST MARKHAM | LITTLE ROCK | AR | 72203 |
| 050599 | UC DAVIS MEDICAL CENTER | 2315 STOCKTON BLVD | SACRAMENTO | CA | 95817- |
| 050348 | UCI MEDICAL CENTER | 101 CITY DRIVE | ORANGE | CA | 92868 |

107

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| | | SOUTH | | | |
| 050262 | UCLA MEDICAL CENTER | 10833 LE CONTE AVENU | LOS ANGELES | CA | 90095 |
| 050025 | UCSD MEDICAL CENTER | UCSD MEDICAL CENTER | SAN DIEGO | CA | 92103 |
| 050454 | UCSF MEDICAL CENTER | 505 PARNASSUS | SAN FRANCISCO | CA | 94143-0824 |
| 140150 | UIC MEDICAL CENTER | 1740 W TAYLOR ST | CHICAGO | IL | 60612 |
| | UMASS MEMORIAL HEALTH CARE | | WORCESTER | MA | |
| 220163 | UMASS MEMORIAL MEDICAL CENTER | 55 LAKE AVE. NORTH | WORCESTER | MA | 01655 |
| 310119 | UMDNJ - UNIVERSITY HOSPITAL | 150 BERGEN STREET | NEWARK | NJ | 07103 |
| | UNION HOSPITAL HEALTH GROUP | | TERRE HAUTE | IN | |
| 150023 | UNION HOSPITAL INC. | 1606 NORTH SEVENTH ST | TERRE HAUTE | IN | 47804 |
| 210024 | UNION MEMORIAL HOSPITAL | 201 EAST UNIVERSITY PARKWAY | BALTIMORE | MD | 21218 |
| | UNITED HEALTH SERVICES | | BINGHAMTON | NY | |
| 330394 | UNITED HEALTH SERVICES HOSPITALS | 10 - 42 MITCHELL AVENUE | BINGHAMTON | NY | 13903 |
| 240038 | UNITED HOSPITAL | 333 SMITH AVENUE NORTH | ST PAUL | MN | 55102 |
| 510006 | UNITED HOSPITAL CENTER | ROUTE 19 SOUTH | CLARKSBURG | WV | 26301 |
| 520021 | UNITED HOSPITAL SYSTEM INC. | 6308 8TH AVENUE | KENOSHA | WI | 53143- |
| 450010 | UNITED REGIONAL HEALTH CARE SYSTEM | 1600 TENTH STREET | WICHITA FALLS | TX | 76301 |
| 240132 | UNITY HOSPITAL | 550 OSBORNE ROAD | FRIDLEY | MN | 55432 |
| 160058 | UNIV OF IOWA HOSP & CLINIC | 200 HAWKINS DRIVE 1353 JCP | IOWA CITY | IA | 52242 |
| 230046 | UNIV OF MI HOSPITALS & HLTH CTRS | 2500 GREEN RD. SUITE 100 | ANN ARBOR | MI | 48105-1500 |
| 250001 | UNIV OF MISS MEDICAL CENTER | 2500 NORTH STATE STREET | JACKSON | MS | 39216 |
| 260141 | UNIV OF MO HOSPITAL & CLINICS | ONE HOSPITAL DRIVE | COLUMBIA | MO | 65212 |
| 010087 | UNIV OF SOUTH ALABAMA MEDICAL CENTER | 2451 FILLINGIM STREET | MOBILE | AL | 36617 |
| 440015 | UNIV OF TN MEM HOSPITAL | 1924 ALCOA | KNOXVILLE | TN | 37920 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| | | HIGHWAY | | | |
| 210002 | UNIV. OF MARYLAND MEDICAL SYSTEM | 22 SOUTH GREEN STREET | BALTIMORE | MD | 21201 |
| | UNIVERSAL HEALTH SERVICES | | KING OF PRUSSIA | PA | |
| | UNIVERSITY COMMUNITY HEALTH | | TAMPA | FL | |
| 100173 | UNIVERSITY COMMUNITY HOSPITAL | 3100 E FLETCHER AVE | TAMPA | FL | 33613 |
| 110028 | UNIVERSITY HEALTH SERVICES INC. | 1350 WALTON WAY | AUGUSTA | GA | 30901 |
| 450213 | UNIVERSITY HEALTH SYSTEM | 4502 MEDICAL DRIVE | SAN ANTONIO | TX | 78229 |
| | UNIVERSITY HEALTH SYSTEMS OF EASTERN CAROLINA | | GREENVILLE | NC | |
| 180067 | UNIVERSITY HOSPITAL | 800 ROSE STREET | LEXINGTON | KY | 40536 |
| 330241 | UNIVERSITY HOSPITAL @ SYRACUSE | 750 EAST ADAMS STREET | SYRACUSE | NY | 13210 |
| 360003 | UNIVERSITY HOSPITAL INC. | 234 GOODMAN STREET | CINCINNATI | OH | 45219 |
| 330350 | UNIVERSITY HOSPITAL OF BROOKLYN | 445 LENOX ROAD | BROOKLYN | NY | 11203 |
| | UNIVERSITY HOSPITALS HEALTH SYSTEMS | | CLEVELAND | OH | |
| 360137 | UNIVERSITY HOSPITALS OF CLEVELAND | 11100 EUCLID AVENUE | CLEVELAND | OH | 44106-5022 |
| 030064 | UNIVERSITY MEDICAL CENTER | 1501 NORTH CAMPBELL AVENUE | TUCSON | AZ | 85721-0001 |
| 290007 | UNIVERSITY MEDICAL CENTER | 1800 WEST CHARLESTON BLVD. | LAS VEGAS | NV | 89102 |
| 450686 | UNIVERSITY MEDICAL CENTER | 602 INDIANA AVE. | LUBBOCK | TX | 79408-5980 |
| 010033 | UNIVERSITY OF ALABAMA HOSPITAL | 619 SOUTH 19TH STREET | BIRMINGHAM | AL | 35233 |
| | UNIVERSITY OF CALIFORNIA LOS ANGELES HEALTHCARE | | LOS ANGELES | CA | |
| | UNIVERSITY OF CALIFORNIA SAN FRANCISCO MEDICAL CENTER | | SAN FRANCISCO | CA | |
| 140088 | UNIVERSITY OF CHICAGO HOSPITALS | 5841 SOUTH MARYLAND AVENUE | CHICAGO | IL | 60637 |
| 170040 | UNIVERSITY OF KANSAS HOSPITAL | 3901 RAINBOW | KANSAS CITY | KS | 66160-7114 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| 180141 | UNIVERSITY OF LOUISVILLE HOSPITAL | 530 SOUTH JACKSON STREET | LOUISVILLE | KY | 40202 |
| | UNIVERSITY OF MARYLAND MEDICAL SYSTEM | | BALTIMORE | MD | |
| 240080 | UNIVERSITY OF MINNESOTA MEDICAL CTR | 2450 RIVERSIDE AVENUE | MINNEAPOLIS | MN | 55426 |
| | UNIVERSITY OF MISSISSIPPI MEDICAL CENTER | | JACKSON | MS | |
| | UNIVERSITY OF MISSOURI HEALTH CARE | | COLUMBIA | MO | |
| 340061 | UNIVERSITY OF NORTH CAROLINA HOSP. | 101 MANNING DRIVE | CHAPEL HILL | NC | 27511 |
| | UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM | | PHILADELPHIA | PA | |
| | UNIVERSITY OF PITTSBURGH MEDICAL CENTER | | PITTSBURGH | PA | |
| | UNIVERSITY OF SOUTH ALABAMA HEALTH SYSTEM | | MOBILE | AL | |
| | UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER | | DALLAS | TX | |
| 460009 | UNIVERSITY OF UTAH HOSPITAL AND CLIN | 50 NORTH MEDICAL DRIVE | SALT LAKE CITY | UT | 84132 |
| 490009 | UNIVERSITY OF VIRGINIA MEDICAL CENTE | 855 WEST MAIN STREET | CHARLOTTESVILLE | VA | 22908 |
| 500008 | UNIVERSITY OF WASHINGTON MED CTR | 1959 NE PACIFIC STREET | SEATTLE | WA | 98195 |
| | UNIVERSITY OF WASHINGTON MEDICINE | | SEATTLE | WA | |
| 520098 | UNIVERSITY OF WISONSIN HOSPITAL & CL | 600 HIGHLAND | MADISON | WI | 53711- |
| 390107 | UPMC PASSAVANT | 9100 BABCOCK BLVD. | PITTSBURGH | PA | 15237 |
| 390164 | UPMC PRESBYTERIAN SHADYSIDE | 200 LOTHROP STREET | PITTSBURGH | PA | 15213 |
| 050696 | USC UNIVERSITY HOSPITAL | 1500 SAN PABLO ST. | LOS ANGELES | CA | 90033 |
| 460001 | UTAH VALLEY REG. MED. CTR. | 1034 NORTH 500 WEST | PROVO | UT | 84603 |
| 450154 | VAL VERDE REGIONAL MEDICAL CENTER | 801 BEDELL ST | DEL RIO | TX | 78840 |
| | VALLEY BAPTIST HEALTH SYSTEM | | HARLINGEN | TX | |
| 450028 | VALLEY BAPTIST MED CNTR BROWN | 1040 WEST JEFFERSON STREET | BROWNSVILLE | TX | 78520 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---------|---------------------|--------|------|----|----|
| 450033 | VALLEY BAPTIST MEDICAL CENTER | 2101 PEASE ST | HARLINGEN | TX | 78551-2588 |
| | VALLEY HEALTH | | WINCHESTER | VA | |
| 290021 | VALLEY HOSPITAL MEDICAL CENTER | 620 SHADOW LANE | LAS VEGAS | NV | 89106 |
| 500088 | VALLEY MEDICAL CENTER | 400 SOUTH 43RD STREET | RENTON | WA | 98055 |
| 450662 | VALLEY REGIONAL MEDICAL CENTER | 100 ALTON GLOOR BLVD | BROWNSVILLE | TX | 78526 |
| 440039 | VANDERBILT UNIVERSITY MEDICAL CENTER | 1161 21ST AVENUE SOUTH | NASHVILLE | TN | 37232 |
| | VANGUARD HEALTH SYSTEM | | NASHVILLE | TN | |
| 330023 | VASSAR BROTHERS MEDICAL CENTER | 45 READE PLACE | POUGHKEEPSIE | NY | 12601 |
| 010118 | VAUGHAN REGIONAL MEDICAL CTR | 1015 MEDICAL CENTER PARKWAY | SELMA | AL | 36701- |
| 490032 | VCU HEALTH SYSTEM MCV HOSPITAL | 401 NORTH 12TH STREET | RICHMOND | VA | 23298 |
| 100070 | VENICE REG L MEDICAL CENTER | 540 THE RIALTO | VENICE | FL | 34285 |
| | VIA CHRISTI HEALTH SYSTEM | | WICHITA | KS | |
| 170122 | VIA CHRISTI REGIONAL MEDICAL CENTER | 929 N. ST. FRANCIS | WICHITA | KS | 67214 |
| | VIAHEALTH | | ROCHESTER | NY | |
| 140084 | VICTORY MEMORIAL HOSPITAL | 1324 NORTH SHERIDAN ROAD | WAUKEGAN | IL | 60085 |
| 190167 | VILLE PLATTE MEDICAL CENTER INC | 800 EAST MAIN STREET | VILLE PLATTE | LA | 70586 |
| 490050 | VIRGINIA HOSPT. CTR. ARLINGTON | 1701 N. GEORGE MASON DR. | ARLINGTON | VA | 22205 |
| 500005 | VIRGINIA MASON MEDICAL CENTER | 925 SENECA STREET | SEATTLE | WA | 98111 |
| 420098 | WACCAMAW COMMUNITY HOSPITAL | 4070 HIGHWAY 17 BY-PASS | MURRELLS INLET | SC | 29576 |
| 450200 | WADLEY REGIONAL MEDICAL CENTER | 1000 PINE STREET | TEXARKANA | TX | 75501 |
| | WAKE FOREST UNIVERSITY BAPTIST MEDICAL CENTER | | WINSTON-SALEM | NC | |
| | WAKEMED | | RALEIGH | NC | |
| 340069 | WAKEMED RALEIGH CAMPUS | 300 NEW BERN AVENUE | RALEIGH | NC | 27620 |
| 030061 | WALTER O. BOSWELL MEMORIAL HOSPITAL | 10401 THUNDERBIRD BLVD. | SUN CITY | AZ | 85351 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---------|---------------------|--------|------|-----|-----|
| 210016 | WASHINGTON ADVENTIST HOSPITAL | 7600 CARROLL AVENUE | TAKOMA PARK | MD | 20912 |
| 210001 | WASHINGTON COUNTY HOSPITAL | 251 E. ANTIETAM STREET | HAGERSTOWN | MD | 21740 |
| 090011 | WASHINGTON HOSPITAL CENTER | 110 IRVING STREET NW | WASHINGTON | DC | 20010 |
| 050195 | WASHINGTON HOSPITAL DISTRICT | 2000 MOWRY AVENUE | FREMONT | CA | 94538-1716 |
| 040004 | WASHINGTON REGIONAL MEDICAL CENTER | 3215 NORTH HILLS BLVD | FAYETTEVILLE | AR | 72703- |
|  | WASHOE MEDICAL CENTER |  | RENO | NV |  |
| 290001 | WASHOE MEDICAL CENTER INC. | 77 PRINGLE WAY | RENO | NV | 89502 |
| 070005 | WATERBURY HOSPITAL | 64 ROBBINS STREET | WATERBURY | CT | 06721 |
| 050194 | WATSONVILLE COMMUNITY | 75 NIELSON STREET | WATSONVILLE | CA | 95076 |
| 520008 | WAUKESHA MEMORIAL HOSPITAL | 725 AMERICAN AVENUE | WAUKESHA | WI | 53188-5099 |
|  | WELLMONT HEALTH SYSTEM |  | KINGSPORT | TN |  |
|  | WELLSPAN HEALTH |  | YORK | PA |  |
|  | WELLSTAR HEALTH SYSTEM |  | MARIETTA | GA |  |
| 170123 | WESLEY MEDICAL CENTER | 550 NORTH HILLSIDE | WICHITA | KS | 67214 |
| 250094 | WESLEY MEDICAL CENTER | 5001 WEST HARDY ST | HATTIESBURG | MS | 39402- |
| 050426 | WEST ANAHEIM MEDICAL CENTER | 3033 WEST ORANGE AVE | WEST ANAHEIM | CA | 92804 |
| 100231 | WEST FLORIDA HOSPITAL | 8232 NORTH DAVIS HWY | PENSACOLA | FL | 32523 |
| 050481 | WEST HILLS REG MEDICAL CENTER | 7300 MEDICAL CENTER DRIVE | CANOGA PARK | CA | 91307 |
| 450644 | WEST HOUSTON MEDICAL CENTER | 12141 ROCHMOND AVE | HOUSTON | TX | 77082 |
| 190039 | WEST JEFFERSON MEDICAL CENTER | 1101 AVENUE D | MARRERO | LA | 70072 |
|  | WEST PENN ALLEGHENY HEALTH SYSTEM |  | PITTSBURGH | PA |  |
| 140049 | WEST SUBURBAN HOSPT. MED. CTR. | 3 ERIE COURT | OAK PARK | IL | 60302 |
|  | WEST TENNESSEE HEALTHCARE |  | JACKSON | TN |  |
| 030110 | WEST VALLEY HOSPITAL MEDICAL CENTER | 13677 WEST MCDOWELL ROAD | GOODYEAR | AZ | 85338 |
| 510001 | WEST VIRGINIA UNIVERSITY HOSPITALS | MEDICAL CENTER DRIVE | MORGANTOWN | WV | 26505 |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---------|---------------------|--------|------|-----|-----|
| 330234 | WESTCHESTER MEDICAL CENTER | 95 GRASSLANDS ROAD | VALHALLA | NY | 10565 |
| 030101 | WESTERN ARIZONA REGIONAL MEDICAL CEN | 2735 SILVER CREEK ROAD | BULLHEAD CITY | AZ | 86442 |
| 180104 | WESTERN BAPTIST HOSPITAL | 2201 KENTUCKY AVENUE | PADUCAH | KY | 42003 |
| 050594 | WESTERN MEDICAL CENTER ANAHEIM | 1025 SOUTH ANAHEIM BLVD. | ANAHEIM | CA | 92805 |
| 050744 | WESTERN MEDICAL CENTER ANAHEIM | 1025 SOUTH ANAHEIM BLVD | ANAHEIM | CA | 92805-5806 |
| 050746 | WESTERN MEDICAL CENTER SANTA ANA | 1001 NORTH TUSTIN AVENUE | SANTA ANA | CA | 92705-3502 |
| 390090 | WESTERN PENNSYLVANIA HOSPITAL | 4800 FRIENDSHIP AVENUE | PITTSBURGH | PA | 15224 |
| 360141 | WESTERN RESERVE CARE SYSTEM(FKA YHA | 500 GYPSY LANE | YOUNGSTOWN | OH | 44501-0240 |
| 140240 | WESTLAKE COMMUNITY HOSPITAL | 1225 SUPERIOR STREET | MELROSE PARK | IL | 60160 |
| 390145 | WESTMORELAND REGIONAL HOSPITAL | 532 WEST PITTSBURGH STREET | GREENSBURG | PA | 15601- |
| 100228 | WESTSIDE REGIONAL MEDICAL CENTER | 8201 WEST BROWARD BOULEVARD | PLANTATION | FL | 33324 |
|  | WHEATON FRANCISCAN SERVICES |  | WHEATON | IL |  |
|  | WHEELING HOSPITAL |  | WHEELING | WV |  |
| 510050 | WHEELING HOSPITAL INC. | 1 MEDICAL PARK | WHEELING | WV | 26003- |
| 040014 | WHITE COUNTY MEDICAL CENTER | 3214 EAST RACE | SEARCY | AR | 72143 |
| 050103 | WHITE MEMORIAL MEDICAL CENTER | 1720 CESAR E. CHAVEZ AVE | LOS ANGELES | CA | 90033 |
|  | WHITE RIVER HEALTH SYSTEM |  | MOUNTAIN VIEW | AR |  |
| 040119 | WHITE RIVER MEDICAL CENTER | 1710 HARRISON STREET | BATESVILLE | AR | 72501- |
| 230130 | WILLIAM BEAUMONT HOSPITAL - ROYAL OA | 3601 WEST 13 MILE ROAD | ROYAL OAK | MI | 48073-6769 |
| 230269 | WILLIAM BEAUMONT HOSPITAL - TROY | 44201 DEQUINDRE | TROY | MI | 48098-1198 |
| 190236 | WILLIS-KNIGHTON BOSSIER | 2400 HOSPITAL DRIVE | BOSSIER CITY | LA | 71111 |
|  | WILLIS-KNIGHTON HEALTH SYSTEM |  | SHREVEPORT | LA |  |

| PROV ID | HOSPITAL/SYSTEM NAME | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| 190111 | WILLIS-KNIGHTON HEALTH SYSTEMS | 2600 GREENWOOD ROAD | SHREVEPORT | LA | 71130-2600 |
| 450469 | WILSON N. JONES MEMORIAL HOSPITAL | 500 NORTH HIGHLAND AVENUE | SHERMAN | TX | 75092 |
| 490005 | WINCHESTER MEDICAL CENTER | 1840 AMHERST STREET | WINCHESTER | VA | 22604-2540 |
| 100052 | WINTER HAVEN HOSPITAL | 200 AVE F NE | WINTER HAVEN | FL | 33881 |
| 330167 | WINTHROP UNIVERSITY HOSPITAL | 259 FIRST STREET | MINEOLA | NY | 11501 |
| 050065 | WMC SANTA ANA | 1001 NORTH TUSTIN AVENUE | SANTA ANA | CA | 92705 |
| 450484 | WOODLAND HEIGHTS MEDICAL CENTER | 505 SOUTH JOHN REDDITT DR | LUFKIN | TX | 75904 |
| | WUESTHOFF HEALTH SYSTEM | | ROCKLEDGE | FL | |
| 100092 | WUESTHOFF MEMORIAL HOSPITAL | 110 LONGWOOD AVE | ROCKLEDGE | FL | 32956-5002 |
| 390137 | WVHCS-HOSPITAL | NORTH RIVER AND AUBURN STREETS | WILKES BARRE | PA | 18764 |
| 530012 | WYOMING MEDICAL CENTER | 1233 E 2ND STREET | CASPER | WY | 82601 |
| | WYOMING VALLEY HEALTH CARE SYSTEM | | WILKES-BARRE | PA | |
| 500012 | YAKIMA REGIONAL MEDICAL & HEART CTR | 110 SOUTH NINTH AVENUE | YAKIMA | WA | 98902 |
| 500036 | YAKIMA VALLEY MEMORIAL HOSPITAL | 2811 TIETON | YAKIMA | WA | 98902 |
| | YALE NEW HAVEN HEALTH SYSTEM | | NEW HAVEN | CT | |
| 070022 | YALE-NEW HAVEN HOSPITAL | 20 YORK STREET | NEW HAVEN | CT | 06504 |
| 030012 | YAVAPAI REGIONAL MEDICAL CENTER | 1003 WILLOW CREEK ROAD | PRESCOTT | AZ | 86301 |
| 200020 | YORK HOSPITAL | 15 HOSPITAL DR | YORK | ME | 03909 |
| 390046 | YORK HOSPITAL | 1001 SOUTH GEORGE STREET | YORK | PA | 17405 |
| 030013 | YUMA REGIONAL MEDICAL CENTER | 2400 AVENUE A | YUMA | AZ | 85364 |

17.     There are additional John Doe Defendants who are likewise liable to the United States under the False Claims Act for submitting claims for reimbursement arising from ICD procedures which are clearly excluded from federal coverage. Such John Doe Defendants

include physicians, physician groups, and medical providers under federal-state Medicaid programs and under the federal TRICARE-CHAMPUS program.

## MULTIPLE DEFENDANTS ARE SUBJECT TO CORPORATE INTEGRITY AGREEMENTS

18.     The Office of Inspector General (OIG) often negotiates compliance obligations with health care providers and other entities as part of the settlement of Federal health care program investigations arising under a variety of civil false claims statutes.  The typical term of a comprehensive corporate integrity agreement (CIA) is five years (three years for national project cases). These compliance measures seek to ensure the integrity of Federal health care program claims submitted by the provider.

19.     A provider or entity consents to these obligations as part of the civil settlement and in exchange for the OIG's agreement not to seek an exclusion of that health care provider or entity from participation in Medicare, Medicaid and other Federal health care programs.  False claims submitted in violation of the False Claims Act or Civil Monetary Penalties Law give rise to the OIG's permissive exclusion authority under 42 U.S.C.1320a-7(b)(7).

20.     Providers under CIAs must promptly notify the appropriate payor of all identified overpayments and must promptly repay the overpayment amount in a manner consistent with the payor's policies. All identified overpayments should be refunded to the appropriate payor, as well as reported to the OIG in the providers' annual reports.

21.     In addition, the provider must report to the OIG within 30 days all "material deficiencies" and "reportable events" as defined by the CIA.  The OIG defines the terms "material deficiency" and "reportable event" in its CIAs by noting that it could be **anything that involves: (i) a substantial overpayment; or (ii) a matter that a reasonable person would consider a potential violation of criminal, civil, or administrative laws applicable to any**

**Federal health care program for which penalties or exclusion may be authorized.** A material deficiency may be the result of an isolated event or a series of occurrences.

22.      Because the OIG is interested in the identification of potential billing problems, the provider must report to the OIG gross total overpayments. Thus, the provider should not report to the OIG an overpayment amount that is reduced (or "netted") based on underpayments. The reporting of only net overpayments does not provide the OIG with a sufficient indication of potential billing problems.

23.      In addition to CIAs, the OIG also may negotiate a Certification of Compliance Agreement (CCA) with health care providers and other entities, in lieu of a comprehensive CIA, under appropriate circumstances. The relevant considerations for whether an entity may be permitted to enter into a CCA instead of a comprehensive CIA include those set forth in the November 20, 2001 Open Letter to Health Care Providers.

24.      The terms of a CCA include a requirement that the entity maintain its existing compliance program, as described in a Declaration that is attached to the CCA. In addition, the entity is required to agree to certain compliance obligations that mirror those found in a comprehensive CIA, **including reporting overpayments**, reportable events, and ongoing investigations and legal proceedings to the OIG, and providing annual reports regarding the entity's compliance activities to the OIG during the term of the CCA.

25.      Based upon information and belief, the Relators allege that many of the Defendants have entered into and are subject to the provisions of such agreements and compliance obligations. Such Defendants included Hospital Corporation of America and Tenet Healthcare among many others.

26.      Relators further allege that the conduct identified in this Complaint constitutes

substantial overpayments and "material deficiencies" and "reportable events" as defined by the OIG, and that the Defendants subject to such agreements have failed to report their violations and overpayments, in breach of the CIAs and CCAs governing such Defendants subject to these agreements.

### The False Claims Act

27.     The False Claims Act ("FCA") provides, in pertinent part:

Any person who--

(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

(3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

(4) has possession, custody, or control of property or money used, or to be used, by the Government and, intending to defraud the Government or willfully to conceal the property, delivers, or causes to be delivered, less property than the amount for which the person receives a certificate or receipt;

(5) authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the

Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(6) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a member of the Armed Forces, who lawfully may not sell or pledge the property; or

(7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus 3 times the amount of damages which the Government sustains because of the act of that person. . . .

31 U.S.C. §3729(a).

For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information--

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required.

31 U.S.C. §3729(b).

## INTRODUCTION TO IMPLANTABLE CARDIOVERTER-DEFIBRILLATORS

28.     Implantable cardioverter-defibrillators are electronic devices designed to detect and treat tachyarrhythmias or fast heart rates.

29.      Implanted under the skin in the upper abdomen, the defibrillator is connected with lead wires to two defibrillation electrodes placed surgically in or around the heart. The defibrillator is designed to interrupt the abnormal rhythm, allowing the normal rhythm to resume. Sensors inside the defibrillator monitor the heart. If a sensor detects an irregularity, such as fibrillation, the defibrillator is programmed to deliver a strong electric shock directly to the heart.

30.      The devices are surgically implanted in persons who have a type of heart disease that creates the risk of a heart arrhythmia (abnormal rhythm).

31.      The FDA approved the first implantable defibrillator in 1985 while the first implantable cardioverter-defibrillators were approved in 1988 and 1989. The FDA approves each device individually and has granted premarket approvals (PMA) for implantable defibrillators for the indications of providing antitachycardia pacing and ventricular defibrillation for automated treatment of life-threatening ventricular arrhythmias.

32.      CMS assesses relevant health outcomes, above and beyond the safety and effectiveness regulatory mandate of the FDA. Although a device must receive FDA approval or clearance for at least one indication to be eligible for Medicare coverage, except for a category B device under an investigational device exemption clinical trial, *see* Medicare Program; Criteria and Procedures for Extending Coverage to Certain Devices and Related Services, 60 Fed. Reg. 48417 (Sept. 19, 1995), FDA approval/clearance alone does not entitle that device to Medicare coverage. The device must fall under a Medicare benefit category and be determined to be reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member to be covered by CMS.

33.     CMS has the authority to conduct a separate assessment of a device's appropriateness for Medicare coverage, including whether it is reasonable and necessary specifically for its intended use for Medicare beneficiaries. *See, e.g.*, 60 Fed. Reg. at 48420.

34.     The FDA and CMS apply different criteria when determining whether to approve medical devices and procedures.   When reviewing an application for premarket approval, the FDA determines whether or not there is reasonable assurance of safety and effectiveness for the device's intended use that is stated in its proposed labeling.   Insert citation to authority.   "Premarket approval is not required if the FDA determines the device is 'substantially equivalent' to a legally marketed 'predicate device' . . . in terms of its intended use, technological characteristics, safety, and effectiveness." *In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781, 786 (3d Cir. 1999).   This is known as 510(k) clearance due to its origination in Food, Drug, and Cosmetic Act, chapter 675 § 510(k).   *See id.*; *Biomedical Systems Corp. v. GE Marquette Medical Systems, Inc.*, 287 F.3d 707, 708 (8th Cir. 2002).

35.     Medicare National Coverage Decisions (NCD) considers the medical benefit and clinical utility of an item or service in determining whether the item or service is considered reasonable and necessary under the Medicare program. CMS determines whether or not the intervention improves net health outcomes in the Medicare population at least as well as established treatments.

36.     Thus, FDA PMA approval or 510(k) clearance by itself is not sufficient for making a determination concerning Medicare coverage.   As CMS stated in Medicare Program; Negotiated Rulemaking: Coverage and Administrative Policies for Clinical Diagnostic Laboratory Services, 66 Fed. Reg. 58788, 58797 (Nov. 23, 2001), "[t]he criteria the FDA uses in making determinations related to substantial equivalency under section 510(k) of

the Food, Drug, and Cosmetic Act is significantly different from the scientific evidence we consider in making 'reasonable and necessary' determinations under Medicare."

37.    The Medicare Act contains an express condition of payment---"no payment may be made [under the Medicare Act] for any expenses incurred [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury. . . ." 42 U.S.C. 1395y(a)(1)(A). The Medicare Act explicitly links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary." *Id.*

38.    The Medicare Act does not define what services are "reasonable and necessary." Rather, under 42 U.S.C. 1395ff(a), the Secretary of Health and Human Services is authorized to define which services meet that criteria. The Secretary has defined which services are "reasonable and necessary" through regulations, rules, and national coverage decisions published in manuals provided to providers.

39.    In establishing Medicare National Coverage Decisions for ICDs, CMS considered the medical benefit and clinical utility of ICDs and determined the conditions under which ICDs are reasonable and necessary under the Medicare program.

40.    CMS evaluated relevant clinical evidence to determine whether or not the evidence was of sufficient quality to support a finding that ICDs were reasonable and necessary. The overall objective for the critical appraisal of the evidence was to determine to what degree CMS was confident that: 1) the specific assessment questions can be answered conclusively; and 2) the intervention will improve net health outcomes for patients. In general, features of diagnostic studies that improve quality and decrease bias include the selection of a clinically relevant inception cohort, the consistent use of a single good reference standard, the inclusion of

patients with and without the disorder in question, and the blinding of readers of the index test and of reference test results.

41.     The Department of Health and Human Services, through CMS, issues Medicare National Coverage Decisions contained in the Medicare Coverage Issues Manual which provides, "The Coverage Issues Manual sets forth whether specific medical items, services, treatment procedures, or technologies can be paid for under Medicare. National coverage decisions have been made on the items addressed in this manual." Medicare Coverage Issues Manual, Forward Par. A.

42.     After extensive and ongoing review of the scientific evidence, CMS has issued National Coverage Decisions regarding ICDs. CMS has determined that there "is a considerable mortality rate for patients who have received defibrillators." CMS has further determined that because ICDs "only treat ventricular tachyarrhythmias, do not prevent death from other cardiac or noncardiac diseases, and may cause adverse events, such as inappropriate shocks and worsening heart failure, they should not be perceived as or projected to be an ideal technology that eliminates significant health risks for patients with heart failure."

43.     CMS established indications and contraindications for ICD procedures in Medicare patients. Medicare does not provide coverage for ICD procedures in patients with specific contraindications determined by CMS. Defendants have repeatedly ignored such contraindications, have repeatedly submitted false claims for reimbursement for ICD procedures clearly excluded from Medicare coverage, and have collectively received hundreds of millions of dollars in payments for ICD procedures that are excluded from Medicare coverage.

44.     In 1986, CMS issued a Medicare National Coverage Determination providing limited coverage for implantable defibrillators. The coverage was expanded under certain conditions over the years with revisions in 1991, 1999, and 2003.

45.     Effective July 1, 1991, ICD procedures were covered by Medicare under the following conditions:

- Documented episode of cardiac arrest due to ventricular fibrillation (VF), **not due to a transient or reversible cause;**
- Documented sustained ventricular tachyarrhythmia (VT), either spontaneous or induced by an electrophysiology (EP) study, **not associated with an acute myocardial infarction (MI) and not due to a transient or reversible cause**;
- Documented familial or inherited indications with a high risk of life-threatening VT, such as long QT syndrome or hypertropic cardiomyopathy.

Medicare Coverage Issues Manual Section 35-85 (Emphasis added). By definition, a patient who undergoes a coronary revascularization procedure is not a candidate for an ICD procedure under this Medicare coverage determination because a revascularization procedure addresses transient or reversible causes of cardiac arrest due to ventricular fibrillation.

46. Since 1991, CMS has established Medicare coverage for ICD implants in patients with a "documented episode of cardiac arrest due to ventricular fibrillation (VF), not due to a transient or reversible cause." Medicare Coverage Issues Manual Section 35-85. Since 1991, CMS has consistently excluded coverage for ICD implants in patients with fibrillation due to transient or reversible causes. Effective July 1, 1999, CMS permitted coverage for ICD procedures in patients with sustained ventricular tachyarrhythmia, "not associated with acute myocardial infarction (MI) and not due to a transient or reversible cause." *Id.*

47.      On August 22, 2003, CMS issued Coverage Issues Manual Transmittal 173, which became effective October 1, 2003. Transmittal 173 revised Section 35-85 governing implantable automatic defibrillators. Transmittal 173 specifically excludes from coverage ICD procedures in any patient who "[h]ad a coronary artery bypass graft (CABG) or percutaneous transluminal coronary angioplasty (PTCA) within past three months," in any patient who "[h]ad an enzyme-positive MI within the past month," and in any patient with "[c]linical symptoms or findings that would make them a candidate for coronary revascularization." *See* Medicare Coverage Issues Manual, Transmittal 173.

48.      The Medicare Coverage Issues Manual Transmittal 173 explicitly states that the National Coverage Determinations are "binding on all carriers, intermediaries, peer review organizations, health maintenance organizations, competitive medical plans, and health care prepayment plans." *Id.* "In addition, an Administrative Law Judge may not review an NCD." *Id.*

49.      On January 27, 2005, CMS announced its most recent ICD coverage decision via CAG-00157R3. CMS again determined that to undergo a covered ICD procedure, Medicare patients must **not** have the following conditions:

   a. Congestive Heart Failure of New York Heart Association classification IV;

   b. Cardiogenic shock or symptomatic hypotension while in a stable baseline rhythm;

   c. **Had a coronary artery bypass graft (CABG) or percutaneous transluminal coronary angioplasty (PTCA) within past 3 months;**

   d. **Had an enzyme-positive MI within past month;**

   e. **Clinical symptoms or findings that would make them a candidate for coronary revascularization;** or

f. Any disease, other than cardiac disease (e.g., cancer, uremia, liver failure), associated with a likelihood of survival less than 1 year.

*See* Defibrillator Flow Chart on CMS web site at http://www.cms.hhs.gov/manuals/103_cov_determ/ncd103index.asp found at Coverage Determinations, Section 20.4, Implantable Automatic Defibrillators (formerly CIM 35-85) (emphasis added).

50.     Throughout the National Coverage Determinations issued by CMS since 2003, CMS has consistently established that such patients "must not have...had a coronary artery bypass graft (CABG) or percutaneous transluminal coronary angioplasty (PTCA) within the past 3 months." There is also no Medicare coverage for ICD procedures in patients who have "clinical symptoms or findings that would make them a candidate for coronary revascularization." Medicare Coverage Issues Manual, Transmittal 173. CMS further excluded coverage for ICD procedures in patients who have "had an enzyme positive MI [myocardial infarction] within past month." *Id.*

51.     Patients who receive an implantable defibrillator in the same hospitalization as coronary revascularization or coronary artery bypass surgery or acute myocardial infarction do not meet Medicare's established clinical indications for ICD procedures. Federal Medicare law explicitly excludes coverage for such ICD procedures. Nevertheless, in 2005 and 2006 alone, the Defendant providers illegally billed and collected more than $400 million dollars in Medicare payments for ICD procedures performed in the same hospital admission as coronary artery bypass surgery or coronary revascularization.

52.     Relators Ms. Ford and Mr. Schuhmann evaluated Medicare paid claims data for every Medicare patient who received an implantable cardioverter-defibrillator (ICD) during

federal fiscal years (FFY) 2005 and 2006.  Ms. Ford and Mr. Schuhmann identified 62,197 such cases billed to Medicare nationwide in FFY 2005 and 76,862 such cases billed in FFY 2006.

53.     Mr. Schuhmann's and Ms. Ford's review found that thousands of these patients had an ICD implant procedure in the same hospital admission as an acute MI or coronary revascularization.  Thousand of patients underwent coronary bypass/coronary stent and/or had an acute myocardial infarction in the same hospitalization as receiving an ICD.   According to Medicare National Coverage Determinations, these patients have clear contraindications for defibrillator placement.  Some patients had both an acute myocardial infarction and coronary revascularization, some had only coronary revascularization, and some had only acute MI. All such patients identified by MedPAR number on Exhibits 1 and 2 attached to Mr. Schuhmann's Disclosure had defibrillators placed.

54.     Such ICD procedures were billed to Medicare despite Medicare's National Coverage Determinations excluding such ICD procedures from coverage. Through extensive investigations and analyses over several months, Ms. Ford and Mr. Schuhmann determined that there were 8,138 such contraindicated cases for ICD procedures billed to Medicare nationwide in FFY 2005 and 6,818 such cases billed to Medicare in FFY 2006.

55.     Mr. Schuhmann and Ms. Ford reviewed these claims to determine under which diagnosis related group (DRG) each claim was actually paid by Medicare versus which DRG should have been paid if the patient had not received the ICD or if the ICD had been treated as non-covered by Medicare when billed.

56.     Mr. Schuhmann calculated the amounts actually paid by Medicare to each hospital Defendant as a result of each Defendant's submission of false claims or reimbursement

requests for ICD procedures excluded from Medicare coverage. Mr. Schuhmann's calculation took into account all of the components of the DRG payment methodology.

57.     Mr. Schuhmann then calculated the amount that would and should have been paid by Medicare to each hospital if the hospital had not submitted false claims for ICD procedures excluded from Medicare National Coverage Determinations. Mr. Schuhmann's calculation took into account all of the components of the DRG payment methodology as stated above.

58.     Mr. Schuhmann then calculated the difference between the DRG payments paid to each hospital for each claim versus the DRG payments that should have been paid without the inclusion of the ICD codes.

59.     Mr. Schuhmann further designed and developed a system to report calculated damages differences by state, by hospital, and by system affiliation (and by other combinations).

60.     There are no known studies or published reports that previously identified the issue of the specific false claims for ICD procedures excluded from Medicare coverage as identified in the Relators' Disclosures, the Exhibits to the Relators' Disclosures, and the Complaint. Mr. Schuhmann performed extensive analyses to confirm and quantify the problem that Ms. Ford had identified firsthand as a Medicare compliance consultant to numerous hospitals.

61.  The Disclosures of Mr. Schuhmann and Ms. Ford and the Exhibits to the Disclosures are incorporated into this Complaint.

62.  Mr. Schuhmann prepared the Charts attached to his Disclosure as Exhibits 1 and 2 which list each false claim in 2005 and 2006 by MedPAR identification number in numerical order. Each of these false claims represents an ICD procedure which was billed to Medicare despite the fact that the ICD procedure was excluded from Medicare coverage based on National Coverage

Determinations. Ms. Ford's Disclosure provides further detail as to how each false claim was identified based on coded conditions which contraindicated coverage for ICD procedures according to Medicare National Coverage Determinations.

63. For each false claim, Mr. Schuhmann has provided the billed DRG, the correct DRG, the covered days for the hospitalization, the covered charges, the fiscal intermediary number, the amount billed by the hospital to Medicare, the amount that should have been billed by each hospital if the hospital had complied with Medicare laws excluding the ICD procedures from coverage, and the amount that the hospital was overpaid by Medicare for each false claim. In Fiscal Year 2005, there were 8138 such false claims with calculated damages to the United States in the amount of approximately $214,071,343.00. (*See* Summary Charts attached as Exhibits 3-5 to Mr. Schuhmann's Disclosure).

64. In Fiscal Year 2006, there were 6818 such false claims with calculated damages to the United States in the amount of approximately $188,962,214.00. (*See* Summary Charts attached as Exhibits 3-5 to Mr. Schuhmann's Disclosure).

65. Ms. Ford's Disclosure provides further detail as to how each false claim was identified based on coded conditions which contraindicated ICD implants according to Medicare National Coverage Determinations.

66. Mr. Schuhmann has also prepared Excel spreadsheets listing the hospitals which have submitted false ICD claims and has organized these hospitals by system and state. These spreadsheets are attached to Mr. Schuhmann's Disclosure as Exhibits 3, 4, and 5 filed under seal with this Complaint.

67. Mr. Schuhmann and Ms. Ford are also in the process of reviewing and analyzing similar data for the years 2003 and 2004. Relators believe that there were a similar number of

false claims for contraindicated ICD procedures excluded from Medicare coverage in 2003 and 2004.

68.    For example, Ms. Ford has performed a study of 2004 MEDPAR data.  Cases were determined to be ICD implants if they were coded as a full ICD system. Patients with components of ICD implants (lead or generator) were not included in an attempt to exclude patients who were admitted for ICD repairs or replacements.  Of the patients with the above procedure codes, Ms. Ford determined whether individual patients also received a coronary revascularization during the same hospitalization.  Of the 60,598 patients receiving an ICD system implant, 5,648 (9%) had a concomitant coronary revascularization coded in the same hospitalization.  Thus, while the vast majority of hospitals have complied with Medicare National Coverage Determinations for ICD procedures, nearly 9 percent of the claims for ICD system implants were clearly excluded from Medicare coverage and constituted false claims in 2004.

69.    Mr. Schuhmann and Ms. Ford will submit a detailed and extensive analysis of false claims for the years 2003 and 2004 by amendment to this Complaint in January of 2008. Based on extensive calculations, Mr. Schuhmann and Ms. Ford estimate that the principal damages or overpayments from the false claims at issue for the years 2003, 2004, 2005, 2006, and 2007 are approximately $1 billion dollars.  This damages estimate does not include penalties available under the False Claims Act.

70.    Relator Ms. Ford has personal knowledge that the nationwide practice of submitting false claims for contraindicated ICD procedures has continued into 2007.  The specific false claims and damages for false claims submitted by hospitals nationwide for fiscal

year 2007 will be provided by further amendment to the Relators' Disclosures and the Complaint.

71.      Mr. Schuhmann has also prepared spreadsheets of hospitals and hospital systems which have received overpayments from their false claims for ICD procedures excluded from Medicare coverage. These spreadsheets are attached to his Disclosure as Exhibits 3 and 4.  The spreadsheets within Exhibit 4 list the Defendant hospital systems in order of highest overpayments arising from the false claims at issue. For example, hospitals operated by Hospital Corporation of America (HCA) submitted 341 false claims in 2006 for ICD procedures excluded from Medicare coverage. For the fiscal years 2005 and 2006, HCA has received illegal overpayments based on their false claims for excluded ICD procedures in the amount of approximately $17,164, 292.00. For the years 2003, 2004, 2005, 2006, and 2007, Relators estimate that HCA hospitals have received overpayments from excluded ICD procedures exceeding $40 million dollars.

72.      Mr. Schuhmann has also calculated overpayments arising from false ICD claims submitted by hospitals in each state. (*See* Exhibit 5 to Mr. Schuhmann's Disclosure). For example, hospitals in Florida submitted approximately $36 million dollars in false claims for ICD procedures excluded from Medicare coverage in 2005 and 2006. Florida is the leading state in terms of hospitals which have submitted false ICD claims described in this Complaint. *Id.*

73.      The damages calculations provided by Relators do not include damages to the United States from false claims paid to individual physicians and physician groups for ICD procedures excluded from Medicare coverage. Relators are not able to identify the individual physicians who have submitted and been paid for false claims for the ICD procedures identified in Exhibit 2 by MedPAR identification number. For the vast majority of the false claims

130

submitted by each hospital Defendant, the United States also received a false claim from the physician or physician group which participated in performing the procedure. Such claims by physicians also constitute false claims for procedures excluded from Medicare coverage for which the United States is entitled to recover under the False Claims Act.

74.     The damages calculations provided in the attached Disclosures and exhibits also do not include false claims for ICD procedures excluded from coverage under the federal-state Medicaid programs and the federal TRICARE-CHAMPUS program.  With inclusion of such damages, the damages to the United States for ICD false claims will continue to increase.

75.     In addition to violating Medicare laws, the Defendants' contraindicated use of ICD procedures presents a public health danger.  In limiting coverage for ICD procedures to certain groups of patients, CMS recognized the risks of ICDs.  As stated by CMS, "Since ICDs only treat ventricular tachyarrhythmias, do not prevent death from other cardiac or noncardiac diseases, and may cause adverse events, such as inappropriate shocks and worsening heart failure, they should not be perceived as or projected to be an ideal technology that eliminates significant health risks for patients with heart failure." Exhibit 1, CAG-00157R3, p. 22.

76.     The extensive recalls and product defects associated with ICDs in the past five years magnify the concerns of CMS for patient safety. Between 2002 and 2007, there were 68 recalls of ICDs in the United States domestic market, affecting hundreds of thousands of products. Attached as Exhibit 3 to the Disclosure of Relator Leatrice Ford is a spreadsheet which lists the extensive recalls of ICDs from 2002 to 2007 due to product defects.  The Relators have culled out recalls that affected products only sold overseas, as well as all non-implantable defibrillator recalls.  The number of recalls magnifies the underlying safety concerns that led CMS to limit coverage for ICD procedures even apart from product defects and recalls.

## The Medicare Program

77.      In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with end-stage renal diseases. *See* 42 U.S.C. §§ 426, 426A. Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including Defendants, derive a substantial portion of their revenue from the Medicare Program.

78.      The United States Department of Health and Human Services (HHS) is responsible for the administration and supervision of the Medicare Program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program. CMS was formerly known as the Health Care Financing Administration or HCFA.

79.      Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility for participating in the Medicare Program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

80.      As detailed below, Defendants submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

81.      To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. §1395h. Fiscal intermediaries, which are typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

82.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays.  42 C.F.R. §§ 413.1, 413.60, 413.64.  Hospitals submit patient-specific claims for interim payments electronically on a CMS Form UB-92 (formerly called an HCFA Form UB-92).

83.     As a prerequisite to payment by Medicare, CMS requires hospitals to annually submit form CMS-2552 (formerly called an HCFA-2552), more commonly known as the Hospital Cost Report.  Hospital Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

84.     After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year.   *See* 42 U.S.C. §1395g(a); 42 C.F.R. §413.20.   *See also* C.F.R. § 405.1801(b)(1).  Hence, Medicare relies upon the Hospital Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 413.50 and 413.64(f)(i).

85.     During the year, providers such as the Defendant hospitals, submit claims to their assigned fiscal intermediaries for reimbursement, based upon hospital utilization by Medicare beneficiaries. 42 C.F.R. §§ 413.1, 413.60, 413.64. Defendants have received interim payments on these claims. Within a specified time after the end of the Defendant hospitals' fiscal years, the Defendants must submit their cost reports to their fiscal intermediary so that the intermediary can make a year-end adjustment to the interim payments, as needed. 42 C.F.R. § 413.20(b). Cost reports are the final claim that a provider submits to its intermediary for items and services

rendered to Medicare beneficiaries.

86.     Cost reports contain important detailed financial and statistical data relating to the provider and form the basis for a determination by Medicare whether the provider is entitled to more reimbursement than already paid, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

87.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year.  On the Hospital Cost Report, the Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider.  This total determines Medicare's liability for services rendered to Medicare beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due to the Medicare Program or the amount due to the provider.

88.     Under the rules applicable at all times relevant to this Complaint, CMS had the right to audit the reimbursement claims, Hospital Cost Reports, and representations made by the Defendants to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  That right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made.  42 C.F.R. §413.64(f).

89.     Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

90.     At all times relevant to this Complaint, the responsible provider official was required to certify, in pertinent part:

> i. to the best of my knowledge and belief, it (the Hospital Cost Report) is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

ii. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

91.     In or about 1996, the Hospital Cost Report was revised to include the following notice:

i. Misrepresentations or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

92.     Defendants were at all relevant times familiar with the laws and regulations governing the Medicare Program.

93.     A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.   42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

i. Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a  . . . concealment or failure  . . . be guilty of a felony.

94.     Reimbursement claims and Hospital Cost Reports submitted by Defendants were, at all times relevant to this Complaint, signed by Defendants' respective employees who attested, among other things, to the certification quoted above.

95.     The Medicare program depends heavily upon the truthfulness of providers in

135

submitting claims and completing their cost reports. At all times relevant to this Complaint it was common knowledge in the healthcare industry that the government lacks adequate resources to conduct a full-scope audit of each of the over 35,000 providers nationwide, including hospitals, which file claims and cost reports with Medicare each year.

96.     To address this problem CMS has devised a methodology that subjects all cost reports to an automated uniform "desk review" process. Based on the results of the desk review, and the funds available for audit, intermediaries select providers for field audits. In 1997 for example, of 35,709 provider cost reports received from hospitals, skilled nursing facilities (commonly known as nursing homes), home health agencies, and other institutional providers for patient care, just over 5,000 (or approximately 14%) were selected for a field audit. Because of limited resources, field audits are usually limited to specific issues. Defendants took advantage of Medicare's limited resources by submitting false claims and false statements with the expectation that they would not be discovered upon audit.

97.     Medicare requires providers to maintain complete and accurate information and to prepare their claims and cost reports based on that information.

98.     Defendants are, and were at all times relevant to this Complaint, familiar with the Medicare law, regulations, instructions, and the PRM governing the preparation and submission of claims for reimbursement.

99.     In addition, if a hospital discovers errors and omissions in its claims submitted for reimbursement to Medicare, it is required to disclose those matters to its fiscal intermediary.  42 U.S.C. § 1320a-7b(a)(3) creates a duty to disclose known errors in cost reports:   "Whoever . . . having knowledge of the occurrence of any event affecting his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to

136

secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony."

### The Medicaid Program

100.     Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal government provides matching funds and ensures that states comply with minimum standards in the administration of the program.

101.     The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation. *See* 42 U.S.C. §§ 1396, *et seq.*

102.     Each state's Medicaid program must cover hospital services.   42 U.S.C. §1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

103.     Provider hospitals participating in the Medicaid program file annual cost reports with the single state agency administering the particular state's Medicaid program, or its fiscal intermediary, in a protocol similar to the one governing the submission of Medicare cost reports.

104.     In some states provider hospitals participating in the Medicaid program file a copy of their Medicare cost report with the Medicaid program which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement.  In other states provider hospitals file a separate Medicaid cost report.

Providers incorporate in these separate Medicaid cost reports the same type of financial and statistical data contained in their Medicare cost reports, and include data concerning the number of Medicaid patient days at a given facility.

105.     Typically, each state requiring the submission of a Medicaid cost report also requires that an authorized agent of the provider expressly certify that the information and data contained within the submitted cost report is true and correct.

106.     This Medicaid patient data is then utilized by individual Medicaid programs to determine the reimbursement to which the facility is entitled.  On the Hospital Cost Report, the Medicaid liability for patient services is then totaled with any other Medicaid liabilities to the provider.   This  total  determines  Medicaid's  liability  for  services  rendered  to  Medicaid beneficiaries during the course of a fiscal year.   From this sum, the payments made to the provider during the year are subtracted to determine the amount due to the Medicaid Program or the amount due to the provider.

107.     Where a provider submits the Medicare cost report to Medicaid, false or incorrect data or information contained in the Medicare cost report necessarily causes the submission of false or incorrect data or information to the state Medicaid program.

108.     Where  a  provider  submits  the  Medicare  cost  report  to  Medicaid,  the  false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

109.     Where a provider submits a Medicaid cost report that contains the same false or incorrect information contained in the provider's Medicare cost report, false statements and false claims have been made for reimbursement from Medicaid.

110.     The United States has been damaged whenever a state Medicaid program has been damaged by the Defendants' submission of false claims and false statements because the United States funds a portion of each state's Medicaid program as described above.

111.    Provider hospitals participating in the Medicaid program file a copy of their Medicare cost reports with the Medicaid program, which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement.

112.    Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

113.    Defendants sought reimbursement from State Medicaid programs for the time period pertinent to this Complaint.

114.    Medicaid does not provide coverage for any ICD procedure that is not considered reasonable and necessary under Medicare rules. Defendants have knowingly misrepresented through the false use of Medicare, Medicaid, and Champus reimbursement codes that the ICD procedures at issue are covered and reimbursed by Medicaid when, in fact, they are not.

## INTRODUCTION TO TRICARE/CHAMPUS

115.    At all times relevant to this Complaint, the Defendants were enrolled in, and sought reimbursement from TRICARE/CHAMPUS. Champus likewise does not provide coverage for procedures that are not considered reasonable and necessary under Medicare rules.

116.    TRICARE/CHAMPUS is a federally-funded program that provides medical benefits, including hospital services, to the spouses and unmarried children of active duty retired service members, to the spouses and unmarried children of reservists who were ordered to active duty for thirty days or longer, to the unmarried spouses and children of deceased service members, and to retirees. Hospital services at non-military facilities are sometimes provided for

139

active duty members of the armed forces, as well.  10 U.S.C. §§ 1071-1109; 32 C.F.R. § 199 *et seq.*

117.     TRICARE/CHAMPUS reimburses hospitals for two types of costs, both of which are based on the Medicare cost report: capital costs and direct medical education costs.  32 C.F.R. § 199.14(a).

118.     A provider seeking reimbursement from TRICARE/CHAMPUS for these costs is required to submit a TRICARE/CHAMPUS prescribed form entitled, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement)."

119.     In the Request for Reimbursement, the provider sets forth its number of TRICARE/CHAMPUS patient days and financial information which relate to these two cost areas covered by TRICARE/CHAMPUS (i.e., capital costs and direct medical education costs), which is derived from the Medicare cost report for that facility.

120.     Upon receipt of a hospital's Request for Reimbursement and the provider's financial data, TRICARE/CHAMPUS or its fiscal intermediary applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE/CHAMPUS patient days as a percentage of total patient days in the facility.

121.     This Request for Reimbursement requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report."

122.     In addition, a hospital is required to be familiar with its duties and responsibilities under the TRICARE/CHAMPUS program.  32 C.F.R. §§ 199.6(a), 199.9(a)(4).

123.    TRICARE/CHAMPUS relies upon the honesty of the provider in disclosing any and all false statements, submissions, errors and necessary corrections or adjustments to the Medicare cost reports, so that similar adjustments can be made by TRICARE/CHAMPUS.

124.    The    Defendants    submitted    Requests    for    Reimbursement    to TRICARE/CHAMPUS that were based on their Medicare cost reports.   Whenever the Defendants' Medicare cost reports contained false claims from which they derived their Requests for Reimbursement submitted to TRICARE/CHAMPUS, those Requests for Reimbursement were also false.

125.    Whenever the Defendants' Requests for Reimbursement were false, the Defendants' employees falsely certified that the information contained in their Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report."

126.    Upon information and belief, Defendants knowingly failed to notify TRICARE/CHAMPUS of false claims for ICD procedures and false Medicare cost reports as required when those errors would have decreased the amount of reimbursement the Defendants were entitled to receive and retain from TRICARE/CHAMPUS.

127.    Whenever the Defendants did not notify TRICARE/CHAMPUS of errors in their Medicare cost reports, they accepted and retained reimbursement from TRICARE/CHAMPUS of more than they were entitled to receive and retain.

128.    The Defendants knew that false claims for ICD reimbursement and false claims included in their Medicare cost reports would illegally increase TRICARE/CHAMPUS reimbursement as well.

129.    TRICARE/CHAMPUS does not provide coverage for any ICD procedure that is not considered reasonable and necessary under Medicare rules. Defendants have knowingly

141

misrepresented through the false use of reimbursement codes that the ICD procedures at issue are covered and reimbursed by TRICARE/CHAMPUS. In fact, they are not.

### The Provider Reimbursement Manual, Part I & Part II

130.     The Provider Reimbursement Manual, Part I & Part II, are considered the "bible" of reimbursement for hospitals. Part I, which consists of 30 chapters, mainly provides principals of reimbursement, allowable costs, cost accounting methods, and other technical guidance of a more general nature. Part II, consisting of 39 chapters, is more forms oriented, and is devoted largely to line by line instructions for completion of the hospital cost report. Part I & Part II together contain essentially all the information and instruction to successfully submit claims for reimbursement and complete a Medicare cost report that complies with the rules and regulations of the Medicare Program.

131.     HHS issues the Provider Reimbursement Manual, which is distributed to all Medicare providers, to inform them of its reimbursement policies and procedures. The Defendants had a legal duty to familiarize themselves with Medicare reimbursement rules, including those stated in the Manuals.

132.     The Manuals are available for viewing or download from the CMS website, as well as from most fiscal intermediaries.

133.     The Defendants had access to current copies of the Reimbursement Manuals at all times relevant to this Complaint and were on notice of the fact that Medicare did not provide coverage for ICD procedures in patients who had undergone revascularization during the same hospital admission.

134.     If the Defendants did not regularly review the Provider Manual and Medicare's National Coverage Decisions regarding ICD procedures, then they acted with reckless disregard.

## OVERPAYMENTS TO PROVIDERS

135.    The Provider Reimbursement Manual - Part 1, chapter 24, page 24-8.2, provides

the following guidance regarding overpayments to hospitals and other providers:

OVERPAYMENTS TO PROVIDERS-GENERAL

1)  Once a determination of overpayment has been made, the amount so determined
is a debt owed to the United States Government.  Under the Federal Claims
Collection Act of 1966, each agency of the Federal Government, pursuant to
regulations jointly promulgated by the Attorney General and the Comptroller
General of the United States, must attempt collection of claims of the Federal
Government for money arising out of the activities of the agency.  These
regulations require the head of each agency to take action on a timely basis to
collect claims of the United States.

136.    The guidance regarding overpayments is explicit and specific and does not

provide exceptions for one category of overpayment versus another.

137.    The Defendants' false certifications of truthfulness, correctness, and accuracy

damaged the Government because they caused the Defendants to be paid for ICD procedures that

are contraindicated and excluded from Medicare coverage.    Defendants' concealment of

overpayments damaged the Government because funds improperly paid were not recovered.

138.    The Defendants had actual and constructive knowledge of the Medicare National

Coverage Decisions that exclude coverage for ICD procedures in patients who have undergone

revascularization during the same hospital admission.

139.    The Defendants repeatedly filled out reimbursement claims forms as if the

services being billed were covered by Medicare.

140.    HCFA Form UB-92 had a column to indicate that the services were "non-covered

charges," yet the Defendants repeatedly listed their charges for ICD procedures in the column for

"covered charges" despite knowing that Medicare excluded coverage for such implants in such

patients.

141.     The Defendants repeatedly failed to disclose to their fiscal intermediaries that their initial claims for payments were for non-covered services.  Defendants also repeatedly submitted Hospital Cost Reports to Medicare that were false because they (a) failed to disclose that the Defendants had received reimbursement for non-covered services, and (b) falsely certified that they had been prepared in accordance with applicable instructions and Medicare laws and regulations. By submitting such false Cost Reports, Defendants evaded their legal obligations to reimburse Medicare and violated the False Claims Act.

142.     The False Claims Act has a liberal scienter requirement. "No proof of specific intent to defraud is required" to state a claim under the FCA. 31 U.S.C. § 3927(b). Additionally, under Federal Rule of Civil Procedure 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."

143.     A plaintiff is not required to plead fraud in a False Claims Act action, rather, only that the conduct by the Defendants was done knowingly. Liability under the Civil False Claims Act is statutory--that is liability arises from performance of one of the acts set forth in 31 U.S.C. § 3729(a). This statutory liability establishes that the False Claims Act is not a fraud statute; instead it is a false claim/false statement statute.

144.     The FCA establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1); "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C. § 3729(a)(2); or "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7).   The FCA defines

"knowing" and "knowingly" as having actual knowledge of the information, or acting in either deliberate ignorance of or in reckless disregard of the information's truth or falsity. 31 U.S.C. § 3729(b).

145.     Fraudulent intent does not need to be pled or proven for a plaintiff to state a claim under the FCA.

146.     The Defendants' scheme of fraud is far-reaching and collectively encompasses thousands of false claims. For each Defendant, the Relators have compiled extensive lists of the false claims for ICD procedures excluded from Medicare coverage. That list is attached to the Disclosures of Thomas Schuhmann and Leatrice Ford filed under seal with this Complaint.

147.     Given the large number of procedures involved, it would be unwieldy and would serve no useful purpose for each of the claims to be discussed individually in this Complaint. The fraudulent activity with respect to each claim is the same. To detail each ICD procedure for thousands of patients would unreasonably increase the length of the Complaint. Moreover, Defendants are in particular possession of the medical records for each patient, which may be tracked to the MEDPAR identification number for each false claim.

148.     The Defendants repeatedly filed claims for ICD procedures that were not reasonable and necessary according to explicit and established Medicare National Coverage Decisions. The Defendants then falsely certified that such services were covered and falsely certified that they complied with Medicare laws. Such certification and compliance were mandatory conditions of payment. The Defendants repeatedly violated the underlying conditions to payment with respect to contraindicated ICD procedures.

149.     The Defendants made false certifications on each of their annual Cost Reports that the reports were true, correct, and accurate and prepared in accordance with applicable

instructions, which included the Provider Manual and the Medicare National Coverage Decisions, when in fact the Medicare instructions had not been followed. The Defendants also implicitly certified that the services billed for ICD procedures were "reasonable and necessary," when in fact they were not, according to the Medicare National Coverage Decisions binding on each Defendant.

150.     The United States would not have paid the claims filed by Defendants if the Defendants had disclosed the fact that the ICD procedures at issue were not covered under Medicare National Coverage Decisions.

151.     The Defendants had an obligation to submit their claims on forms approved by Medicare and in accordance with Medicare instructions. 42 C.F.R. 424.32. On the UB-92 forms there was a column bearing the heading "Non-covered Charges" in which the Defendants should have listed charges that were not covered. The Provider Manual contains detailed instructions for completion of this UB-92 form.

152.     Likewise, the Cost Report instructions required providers to identify any non-covered items as "protested items." The Provider Manual contains detailed instructions for how to complete the Cost Report.

153.     The Defendants' failure to disclose the non-covered services on the UB-92 form and in the Cost Reports was fraudulent and factually false.

154.     The Medicare Act, 42 U.S.C. 1395y(a)(1)(A), contains an express condition of payment---"no payment may be made [under the Medicare statute] for any expenses incurred which…are not reasonable and necessary for the diagnosis or treatment of illness or injury." The Medicare Act explicitly links each Medicare payment to the requirement that the particular item

or service be "reasonable and necessary." Section 1395y(a)(1)(A) expressly prohibits payment if a provider fails to comply with its terms.

155.     In submitting claim forms, Defendants implicitly certified compliance with the Medicare Act Section 1395y(a)(1)(A) and certified that they were only seeking payment for services that were reasonable and necessary as determined by Medicare National Coverage Decisions. Despite such certification, the claim forms submitted by Defendants included requests for payment for services that were not reasonable and necessary under clear and unambiguous Medicare National Coverage Decisions. The Defendants' claims were false.

156.     On their annual Cost Reports, Defendants expressly certified that they were "true, correct, and complete" and "prepared…in accordance with applicable instructions, except as noted." Yet Defendants included in their Cost Reports payments for non-covered ICD procedures. The Defendants' certifications were false.

157.     In submitting their claims, Defendants were obligated to seek payment only for those services that were covered. Nevertheless, they sought and received payment for ICD procedures that were clearly not covered under Medicare rules. The Defendants knowingly submitted claims for payment of non-covered ICD procedures that Medicare has determined are not reasonable or necessary.

158.     Protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law. Participants in the Medicare program have a duty to familiarize themselves with the legal requirements for payment and ensure compliance. A defendant who fails to inform himself of those requirements acts in reckless disregard or in deliberate ignorance of those requirements, either of which is sufficient to charge him with knowledge of the falsity of the claims in question.  Likewise, a defendant who fails to verify and

evaluate the accuracy of information or investigate the accuracy of information when on notice of questions concerning the accuracy of such information acts in reckless disregard or deliberate ignorance sufficient to charge him with knowledge of the falsity of the claims in question.

159.    A case under the FCA must be proven by a preponderance of the evidence.

160.    More probably than not, at a minimum, the Defendants acted in reckless disregard of explicit and clear Medicare regulations that exclude coverage for ICD procedures in patients undergoing a revascularization procedure or coronary artery graft bypass in the same hospital admission. At a minimum, the Defendants acted in reckless disregard or deliberate ignorance sufficient to charge them with knowledge of the falsity of the claims in question.

## FIRST CAUSE OF ACTION
### False Claims Act; Presentation of False Claims
### (31 U.S.C. § 3729(a)(1))

161.    Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

162.    The Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States.

163.    By virtue of the false or fraudulent claims made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## SECOND CAUSE OF ACTION
### False Claims Act:  Making Or Using False Record Or Statement
### To Cause Claim to be Paid
### (31 U.S.C. §3729(a)(2))

164.    Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

165.    The Defendants knowingly made, used, or caused to be made or used false records or statements. The Defendants made false certifications and representations when

initially submitting the claims for interim payments and they made false certifications in submitting the cost reports. The Defendants' conduct resulted in false and fraudulent claims being paid or approved by the United States.

166.    By virtue of the false records or false statements made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## THIRD CAUSE OF ACTION

### False Claims Act; Conspiring to Submit False Claims
### (31 U.S.C. §3729(a)(3))

167.    Plaintiffs repeat and reallege the foregoing Paragraphs as though fully set forth herein.

168.    The Defendants and the John Doe Defendants conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3).   As part of schemes and agreements to obtain reimbursements from the United States in violation of federal laws, these Defendants conspired together to receive illegal remunerations.

169.    By virtue of the Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## FOURTH CAUSE OF ACTION

### Payment by Mistake of Fact

170.    Plaintiffs repeat and reallege the foregoing Paragraphs as though fully set forth herein.

171.     This is a claim for the recovery of monies paid by the United States to the Defendants as a result of mistaken understandings of fact.

172.     The false claims that the Defendants submitted to the United States' agents were paid by the United States based upon mistaken or erroneous understandings of material fact.

173.     The United States, acting in reasonable reliance on the truthfulness of the claims and the truthfulness of the Defendants' certifications and representations, paid the Defendants certain sums of money to which they were not entitled, and the Defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.

### FIFTH CAUSE OF ACTION

**Unjust Enrichment**

174.     Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

175.     This is a claim for the recovery of monies by which the Defendants have been unjustly enriched.

176.     By directly or indirectly obtaining Government funds to which they were not entitled, the Defendants were unjustly enriched, and are liable to account and pay with amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

### SIXTH CAUSE OF ACTION

**Disgorgement of Illegal Profits, Imposition of a Constructive Trust, And an Accounting**

177.     Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

178.     This is a claim for disgorgement of profits received by the Defendants because of illegal payments obtained by the Defendants.

179.     The Defendants concealed their illegal activity through false statements, claims and records, and failed to abide by their duty to disclose such information to the United States.

180.    The United States did not detect the Defendants' illegal conduct.

181.    This Court has the equitable power to, among other things, order the Defendants to disgorge the entire profit they earned from business generated as a result of their violations of the False Claims Act.

## SEVENTH CAUSE OF ACTION

### Recoupment of Overpayments

182.    Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

183.    This is a claim for recoupment for the recovery of monies unlawfully paid by the United States to the Defendants contrary to statute or regulation.

184.    The United States paid the Defendants certain sums of money to which they were not entitled, and the Defendants are thus liable under the law of recoupment to account and return such amounts, which are to be determined at trial, to the United States.

## EIGHTH CAUSE OF ACTION

### Common Law Fraud

185.    Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

186.    The Defendants made material and false representations in their initial requests for interim payments and in their cost reports with knowledge of their falsity or reckless disregard for their truth, with the intention that the United States act upon the misrepresentations to its detriment.   The United States acted in justifiable reliance upon the Defendants' representations by making interim payments on the false claims and then by settling the cost reports at inflated amounts.

187.     Had the true facts been known to the United States, the Defendants would not have received the payments.

188.     By reason of these interim payments and the inflated amounts on the cost reports, the United States has been damaged in an as yet undetermined amount.

## NINTH CAUSE OF ACTION

### Violation of 31 USC § 3729(a)(7) Reverse False Claims

189.     Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

190.     The Defendants knowingly and consciously manipulated claims in order to obtain greater reimbursements than to which they were entitled.

191.     The Defendants have consistently created false records or statements.

192.     The Defendants are aware that they have been overpaid on Medicare and Medicaid admissions and that they are obligated to repay those overpayments to the federal government.

193.     The Defendants have continued to create false records in order to avoid, conceal, decrease, or diminish their obligation to repay the Medicare program for wrongful payments based on the illegal claims for ICD procedures.

194.     As such they are liable to the government for three times the amount of the over-payments.

195.     The Defendants are also liable for a civil penalty attaching to all claims for reimbursement in an amount no less than $5,500 or more than $11,000 per claim.

## TENTH CAUSE OF ACTION

### Submission of False Claims in Violation of 31 USC § 3729(a)(1)

196.     Plaintiffs repeat and re-allege the foregoing Paragraphs as if fully set forth herein.

197.     Because the Defendants must certify their compliance with all applicable Medicare and Medicaid regulations as a condition of payment under the Prospective Payment System, the false certification of compliance, which has been willfully and knowingly done, constitutes a false claim under 31 USC § 3729.

198.     By virtue of the false or fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## ELEVENTH CAUSE OF ACTION

### Creation of False Records
### (31 USC § 3729(a)2 )

199.     Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

200.     The Defendants have engaged in the creation of false records in support of false claims.

201.     By virtue of the false or fraudulent claims made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYERS FOR RELIEF

202.     WHEREFORE, on behalf of the United Stats, Plaintiffs demand and pray that judgment against Defendants, jointly and severally, as follows:

203.     On the First, Second, Third, Ninth, Tenth, and Eleventh Causes of Action under the False Claims Act, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, for a qui tam relators share as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all

such further relief as may be just and proper.

204.    On the Fourth, Fifth and Seventh Causes of Action, for payment by mistake, unjust enrichment, and recoupment, for the damages sustained and/or amounts by which the Defendants were unjustly enriched or by which Defendants retained illegally obtained monies, plus interest, costs, and expenses, and all such further relief as may be just and proper, and for a qui tam relators share as an alternative remedy as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further relief as may be just and proper.

205.    On the Sixth Cause of Action for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by Defendants, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Defendants and for a qui tam relators share as an alternative remedy as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further and equitable relief as may be just and proper.

206.    On the Eighth Cause of Action for common law fraud, for compensatory and punitive damages in an amount to be determined, together with costs and interest, and for a qui tam relators share as an alternative remedy as specified by 31 USC § 3730, for attorneys fees, costs and expenses as provided by 31 USC § 3730, and for all such further relief as may be just and proper.

**JURY TRIAL IS HEREBY DEMANDED.**

Respectfully submitted, this the ___ day of _January_ 2008

THEODORE J. LEOPOLD, ESQ.
Florida Bar No. 705608
Ricci-Leopold, PA
2925 PGA Blvd
Suite 200
Palm Beach Gardens, Fl 33410
tleopold@riccilaw.com

BRYAN A. VROON, ESQ.
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, Esq.
1718 Peachtree Street, Suite 1088
Atlanta, Georgia  30309
Telephone: (404) 607-6710
Facsimile:  (404) 607-6711
bvroon@vclaw.com

155

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing Qui tam

Relator Complaint Under 31 U.S.C. §3729, Federal False Claims Act by depositing a true and

correct copy of same by **Certified Mail** in the United States Mail, postage prepaid, addressed as

follows:

Honorable Michael B. Mukasey
Attorney General of the United States
5111 Main Justice Building
10th & Constitution Avenue, N.W.
Washington, D.C.  20210

R. Alexander Acosta, USA
Civil Process Clerk
U.S. Attorney's Office
99 NE 4th Street
Miami Florida  33132

This _9_ day of January 2008

THEODORE J. LEOPOLD