

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 08-20071-CIV-HUCK/SIMONTON

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*,<br>LEATRICE FORD and THOMAS SCHUHMANN.<br><br>　　　Plaintiffs,<br><br>vs.<br><br>ABBOTT NORTHWESTERN HOSPITAL;<br>*et al.*<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) **TO BE FILED IN CAMERA**<br>) **AND UNDER SEAL**<br>)<br>)<br>) |

### QUI TAM RELATORS' SECOND AMENDED COMPLAINT UNDER 31 U.S.C. §3729, FEDERAL FALSE CLAIMS ACT

Table of Contents

Introduction ............................................................................................................. 2

Jurisdiction and Venue ........................................................................................... 4

Introduction to the Medicare Program's National Coverage Determinations Governing Payments for ICD Procedures ................................................................ 8

The Defendants Have Submitted Factually False Claims to Federal Healthcare Programs ........ 12

Introduction to Leatrice Ford's Experience, Knowledge, and Investigation as an Industry Insider 19

The Four Groups of False Claims Identified by Ms. Ford Which Represent ICD Procedures Excluded from Medicare Coverage ............................................................ 27

　　　Group One of False Claims ........................................................................ 28

　　　Group Two of False Claims ........................................................................ 36

　　　Group Three of False Claims ..................................................................... 41

1

Group Four of False Claims ................................................................................ 44

The Respective Defendants Have Evidence of False Claims in Their Possession ...................... 48

Additional Damages to the Medicare Trust Fund ........................................................... 49

Each False Claim Represents the Absence of the Requisite Advance Beneficiary Notices to
Medicare Patients ............................................................................................... 51

Defendants' Liability under the False Claims Act ........................................................... 54

Each False Claim Represents Multiple False Statements and False Records Submitted to
Federal Healthcare Programs ................................................................................. 58

False Certifications in the UB-92 and UB-04 Claim Forms .................................. 58

False Certifications in the Annual Cost Reports ............................................... 60

This Action is Not Subject to the Public Disclosure Defense ..................................... 62

FIRST CAUSE OF ACTION   False Claims Act; Presentation of False Claims for Payment or
Approval in Violation of 31 U.S.C. § 3729(a)(1)(A) ...................................................... 69

SECOND CAUSE OF ACTION   False Claims Act; Making or Using False Record or Statement
Material to False Claim in Violation of 31 U.S.C. § 3729(a)(1)(B) .................................... 70

THIRD CAUSE OF ACTION   False Claims Act; Conspiring to Submit False Claims in
Violation of  31 U.S.C. § 3729(a)(1)(C)) ................................................................. 71

FOURTH CAUSE OF ACTION  False Claims Act; Submission of Express and Implied False
Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B) ............................................... 71

FIFTH CAUSE OF ACTION  False Claims Act; Knowingly Causing and Retaining
Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G) ............................................... 72

PRAYERS FOR RELIEF ........................................................................................ 73

Relators Leatrice Ford and Thomas Schuhmann, by and through their counsel of record, state
their Second Amended Complaint to the Court as follows:

## **Introduction**

1.  Based on extensive review of scientific studies and concerns for patient safety, the

Centers for Medicare and Medicaid Services (CMS) has consistently, clearly, and

absolutely excluded coverage for implantable cardioverter-defibrillator (ICD)[1] procedures in three groups of patients relevant to this Second Amended Complaint: (1) patients who have undergone coronary artery bypass graft surgery or percutaneous transluminal coronary angioplasty within the past 3 months; (2) patients with clinical symptoms or findings that would make them candidates for coronary revascularization; and (3) patients who have suffered an acute myocardial infarction within the past 40 days. Under Section 1862(a) (1) of the Social Security Act, CMS has issued National Coverage Determinations which exclude such implants from Medicare coverage.

2.  Despite such exclusions from Medicare coverage, the respective Defendants have repeatedly submitted claims for ICD procedures excluded from Medicare coverage under the governing National Coverage Determination. In connection with each claim, the respective Defendants have submitted false statements, false records, and false certifications to the Medicare Program.

3.  Based on the determinations of the Medicare Coverage Advisory Committee composed of independent medical experts and based on the findings of published controlled scientific studies, CMS has established the conditions of Medicare coverage governing ICD procedures. CMS has published such conditions of coverage in National Coverage Determinations binding on all medical providers.

---

[1] Implantable cardioverter-defibrillators are electronic devices designed to detect and treat tachyarrhythmias or fast heart rates. Implanted under the skin in the upper abdomen, the defibrillator is connected with lead wires to two defibrillation electrodes placed surgically in or around the heart. The defibrillator is designed to interrupt the abnormal rhythm, allowing the normal rhythm to resume. Sensors inside the defibrillator monitor the heart. If a sensor detects an irregularity, such as fibrillation, the defibrillator is programmed to deliver a strong electric shock directly to the heart.

Such National Coverage Determinations govern payments for ICD procedures on Medicare patients.

4. Each Defendant Hospital has executed at least one provider agreement with CMS in which it agreed to be bound by the laws, regulations and program instructions of the Medicare Program.

5. The vast majority of ICD procedures in the United States have complied with Medicare's National Coverage Determinations. Yet a significant number of ICD procedures have been billed to and paid by the Medicare Program in contravention of the governing National Coverage Determination. Each violation represents a Medicare patient who underwent an invasive surgical procedure to implant an ICD in clinical conditions which CMS has determined are not covered by Medicare. Such violations have caused substantial damages to the Medicare Trust Fund.

**Jurisdiction and Venue**

6. This is an action to recover damages and civil penalties on behalf of the United States arising out of the false claims presented for payment by the respective Defendants to Federal Healthcare Programs, including the Medicare Program. This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act, which provides that the United States District Courts shall have exclusive jurisdiction of actions brought under the Act.

7. The False Claims Act was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009. "The amendments made by this section shall take effect on the date of enactment of the

Act and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729 (a) (1), as added by subsection (a) (1) shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. § 3729) that are pending on or after date..." FERA, § 4(f). The conduct in this Second Amended Complaint occurred both before and after the enactment of FERA. This Second Amended Complaint will predominantly reference post-FERA numbering for 31 U.S.C. § 3729(a) of the False Claims Act.

8. On March 23, 2010, the President of the United States signed the Patient Protection and Affordability Care Act, Pub. L. 111-148, 124 Stat. 119, which includes several provisions which broaden the reach of the False Claims Act. The claims at issue in this action arose before and after the amendments to the False Claims Act in March of 2010.

9. Section 3732(a) of the False Claims Act provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

10. Florida is the leading state in terms of the location of hospitals which have submitted the highest amount of false claims for ICD procedures excluded from Medicare coverage between 2002 and 2009.

11. An action for violation of the False Claims Act may be brought by the Attorney General under 31 U.S.C. § 3730(a) or by private persons under the qui tam provisions of 31 U.S.C. § 3730(b).

12. Defendants to this action were identified in the First Amended Complaint and this

Second Amended Complaint does not add any new defendants.   A list of the Defendants is attached as Exhibit A to this Second Amended Complaint.

13. The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345.  The Court may exercise personal jurisdiction over the Defendants under 31 U.S.C. § 3732(a) because at least one of the Defendants resides or transacts business in this District or has committed acts proscribed by 31 U.S.C. § 3729, *et seq*, in this District.

14. In 1986, Congress eliminated all reference to jurisdiction within Section 3732 of the False Claims Act. As amended in 1986, Section 3732 is purely a venue statute.

15. Senate Report 99-345 explains the 1986 amendment of the venue provision in 31 U.S.C. § 3732.  The "new section 3732 of title 31 [was added] to modernize the jurisdiction and venue provisions of the False Claims Act, by recognizing the existence of multi-defendant and multi-district frauds against the Government." S. Rep. No. 99-345, at 32 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5297. "Multiple suits, of course, increase the cost to the Government to pursue these cases and have a comparable impact upon the judicial resources required for a complete adjudication.  This expansion of jurisdiction and venue is made with a view to more effective litigation by the Government as well as convenience and fairness." *Id*.

16. Further, the consolidation of all the Defendants in this single action is proper because of common questions of law and fact, which include the national enforcement of the governing National Coverage Determination to ICD procedures under the common clinical conditions addressed in this action.

17. The consolidation of this action in a single forum permits the United States

Department of Justice to investigate, determine intervention, make national enforcement decisions, and prosecute this action without the administrative expense and burden of managing hundreds of duplicative proceedings across the United States over the identical common issue of enforcing the uniform National Coverage Determination governing ICD procedures for Medicare patients.  The consolidation of this action in a single forum saves judicial resources and prevents duplicative proceedings over the identical federal issue from clogging the dockets of federal courts across the United States.

18. The claims at issue also concern common participants nationwide. Although the Defendant hospitals and their physicians bear primary responsibility under the False Claims Act, during each of the years in question, sales agents of the three major device manufacturers customarily participated in each surgery to implant ICDs. Such sales agents have detailed knowledge of the governing National Coverage Determination and the clinical conditions under which the Medicare Program excludes coverage for ICD procedures. The procedures in contravention of the governing National Coverage Determination were performed in the presence of and with the assistance of the device manufacturers' representatives who were common participants in the respective ICD procedures at issue.

19. If a defendant succeeds with a  challenge to venue, the remedy is transfer under 28 U.S.C. § 1404 (a) which states, "[f]or the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought."

20. There are additional John Doe Defendants who are likewise liable to the United

States under the False Claims Act for causing or contributing to the submission of claims for payment to the Medicare Program and other federal healthcare programs arising from ICD procedures excluded from coverage. Such John Doe Defendants include physicians, physician groups, and medical providers under federal-state Medicaid programs and under the federal TRICARE-CHAMPUS program.

## Introduction to the Medicare Program's National Coverage Determinations Governing Payments for ICD Procedures

21. Congress established the Medicare Program by enacting Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U.S.C. § 1395 *et seq*. (1982), which provides federally funded health insurance for the aged and disabled. Congress restricted the scope of the program by precluding reimbursement for any "items or services . . . [which] are not reasonable and necessary for the diagnosis or treatment of illness or injury. . . ." 42 U.S.C.A. § 1395y (a) (West Supp. 1989).

22. The Medicare Act contains an express condition of payment---"no payment may be made [under the Medicare Act] for any expenses incurred [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury. . . ." 42 U.S.C. § 1395y (a)(1)(A).

23. Under 42 U.S.C. § 1395ff(a), the Secretary of Health and Human Services is authorized to define which services are "reasonable and necessary." The Secretary has defined which services are "reasonable and necessary" through regulations, rules, and national coverage determinations published in manuals provided to providers.

24. The Act vests the Secretary of Health and Human Services with final authority to determine whether individual claimants are entitled to benefits "in accordance with regulations prescribed by him." 42 U.S.C.A. § 1395ff (a).

25. The Secretary adopts National Coverage Determinations ("NCD") to exclude from Medicare coverage certain items and services determined to be not "reasonable and necessary." *See* 42 U.S.C. § 1395ff (f)(1)(B). An NCD is a determination by the HHS Secretary with respect to whether a particular item or service is covered nationally by Medicare.  *See* 42 U.S.C. § 1395ff (f)(1)(B). All Medicare providers are legally bound by National Coverage Determinations.  *See* 42 C.F.R. § 405.1060(a)(4).

26. In 1986, CMS issued a Medicare National Coverage Determination providing limited coverage for implantable defibrillators. Since 1986, CMS expanded coverage under certain conditions with revisions to the National Coverage Determination in 1991, 1999, 2003, and 2005.

27. Effective July 1, 1999, CMS permitted coverage for ICD procedures only under the following conditions:

- Documented episode of cardiac arrest due to ventricular fibrillation (VF), not due to a transient or reversible cause;
- Documented sustained ventricular tachyarrhythmia (VT), either spontaneous or induced by an electrophysiology (EP) study, not associated with an acute myocardial infarction (MI) and not due to a transient or reversible cause;
- Documented familial or inherited indications with a high risk of life-threatening VT, such as long QT syndrome or hypertrophic cardiomyopathy. See Medicare Coverage Issues Manual § 35-85.

28. Between July 1, 1999 and October 1, 2003 when the amended National Coverage Determination Transmittal 173 became effective, the Medicare Program covered

ICDs only when a patient (1) suffered "cardiac arrest due" to VF, "not due to a transient or reversible cause," (2) had documented sustained VT "not associated with an acute myocardial infarction" and "not due to a transient or reversible cause," or (3) had documented familial or inherited indications with a high risk of life-threatening VT. [2]

29. On August 22, 2003, CMS issued Coverage Issues Manual Transmittal 173 which became effective October 1, 2003. Transmittal 173 revised Section 35-85 governing implantable automatic defibrillators and added two indications to the earlier three covered indications. Effective for services performed on or after October 1, 2003, Covered Indications Numbers 4 and 5 are as follows:

[Indication 4]. Coronary artery disease with a documented prior MI, a measured left ventricular ejection fraction 0.35, and inducible, sustained VT or VF at EP study. (The measured MI must have occurred more than 4 weeks prior to defibrillator insertion. The EP study must be performed more than 4 weeks after the qualifying MI.);

[Indication 5]. Documented prior MI and a measured left ventricular ejection fraction 0.30 and QRS duration of 120 milliseconds.

30. With respect to Coverage Indication Number 5, patients must not have:

    i.  New York Heart Association classification IV;
   ii.  Cardiogenic shock or symptomatic hypotension while in stable baseline rhythm;
  iii.  "[h]ad a coronary artery bypass graft (CABG) or percutaneous transluminal coronary angioplasty (PTCA) within past three months,"
  iv.  "[h]ad an enzyme-positive MI within the past month," or "[c]linical symptoms or findings that would make them a candidate for coronary revascularization;"
   v.  or "Any disease, other than cardiac disease (e.g., cancer, uremia, liver failure) associated with a likelihood of survival less than 1 year.
*See* Medicare Coverage Issues Manual, Transmittal 173.

---

[2] Familial or inherited indications with a high risk of life-threatening VT are not at issue in the Medicare claims addressed in this action.

31. Under both Coverage Indications 4 and 5, there is no Medicare coverage for an ICD procedure within four weeks of an acute myocardial infarction.

32. Transmittal 173 was effective between October 1, 2003 and January 27, 2005. CMS issued the 2003 National Coverage Determination based on expert review of published scientific data, including multiple randomized and controlled clinical trials.

33. Effective January 27, 2005, based on updated review of published controlled scientific studies, CMS issued Transmittal 29 which revised the National Coverage Determination governing ICD procedures. Transmittal 29 added three additional covered indications to the 2003 National Coverage Determination. Those additional indications were numbered 6-8.

34. With respect to Indications 3-8, Transmittal 29 also confirmed the same exclusions from coverage as applied to Indication Number 5 of the 2003 National Coverage Determination:  **Patients must not have…**"

> (1) "[had] a CABG or PTCA within the past 3 months,"
> (2) "an acute MI within the past 40 days,"
> or (3) "clinical symptoms or findings that would make them a candidate for coronary revascularization."

35. In the 2005 Transmittal from CMS, the time period after an acute MI in which such ICD procedures were excluded from Medicare coverage was extended from 30 days to 40 days.

36. Despite the absolute language in the NCD which states that "patients must not have an acute MI within the past 40 days" or bypass surgery/angioplasty "within the past 3 months" or be candidates for coronary revascularization, the respective Defendants

have repeatedly submitted claims for payment for ICD procedures in contravention of the coverage conditions.

37. The National Coverage Determination consistently excludes coverage for ICD devices in circumstances surrounding an acute myocardial infarction. Under Indication Number 2, if a patient has sustained ventricular tachycardia, there is no coverage for an ICD if that sustained VT is associated with an acute myocardial infarction. Under Indications 3-9 of the 2005 National Coverage Determination, there is no coverage for an ICD within 40 days of an acute myocardial infarction. The reason for such exclusions from Medicare coverage is the scientific studies have consistently demonstrated that ICDs implanted soon after an AMI do not offer patient benefit and may cause patient harm. Such harm includes worsening heart failure as the damaged heart is healing after an AMI and increased rates of death from causes other than arrhythmias.

38. In limiting and excluding coverage for ICD procedures in certain patients under certain explicit conditions, CMS based its National Coverage Determinations on the recommendations of the Medicare Coverage Advisory Committee composed of national public health and medical experts and their extensive review of published controlled scientific studies addressing the benefits and risks of ICDs

**The Defendants Have Submitted Factually False Claims to Federal Healthcare Programs**

39. As detailed below, Defendants submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

40. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries are typically insurance companies responsible for processing and paying Medicare claims and auditing cost reports.

41. Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services provided to those beneficiaries during their hospital stays. *See* 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments electronically on a CMS Form UB-92 or the UB-04 Form which replaced the UB-92 Form in March of 2007.

42. For each of the years in question, on the UB-92 and UB-04 forms there was and is a column bearing the heading "NON-COVERED CHARGES" in which the hospital is required to list charges not covered by the Medicare Program.

43. The respective hospitals failed to list the ICD procedures at issue as "non-covered charges" on the UB-92 and UB-04 Forms. They repeatedly sought payments for the ICD procedures at issue as covered "charges" despite the fact that the procedures were explicitly excluded from coverage under the governing National Coverage Determination.

44. Both the UB-92 and UB-04 Forms contain explicit certifications of accuracy. The UB-92 contains the following notice in bold capital letters: "ANYONE WHO

13

MISREPRESENTS OR FALSIFIES ESSENTIAL INFORMATION REQUESTED BY THIS FORM MAY UPON CONVICTION BE SUBJECT TO FINE AND IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW."

45. The UB-92 Form also requires the provider's representative to "certify the certifications on the reverse apply to this bill and are made a part hereof." Such certifications include the following:

- "This claim, to the best of my knowledge, is correct and complete and in conformance with the Civil Rights Act of 1964 as amended."

- "I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claim, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

- "For CHAMPUS purposes: This is to certify…the information submitted as part of this claim is true, accurate, and complete, and, the services shown on this form were medically indicated and necessary for the health of the patient."

46. The UB-04 Form contains the following notice in bold capital letters: "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/PR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

14

47.  The UB-04 Form requires the provider to certify the following:

- "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

- "For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws."

- "For TRICARE Purposes: The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically [sic] and appropriate for the health of the patient."

**False Certifications in the Annual Cost Reports**

48.  As a prerequisite to Medicare payments, the Medicare Program requires hospitals to annually submit form CMS-2552 (formerly called an HCFA-2552), more commonly known as the Hospital Cost Report.  Hospital Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services provided to Medicare beneficiaries.

49.  After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider claims it is due for the year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* C.F.R. § 405.1801(b)(1).  The Medicare Program relies upon the Hospital Cost

Report to determine whether the provider is entitled to more payments than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.50 and 413.64(f)(i).

50. During the year, providers submit claims to their assigned fiscal intermediaries for reimbursement, based upon hospital utilization by Medicare beneficiaries. 42 C.F.R. §§ 413.1, 413.60, 413.64. Providers receive interim payments on these claims. Within a specified time after the end of their fiscal years, hospitals must submit their cost reports to their fiscal intermediary so that the intermediary can make a year-end adjustment to the interim payments, as needed. 42 C.F.R. § 413.20(b). Cost reports are the final claim that a provider submits to its intermediary for items and services provided to Medicare beneficiaries.

51. Cost Reports contain important detailed financial and statistical data and form the basis for the Medicare Program's determination whether the provider is entitled to more reimbursement than already paid, or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

52. The Medicare Program determines payments for inpatient hospital services based on the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s or UB-04s) during the course of the fiscal year. On the Hospital Cost Report, the Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total determines the Medicare Program's liability for services provided to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made by the Medicare Program to the provider during the year are subtracted to determine the amount due to the Medicare

Program or the amount due to the hospital.

53. Every Hospital Cost Report contains a "Certification" which must be signed by the chief administrator of the provider or a responsible designee of the administrator. For each of the years in question, the responsible officer or employee of each hospital Defendant was required to certify the following on the annual Cost Report:

    i.  To the best of my knowledge and belief, it (the Hospital Cost Report) is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

    ii.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

54. The Hospital Cost Report also contains the following notice: "Misrepresentations or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law."

55. A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary.  42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater

> amount or quantity than is due or when no such benefit or payment
> is authorized . . . shall in the case of such a  . . . concealment or
> failure  . . . be guilty of a felony.

56. If a hospital wishes to contest charges which are non-covered under the Medicare Program, Medicare rules require such hospital to calculate the reimbursement impact (or "settlement" impact) of such non-covered charges separately on its annual Cost Reports and individually disclose such amounts on line 30 of worksheet E, Part A (inpatient) and Line 36 of E, Part B (outpatient) in accordance with CMS Pub. 15-II, section 115.2.

57. "Non-covered" charges should not be included with "covered" charges in the Cost Report. There are multiple worksheets and columns on the Cost Report where inpatient and outpatient "covered" charges are required to be listed.

58. Despite the coverage exclusions established in the National Coverage Determination, the respective Defendants included non-covered charges for the ICD procedures at issue intermingled with covered charges on multiple Cost Report pages, thereby distorting various Cost Report calculations and settlements.

59. The Medicare Program depends upon the truthfulness and accuracy of providers in submitting claims and completing their cost reports. This fact is well known to providers participating in the Medicare Program.

60. Cost reports are generally due to be filed and were filed within 5 months after the end of each fiscal year. This deadline may be extended upon request. Therefore, the respective Defendants' cost reports for fiscal year 2002 would have been filed in late 2002 or early 2003.  The respective Defendants' cost reports for fiscal year 2003 would not have been filed until late 2003 or early 2004. The same is true for each

subsequent fiscal year.

61. CMS issues a Notice of Provider Reimbursement based on the financial data submitted in the cost reports by each hospital for each fiscal year. In accordance with 42 C.F.R. § 415.1885, a cost report may be reopened within three (3) years of the Notice of Program Reimbursement (NPR) date. The federal regulations establish that the cost report may be reopened due to false claims or if the provider has provided inaccurate cost report data. Thus, even after the submission of their cost reports each year to CMS, the respective Defendants had ongoing duties and opportunities to request the reopening of their previous cost reports which contained false information submitted to Federal Healthcare Programs.

62. The Defendants' inclusion of charges for the ICD procedures at issue as "covered charges" and their failure to disclose the non-covered ICD procedures on the UB-92 and UB-04 Forms and in their Cost Reports submitted to CMS were factually false.

63. The United States would not have paid the claims filed by the Defendants if the respective Defendants had disclosed the fact that the ICD procedures at issue were not covered under Medicare's National Coverage Determinations.


**Introduction to Leatrice Ford's Experience, Knowledge, and Investigation as an Industry Insider**

64. Leatrice Ford is a registered nurse and a certified coding specialist. She has worked in the cardiovascular field since 1976 as both a clinician and as a consultant.

65. As a nurse clinician, Ms. Ford has extensive experience with the clinical course and treatment of cardiac diseases. She has worked as a nurse in the coronary care unit at

three different hospitals. She assisted with the startup and served as the clinical coordinator of a new cardiac surgery program in Owensboro, KY.

66. In 1992, Ms. Ford began consulting with hospitals. She worked for three national health data consulting companies before forming her own company, ConsultCare Partners, LLC, which is a healthcare consulting company offering cardiovascular program analyses, Medicare compliance evaluations, and strategies to improve documentation, coding, and billing processes.

67. In 2004 she received the highest coding certification from the American Health Information Management Association as a certified coding specialist.

68. Since 1992 she has consulted with over 100 hospitals to reduce costs, improve quality, and ensure documentation to support Medicare coding and billing compliance. She frequently reviews hospital billing records and medical charts to confirm that the services billed are accounted for in the patient record and in compliance with Medicare rules.

69. Ms. Ford's consulting engagements have included:

- Conducting regular quality reviews for hospitals to confirm certain patient care is delivered appropriately and to ensure that complications are kept to a minimum. Ms. Ford's focus is cardiac surgery and interventional cardiology cases.
- Making recommendations for improvement when patient care is compromised.
- Reviewing records for appropriate documentation to support medical necessity of cardiac procedures under Medicare rules and regulations, including coronary stenting, coronary bypass surgery, permanent pacemaker insertion and implantation of automatic implantable cardioverter defibrillators.
- Comparing billing and coding with the patient medical chart to ensure accuracy and Medicare compliance.
- Educating physicians on the proper documentation of medical necessity when appropriate.

70. For the last eight years, Ms. Ford's consulting work with hospitals has focused on the appropriate use and billing of coronary stents, pacemakers, and automatic implantable cardioverter-defibrillators. As part of her consulting work with hospitals, Ms. Ford has regularly reviewed medical charts of Medicare patients receiving ICDs. During the past eight years, she has reviewed hundreds of medical charts of Medicare patients who received an ICD.

71. While reviewing such medical charts over multiple years, Ms. Ford found disconcerting and persistent patterns of Medicare patients receiving ICDs under clinical conditions excluded from Medicare coverage. Ms. Ford learned from reviewing specific patient records and hospital billing records that ICDs were being implanted and billed to the Medicare Program as covered charges at certain facilities in contravention of the National Coverage Determinations discussed above.

72. In every medical chart reviewed by Ms. Ford which evidenced an ICD device placed and billed to the Medicare Program, Ms. Ford also saw evidence that a sales representative employed by one of the three major device manufacturers participated and assisted the surgeon in the procedure. With respect to each chart reviewed by Ms. Ford, the physician implanted the ICD at issue with the assistance of a sales representative employed by the respective device manufacturer.

73. Ms. Ford's concern for patient safety, her training and understanding of the scientific bases supporting the National Coverage Determination, and her focus on Medicare compliance led her to continue investigating the issue. Because of her expertise in claims coding, she knew how specific clinical diagnoses and procedures should be coded and billed to Medicare and other payers. Combining her knowledge gained

reviewing patient medical records and her knowledge of coding and Medicare coverage conditions, she determined that she could identify ICD procedures excluded from Medicare coverage via a methodical review of the diagnostic and procedure codes submitted by hospitals to MedPAR.

74. To report a particular medical condition or medical procedure, CMS has implemented a system of numerical codes. Such numerical codes submitted by hospitals are used by CMS to determine payments to hospitals for services to Medicare patients. There are thousands of diagnostic and procedure codes used within the Medicare Program and these codes submitted by hospitals for payment are highly specific to patient conditions and procedures.

75. MedPAR contains numerical codes from Medicare inpatient admissions in the United States. Each patient admission contains up to nine diagnostic codes, up to six procedure codes, claim costs and charges, the DRG, the length of stay, and multiple other admission-specific parameters.

76. The millions of procedure and diagnostic codes within MedPAR are not available or disclosed to the general public. Rather CMS has established restrictions on access to MedPAR's detailed codes for each patient admission and Ms. Ford had access to such codes under a specific agreement with CMS.

77. CMS has authority to grant restricted and confidential access to the limited data set files of Medicare claims for research projects with the "potential to improve the quality of life for Medicare beneficiaries or improve the administration of the program, including payment related projects."

78. Under her Data Use Agreement with CMS, Ms. Ford "shall not use, disclose, release, show, sell, rent, lease, loan or otherwise grant access to the limited data set files specified in section 4 of this Agreement, except as expressly permitted by this Agreement or otherwise required by law." (Data Use Agreement, ¶ 7).

79. The Data Use Agreement contains multiple provisions requiring Ms. Ford to protect the confidentiality of the limited data set files.

> The User agrees to establish appropriate administrative, technical, and physical safeguards to protect the confidentiality of the limited data set file(s) and to prevent unauthorized use or access to it. The safeguards shall provide a level and scope of security that is not less than the level and scope of security established by the Office of Management and Budget (OMB) in OMB Circular No. A–130, Appendix III—Security of Federal Automated Information Systems http://www.whitehouse.gov/omb/circulars/a130/a130.html), which sets forth guidelines for security plans for automated information systems in Federal agencies. The User acknowledges that the use of unsecured telecommunications, including the Internet, to transmit individually identifiable or deducible information derived from the limited data set file(s) specified in section 4 is prohibited. Further, the User agrees that the limited data set file(s) must not be physically moved or electronically transmitted in any way from the site indicated in section 15 without prior written approval from CMS.

> (Data Use Agreement, ¶ 9)

> The User shall promptly report to CMS any use or disclosure of the information not provided for by this Data Use Agreement of which it becomes aware. CMS in its sole discretion may require the User to: (a) promptly investigate and respond to CMS concerns regarding any alleged disclosure; (b) promptly resolve any problems identified by the investigation; (c) submit a corrective action plan with steps designed to prevent any future unauthorized disclosures; and/or (d) require that all limited data set files be immediately returned...

> (Data Use Agreement, ¶ 11)

> The User acknowledges that penalties under §1106(a) of the Social Security Act [42 U.S.C. § 1306(a)], including possible imprisonment, may apply with

respect to any disclosure of information in the files(s) that is inconsistent with the terms of the Agreement....

(Data Use Agreement, ¶ 12)

By signing this Agreement, the User agrees to abide by all provisions set out in this Agreement for protection of the limited data set file(s) specified in section 4, and acknowledges having received notice of potential criminal, civil, and/or administrative penalties for violation of the terms of the Agreement.

(Data Use Agreement, ¶ 13)

80. Through months of work spanning multiple years, Ms. Ford has investigated how frequently hospitals have billed the Medicare Program for ICD procedures under clinical conditions that patients "must not have" for Medicare coverage under the National Coverage Determination.

81. Using 2002, 2003, 2004, 2005, 2006, 2007, 2008, and 2009 MEDPAR[3] files composed of approximately 12 million claims per fiscal year, Ms. Ford identified all patients who received a defibrillator system (generator and leads) using the ICD9 procedure codes 37.94, implantation or replacement of automatic cardioverter defibrillator, total system (AICD) or 00.51 implantation of cardiac resynchronization defibrillator, total system (RT-D).

82. Of those patients receiving ICD systems, Ms. Ford reviewed all of the nine diagnosis fields for the ICD9 diagnosis code 410.x1 (x can be any number 0-9) for acute myocardial infarction initial episode (indicating the first treatment of an acute MI).

---

[3] Relators will provide an updated list of false claims submitted to the Medicare Program for Fiscal Year 2010 as soon as the MedPAR claims files for such year are available to Ms. Ford.

83. To identify patients who had a coronary revascularization, Ms. Ford queried the same defibrillator patients and identified patient who also had one of the following ICD9 procedure codes.

00.66 Percutaneous coronary angioplasty (new in 2006)

36.01 Percutaneous coronary angioplasty (PCTA) single vessel without mention of thrombolytic agent (2005)

36.02 Single vessel PTCA with mention of thrombolytic agent (2005)

36.03 Open coronary angioplasty

36.05 Multiple vessel PTCA with or without mention of thrombolytic agent

36.06 Insertion of non drug eluting coronary artery stent

36.07 Insertion of drug eluting coronary artery stent

36.09 Other removal of coronary artery obstruction

36.1X (0-9) Bypass anastomosis for heart revascularization

36.2 Heart revascularization by arterial implant

36.3X Other heart revascularization

84. For fiscal years 2002-2009, Ms. Ford has systematically searched in excess of 96 million hospital admissions of Medicare patients for specific diagnostic and procedure codes. She will perform the same analyses for fiscal year 2010. After identifying patient admissions in which a Medicare patient received an ICD in the same admission as being diagnosed with an AMI initial episode or undergoing a revascularization procedure, Ms. Ford then studied all of the diagnostic and procedure codes submitted by the respective Defendants for each of these admissions. Her extensive analyses of all diagnosis and procedure codes for each admission lead her to identify and organize the false claims into four major groups discussed below.

85. After identifying claims for ICD procedures that the Defendants billed to Medicare despite such procedures being excluded from Medicare coverage under the National Coverage Determinations discussed above, Ms. Ford provided this information to her colleague and Co-Relator, Mr. Tom Schuhmann, who has assisted her in her investigation.

86. Mr. Schuhmann then determined the correct Medicare reimbursement amounts if properly billed. Mr. Schuhmann calculated the differences between the correct reimbursement amounts and the actual reimbursement amounts paid to each of the respective Defendants for each false claim representing an ICD placement procedure excluded from Medicare coverage in Fiscal Years 2002, 2003, 2004, 2005, 2006, 2007, 2008, and 2009. Mr. Schuhmann designed and implemented computer programs to perform these extensive calculations which are described in more detail in his confidential Disclosures to the Department of Justice.

87. Based on the extensive investigation conducted by Ms. Ford, Relators prepared the Charts attached to the First Amended Complaint as Exhibits 1, 2, 3, 4, and 5 for Fiscal Years 2002-2006, the subsequent charts filed with the Court's permission as Exhibit 6 and 7 for Fiscal Years 2007 and 2008, and the charts listing false claims for ICD procedures in Fiscal Years 2009 and 2010 to be filed as Exhibits 8 and 9. The filed charts list each false claim in Fiscal Years 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010 by MedPAR identification number in numerical order. Each of these false claims represents an ICD procedure which was billed to and paid by the Medicare Program despite the fact that the ICD procedure was excluded from Medicare coverage under the National Coverage Determinations. All Exhibits 1

through 9 and the information provided in each Exhibit 1-9 with respect to each false claim are hereby incorporated into this Second Amended Complaint.

88.     With respect to each false claim for each Fiscal Year 2002-2009 and each false claim within each of the four major groups discussed below, Ms. Ford has provided the Department of Justice with the patient reference number, the hospital provider number, the billed DRG, the corrected DRG (except for 2008), the covered days for the hospitalization, the covered charges, the fiscal intermediary number, the amount billed by the hospital to Medicare, the amount that should have been billed by each hospital if the hospital had complied with the National Coverage Determination excluding the ICD procedures from coverage, and the minimum amount that the hospital was overpaid by Medicare for each false claim.

89.  At the time of service of this Second Amended Complaint with respect to a particular Defendant, Relators will provide similar lists of the false claims at issue submitted by such Defendant to be served with the Second Amended Complaint on that Defendant.

### The Four Groups of False Claims Identified by Ms. Ford Which Represent ICD Procedures Excluded from Medicare Coverage

90.  As mentioned above, Ms. Ford has performed extensive analyses of all diagnostic and procedure codes as reported by each hospital for each admission involving an ICD procedure performed in the same admission as the patient was diagnosed with AMI initial episode (indicating the first treatment of an AMI) or underwent a revascularization procedure or both.  In submitting diagnostic and procedure codes to the Medicare Program for each hospital admission of a Medicare patient, the

respective Defendants certified the accuracy and truthfulness of such information. Accurate coding by hospitals is critical to the Medicare Program. Such codes are used by the Medicare Program to determine the amounts of payments to the hospital for each admission of a Medicare patient.

### Group One of False Claims

91. The first group represents ICD devices placed in patients in whom the respective hospital Defendants did not find and code ventricular tachycardia, ventricular fibrillation, or cardiac arrest.  In each case an ICD device was implanted in the same short hospital admission as each patient was diagnosed with acute myocardial infarction initial episode (indicating the first treatment of an acute MI) or underwent a revascularization procedure or both.

92. According to the diagnostic and procedure codes reported by the respective Defendants to CMS, only 1.4 percent of the patients within Group One underwent counter shock or electrical cardioversion. This fact provides further evidence that the patients undergoing ICD procedures within Group One did not experience sustained ventricular tachycardia or ventricular fibrillation or cardiac arrest. The routine response to sustained ventricular tachycardia or ventricular fibrillation which presents hemodynamic compromise to a patient is electrical cardioversion or shock treatment. That did not happen in nearly 99 percent of these patients within Group One.

93. Furthermore, only 1 percent of these patients within Group One underwent an EP mapping study according to the procedures reported by the respective Defendants to CMS. According to the American College of Cardiology and American Heart

Association Guidelines for Clinical Intracardiac Electrophysiological and Catheter Ablation Procedures, an EP study is indicated in "patients with sustained VT."[4] The absence of an EP mapping study being performed in 99 percent of these patients further supports the conclusion that the patients did not experience sustained ventricular tachycardia.

94. Without finding sustained ventricular tachycardia, ventricular fibrillation or cardiac arrest, there is no possible coverage for an ICD under Indication Number 1 or Indication Number 2 of the National Coverage Determination as established in 1999, 2003, and 2005.

95. From the 2005 National Coverage Determination, only Indications 3-9 could provide potential Medicare coverage. Yet with respect to every Indication 3-9 of the 2005 National Coverage Determination, patients "**must not**" have (1) "a CABG or PTCA within the past 3 months," (2) "an acute MI in the past 40 days," or (3) "clinical symptoms or findings that would make them a candidate for coronary revascularization."

96. With respect to this Group One, in each false claim, the respective Defendants reported that the patients suffered an acute myocardial infarction initial episode (indicating the first treatment of an acute MI) and/or underwent a cardiac revascularization procedure in the same hospital admission with an average length of

---

[4] Zipes DP, DiMarco JP, Gillette PC, Jackman VM, Myerburg RJ, Rahimtoola SH, Ritchie JL, Cheitlin MD, Garson A Jr, Gibbons RJ, et al. Guidelines for Clinical Intracardiac Electrophysiolgical and Catheter Ablation Procedures. A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Clinical Intracardiac Electrophysiologic and Catheter Ablation Procedures), developed in collaboration with the North American Society of Pacing and Electrophysiology, *J. Am. Coll. Cardiol.* 1995 Aug. 26(2): 555-73.

stay within this Group of 11.27 days. Under the 1999, 2003, and 2005 National Coverage Determinations, CMS has excluded coverage for ICD procedures under these conditions.

97. These claims for ICD procedures could not be covered under Indication Number 1 or Indication Number 2 because the Hospital Defendants did not find and code ventricular fibrillation, ventricular tachycardia, or cardiac arrest. And these claims for ICD procedures could not be covered under Indication Numbers 3-9 of the 2005 National Coverage Determination because the NCD establishes that patients must not have (1) "a CABG or PTCA within the past 3 months," (2) "an acute MI within the past 40 days," or (3) "clinical symptoms or findings that would make them a candidate for coronary revascularization." Such ICD procedures likewise are not covered by Medicare under the more restrictive 1999 and 2003 National Coverage Determinations.

**Introduction to the Scientific Bases for the National Coverage Determination's Exclusions from Coverage Applicable to Group One**

98. The National Coverage Determination's exclusion of coverage for ICD procedures within 40 days of an acute myocardial infarction is based on numerous scientific studies which have demonstrated that such procedures in the days and weeks following an acute myocardial infarction are not beneficial and are potentially harmful to the heart as it heals after an AMI. Such harm includes worsening heart failure. The 2005 Decision Memorandum published by CMS concerning ICD coverage confirms, "As demonstrated in DINAMIT, implantation of an ICD within 40 days of an acute myocardial infarction has not been shown to reduce mortality." "Based on the data from DINAMIT, an ICD should not be implanted within 40 days

of an AMI." "ICDs have not been shown to improve health outcomes when implanted in patients within 40 days of an AMI and may, in some instances, be harmful in these patients." "Therefore, we have decided to not cover ICD implantation within 40 days of an AMI." (Decision Memorandum for Implantable Defibrillators CAG-00157R3 dated January 27, 2005 at p. 17).

99. In the study cited by CMS, the DINAMIT[5] investigators from 73 surgical sites in 12 countries concluded, "In this randomized trial of high-risk patients who had recently had a myocardial infarction, overall survival was not improved by prophylactic implantation of an ICD." The DINAMIT investigators also noted that a "recent analysis of the MADIT II trial, which also enrolled patients with a previous myocardial infarction, supports the main finding of DINAMIT---that patients who have recently had an infarction do not benefit from ICD." *Id.* at 2486-2487 (citing Wilber DJ, Zareba W, Hall WJ, et al, *Time Dependence of Mortality Risk and Defibrillator Benefit After Myocardial Infarction,* Circulation 2004; 109: 1082-4).

100.  In published 2004 Guidelines for the Management of Patients with ST-Elevation Myocardial Infarction (STEMI), the American College of Cardiology and American

---

[5] This clinical trial was called the Defibrillator in Acute Myocardial Infarction Trial ("DINAMIT"), a randomized open-label comparison of ICD therapy in 332 patients and no ICD therapy in 342 patients 6 to 40 days after a myocardial infarction. The DINAMIT trial was approved by the institutional review boards of 73 participating investigational sites in 12 countries. The study commenced in April 1998 and follow-up ended in September 2003. Hohnloser S, Kuck K, Dorian P, et al., "Prophylactic Use of an Implantable Cardioverter-Defibrillator After Acute Myocardial Infarction," *N. Eng. J. Med.* 2004; 351: 2481-8

Heart Association Task Force stated, "Thus, ejection fraction should be measured at least 1 month after STEMI before a decision regarding ICD placement is made." [6]

101.   The 2006 Guidelines published by the American College of Cardiology and American Heart Association confirmed again, "ICD implantation should be deferred until at least 40 d [days] after AMI in patients meeting the above criteria in order to allow time for ventricular function and because ICD therapy has not been demonstrated to improve survival when implanted within 40 days after myocardial infarction."[7]

102.   The IRIS Study published in 2009 further confirms the consensus of studies finding that ICD implantation in the weeks after acute myocardial infarction is not beneficial to patients.[8] Investigators from 92 medical centers or universities participated in this study. The study spanned three years and seven European countries. This "randomized, prospective, open-label, investigator-initiated multicenter trial" tested the "hypothesis that early implantation of an ICD, as compared with optimal medical therapy, would improve survival among patients with acute myocardial infarction and predefined markers of elevated risk." p. 1428.

---

[6] ACC/AHA Guidelines for the Management of Patients With ST-Elevation Myocardial Infarction: A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee to Revise the 1999 Guidelines for the Management of Patients With Acute Myocardial Infarction). *Circulation* 2004; 110: e82-e293, p. e194.

[7] *See* ACC/AHA/ESC 2006 Guidelines for Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death: A Report of the American College of Cardiology/ American Heart Association and the European Society of Cardiology Committee for Practice Guidelines, *J. Am. Coll. Cardiol.* 2006; 48; e247-e346, p. e283.

[8] Steinbeck G, Anresen D, Seidl K, Brachmann J, Hoffmann E, Wojciechowski, Kornacewicz-Jach Z, et al., *Defibrillator Implantation Early After Myocardial Infarction,* 361 New England Journal of Medicine, 1427-1436 (October 9, 2009).

The IRIS investigators from 92 medical centers spanning seven countries concluded "ICD implantation did not convey a prognostic advantage in our study." p. 1433. "In conclusion, we found no evidence that implantation of an ICD improved survival in patients with acute myocardial infarction who received optimal medical therapy and underwent risk stratification based on elevated heart rate on admission, low LVEF, and rapid, non-sustained ventricular tachycardia." p. 1435.

103.   In addition to stating that patients receiving an ICD "must not have an acute MI within 40 days," the National Coverage Determination excludes coverage for patients who have "had a coronary artery bypass graft (CABG) or percutaneous transluminal coronary angioplasty (PTCA) within the past 3 months." This specific exclusion from Medicare coverage is based on numerous scientific studies.

104.   The CABG Patch Trial Investigators from 35 medical centers across the United States conducted a controlled trial to determine if "the prophylactic implantation of a cardiac defibrillator at the time of bypass surgery would further improve long-term survival in patients at high risk for sudden death who were identified on the basis of either left ventricular ejection fraction below 0.36 and abnormalities on a signal-averaged electrocardiogram."[9] "Survival was not improved by the prophylactic implantation of a defibrillator at the time of elective coronary bypass surgery in patients at high risk for death from ventricular arrhythmia." *Id*. at 1572. During an average follow-up of 32 months, "there were 101 deaths in the defibrillator group

---

[9] Bigger T, "Prophylactic Use of Implanted Cardiac Defibrillators in Patients at High Risk for Ventricular Arrhythmias After Coronary Artery Bypass Graft Surgery," *N. Engl. J. Med.*, 1997; 337:1569-75, p. 1570.

(71 from cardiac causes) and 95 in the control group (72 from cardiac causes)."

*Id.* at 1571.

105. The 2006 Guidelines from the American College of Cardiology and American Heart Association confirm, "Evaluation of the need for an ICD and implantation should be deferred until at least 3 months after revascularization procedures (i.e., surgical bypass grafting or percutaneous angioplasty) to allow adequate time for recovery of ventricular function following revascularization."[10] "If obstructive CHD [coronary heart disease] is complicated by ventricular arrhythmias, especially in patients with left main and proximal left anterior descending coronary artery disease, there is a reasonable likelihood that revascularization will reduce the frequency and complexity of the arrhythmias and, in some patients, will eliminate such arrhythmias."   J. Am. Coll. Cardiol. 2006; 48; at e273. "[R]evascularization will reduce the frequency and complexity of the arrhythmias and, in some patients, will eliminate such arrhythmias."   *Id.*   "Surgical or percutaneous coronary revascularization with improved coronary blood flow and reduction in myocardial ischemia has favorable antiarrhythmic effects." *Id.* at e272.

106. The MADIT-II investigators also found "the benefit of ICD therapy is time dependent."[11] "No survival benefit with ICD therapy was shown among patients in

---

[10] ACC/AHA/ESC 2006 Guidelines for Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death---Executive Summary: A Report of the American College of Cardiology/ American Heart Association and the European Society of Cardiology Committee for Practice Guidelines, J. Am. Coll. Cardiol. 2006; 48; e247-e346, e273.

[11] On May 2, 2006, the MADIT-II investigators published their evaluation of the effect of elapsed time from coronary revascularization on the benefit of implantable cardioverter defibrillators and the risk of sudden death. Goldenburg I,  Moss A, McNitt S, Zareba W, Hall J, Andrews M, Wilber D, Klein H, *Time Dependence of Defibrillator Benefit After Coronary*

whom the device was implanted during the early post-CR [cardiac revascularization] period [less than 6 months]." *Id.* at p.1813. The benefit of ICDs is "time dependent, and in the current analysis of the MADIT-II study, improved survival was apparent when the ICD was implanted more than six months after CR." *Id.* at p.1817. "Our findings are consistent with those of the CABG-Patch trial, in which no evidence of improved survival was shown among patients…in whom an ICD was implanted prophylactically at the time of CABG." *Id.* (Emphasis added).

107. The MADIT-II investigators further noted "patients were excluded from enrollment in the MADIT-II study if their most recent CR procedure was performed within three months before enrollment." *Id.* at 1816. "Therefore the current results do not include sufficient data on the immediate post-CR period in which an even lower risk of SCD may exist, corresponding to a further reduction in ICD benefit during this time period." *Id.* [12]

108. Despite the absolute language of the National Coverage Determinations and the extensive scientific studies supporting such National Coverage Determinations, the respective Defendants have billed Medicare for ICD procedures performed on Medicare patients without a finding of sustained ventricular tachycardia, cardiac arrest, or ventricular fibrillation and in the same short hospital admissions as such

---

*Revascularization in the Multicenter Automatic Defibrillator Implantation Trial (MADIT-II)*, J. Am. Coll. Cardiol., Vol. 47, No. 9, May 2, 2006: 1811-7.

[12] In the Medicare Coverage Advisory Committee Meeting in 2002, the American College of Cardiology stated, "We support the ICD therapy for MADIT-II indications in this particular subject population." "We recommend strict adherence to the MADIT-II inclusion and exclusion criteria." *See* CMS Decision Memorandum June 6, 2003, p. 21.

patients experienced an acute myocardial infarction initial episode and/or underwent coronary revascularization. [13]

### Group Two of False Claims

109.   The Second Group of false claims represents cases in which the respective Defendants have reported patient findings of ventricular tachycardia without ventricular fibrillation or cardiac arrest in the same relatively short hospital admission as such patients being diagnosed with acute myocardial infarction initial episode and receiving an ICD device.

110.   These claims within Group Two are not covered under Indication Number 1 of the 1999, 2003 or 2005 National Coverage Determination because there was no reported finding of ventricular fibrillation or cardiac arrest. These claims could not be covered under Indications 3-9 of the 2005 National Coverage Determination because the respective Defendants reported the patients were diagnosed with an acute myocardial infarction initial episode and/or underwent a revascularization procedure in the same short hospital admission in which the patient received an ICD.

---

[13]Moreover, the MedPAR diagnostic and procedure codes provided to Ms. Ford by CMS under the Data Use Agreement is limited to single admission hospitalizations. Additionally, prior to 2008, MedPAR did not include Medicare managed care claims. Further false claims arising from the same violations of the National Coverage Determination by the respective Defendants can be identified through systematic review of claims for ICD procedures submitted by the respective Defendants using the same analyses described by Ms. Ford and evaluating time periods longer than single admission hospitalizations. For example, the National Coverage Determination precludes coverage for ICD procedures within 40 days of an acute myocardial infarction under Indications 3-9 of the 2005 National Coverage Determination. Evaluation of claims for ICD procedures within the 40 day time period after an acute myocardial infarction or the 90 day period after revascularization will also reveal further false claims arising from identical violations of the National Coverage Determination addressed by Relators in this action. Evaluation of Medicare managed claims will also reveal further false claims arising from the identical violations of the National Coverage Determination detected by Relators in this action.

111.   Ms. Ford has evaluated these claims under Indication Number 2 of the 1999, 2003, and 2005 National Coverage Determination which states, "Documented sustained ventricular tachyarrhythmia (VT), either spontaneous or induced by an electrophysiology (EP) study, not associated with an acute myocardial infarction (MI) and not due to a transient or reversible cause."

112.   Within the MedPAR system, the numeric code for ventricular tachycardia is not specific to sustained or non-sustained ventricular tachycardia. As discussed below, the clinical codes reported by the respective Defendants indicate that most of these patients within Group Two experienced non-sustained ventricular tachycardia which would not trigger potential coverage of the ICD procedure under Indication Number 2 of the National Coverage Determination.

113.   Under the 1999, 2003, and 2005 National Coverage Determinations, the presence of ventricular tachycardia (VT) potentially supports Medicare coverage of an ICD only under the following conditions which all must be present: (1) the VT must be "documented" and "sustained" (2) the sustained VT must not be "associated with acute myocardial infarction," and (3) the sustained VT must not be "due to a transient or reversible cause."

114.   The language "not associated with an acute myocardial infarction" dates back to the 1999 National Coverage Determination. In the 2003 Decision Memorandum from the Centers for Medicaid and Medicare Services (CMS), CMS stated, "There are a number of potential causes of ventricular tachyarrhythmias, including acute myocardial infarction…" CMS Decision Memorandum dated June 6, 2003, p. 2. In the 2003 Decision Memorandum, CMS quoted a published medical review article

which stated, "Defibrillators should not be implanted in response to ventricular arrhythmias that have been triggered by myocardial infarction."

115. The 2002 Guidelines of the American College of Cardiology and the American Heart Association state, "ICD therapy is not recommended for patients in whom a reversible triggering factor for VT/VF can be definitely identified, such as ventricular tachyarrhythmias in evolving AMI or electrolyte abnormalities." (p. 31).

116. The reasons for this exclusion from Medicare coverage are well-established: acute myocardial infarction commonly triggers transient and reversible ventricular tachycardia.

117. According to the diagnostic and procedure codes reported by the respective Defendants to CMS, less than six percent of these patients within Group Two underwent counter shock or electrical cardioversion. This fact suggests that the reported ventricular tachycardia in a substantial number of cases was not sustained. The routine response to sustained ventricular tachycardia which presents hemodynamic compromise to a patient is electrical cardioversion or shock treatment. That did not happen in 94.2 percent of these patients within Group Two who had reported ventricular tachycardia, indicating that the VT at issue in these patients was not sustained VT. This fact is important because under Indication Number Two of the 1999, 2003 and 2005 National Coverage Determinations, the ventricular tachycardia must be "sustained."

118. Secondly, even if some of these patients did experience sustained ventricular tachycardia, in each of these claims in which the respective hospital Defendants reported a finding of ventricular tachycardia, the hospital also reported a diagnosis of

acute myocardial infarction initial episode in the same hospital admission with an average length of stay within Group Two of 10.96 days.

119.   Furthermore, only 1 percent of these patients underwent an EP mapping study according to the procedures reported by Defendants to CMS. According to the American College of Cardiology and American Heart Association Guidelines for Clinical Intracardiac Electrophysiological and Catheter Ablation Procedures, an EP study is indicated in "patients with sustained VT."[14] The absence of an EP mapping study being performed in the vast majority of these patients supports the conclusion that the patient did not experience sustained ventricular tachycardia.

120.   There are additional EP studies reported within Group 2, however, the respective Defendants did not report these EP studies as diagnostic mapping studies. Prior to 2007, hospitals sometimes reported and coded an EP study as part of the intra-operative testing of an ICD device. Such EP studies do not represent diagnostic mapping studies used to determine the cause and treatment of ventricular tachycardia or whether a patient should receive an ICD. In 2007, CMS established a separate code to report catheter based invasive EP studies separate from the actual implantation and testing of an ICD.  The 2007, 2008, and 2009 MedPAR procedure codes confirm that such catheter based invasive EP studies were reportedly performed on only 8.2 percent of the Group Two admissions at issue in such years.

---

[14] Zipes DP, DiMarco JP, Gillette PC, Jackman VM, Myerburg RJ, Rahimtoola SH, Ritchie JL, Cheitlin MD, Garson A Jr, Gibbons RJ, et al. Guidelines for Clinical Intracardiac Electrophysiolgical and Catheter Ablation Procedures. A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Clinical Intracardiac Electrophysiologic and Catheter Ablation Procedures), developed in collaboration with the North American Society of Pacing and Electrophysiology, *J.  Am. Coll. Cardiol.* 1995 Aug. 26(2): 555-73.

121.   Indication Number Two of the National Coverage Determination states that the patient must have documented sustained ventricular tachycardia "not associated with acute myocardial infarction." These patients within Group Two had diagnosed acute myocardial infarction initial episode in the same hospital admission with an average length of stay within Group Two of 10.96 days. For the reasons identified above, such claims for ICD procedures are not covered under Indication Number 2 of the 1999, 2003, and 2005 National Coverage Determination. Such claims for ICD procedures also do not satisfy the conditions for coverage under any of the other 8 Indications established in the 2005 National Coverage Determination.

122.   Nor do such claims for ICD procedures in prior time periods satisfy the more restrictive conditions of coverage established in the 1999 or 2003 National Coverage Determinations.

123.   In 43 percent of the patients within Group Two, the patient underwent a revascularization procedure. These patients in this revascularization subgroup were diagnosed with the leading common transient or reversible cause of ventricular tachycardia (acute myocardial infarction initial episode) and underwent a surgical procedure which potentially reverses their ischemic causes of VT, yet they still received an ICD in the same admission and such ICD was billed to the Medicare Program as a covered charge.

124.   91 percent of these patients undergoing revascularization with a diagnosis of an acute myocardial infarction initial episode had no prior myocardial infarction reported by the Defendants, providing further support for the efficacy of revascularization to reverse potentially the causes of the patient's tachycardia.

125.   Among these patients undergoing revascularization and diagnosed with acute myocardial infarction within Group Two, less than 8 percent of such patients had undergone a prior revascularization procedure according to the diagnoses codes reported by the respective Defendants. This fact also provides further support for the efficacy of revascularization to reverse potentially the causes of the patient's tachycardia.

126.   98 percent of these patients in this revascularization subgroup did **not** undergo counter shock treatment according to the procedure codes submitted by the respective Defendants to CMS.

127.   99.7 percent of these patients in this revascularization subgroup did not undergo a diagnostic EP mapping study according to the procedure codes reported by the respective Defendants to CMS.

128.   The National Coverage Determination Indication Number 2 states the ventricular tachycardia must be "sustained," must not be "associated with acute myocardial infarction," and must not be "due to any transient or reversible cause." Each of these patients within this revascularization subgroup of Group Two was diagnosed with AMI initial episode and each of these patients underwent a major revascularization procedure which is performed to reverse the ischemic cause of tachycardia.

**Group Three of False Claims**

129.   The Third Group of false claims are claims for ICD procedures in which the respective Defendants reported ventricular tachycardia without ventricular fibrillation or cardiac arrest, the patient was not diagnosed with acute myocardial infarction, and the patient underwent revascularization.

130.   As mentioned above, under Indication Number Two of the 1999, 2003, and 2005 National Coverage Determination, the presence of ventricular tachycardia triggers coverage for an ICD procedure only on the following conditions which all must be present: (1) the VT must be documented and sustained; (2) the sustained VT must not be "associated with acute myocardial infarction," and (3) the sustained VT must not be "due to a transient or reversible cause."

131.   The diagnostic and procedure codes submitted by the respective Defendants indicate that the vast majority of these patients within Group Three did not experience sustained VT. In 98 percent of these admissions, the respective Defendants did not report that the patient underwent counter shock or electrical cardioversion. This fact suggests that the reported ventricular tachycardia was not sustained VT which presented hemodynamic compromise to the patient. As mentioned above, the routine response to sustained ventricular tachycardia which presents hemodynamic compromise to a patient is electrical cardioversion or shock treatment.   That did not happen in 98 percent of the patients with reported ventricular tachycardia in Group Three, indicating that the ventricular tachycardia was not sustained VT which presented hemodynamic compromise to these patients. Under Indication Number Two of the 1999, 2003 and 2005 National Coverage Determination, the patient's ventricular tachycardia must be "sustained."

132.   Among the Group Three claims, each patient underwent a coronary revascularization procedure. These patients underwent a surgical procedure which potentially reverses ischemic causes of ventricular tachycardia, yet they still received an ICD in the same admission with an average length of stay among Group Three of

10.41 days and such procedures were billed to the Medicare Program as covered charges. Over 80 percent of these patients within Group Three undergoing revascularization had no prior myocardial infarction reported by the respective Defendants, providing further support for the efficacy of revascularization to reverse the causes of the patient's reported tachycardia.

133.   Only .5 percent of these patients within Group Three underwent an EP mapping study according to the procedures reported by the respective Defendants to CMS. According to the American College of Cardiology and American Heart Association Guidelines for Clinical Intra-cardiac Electrophysiological and Catheter Ablation Procedures, an EP study is indicated in "patients with sustained VT."[15]  The absence of any EP mapping study suggests that the ventricular tachycardia was not sustained.

134.   Even if some of such patients within Group 3 did experience sustained ventricular tachycardia, each of these patients underwent a major revascularization procedure which is performed to reverse the ischemic causes of tachycardia. The National Coverage Determination only permits coverage of an ICD device if the sustained ventricular tachycardia is not associated with AMI and not "due to any transient or reversible cause." Major revascularization procedures performed without any EP mapping study do not support such a conclusion which is essential for coverage under the National Coverage Determination.

---

[15] Zipes DP, DiMarco JP, Gillette PC, Jackman VM, Myerburg RJ, Rahimtoola SH, Ritchie JL, Cheitlin MD, Garson A Jr, Gibbons RJ, et al. Guidelines for Clinical Intracardiac Electrophysiolgical and Catheter Ablation Procedures. A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Clinical Intracardiac Electrophysiologic and Catheter Ablation Procedures), developed in collaboration with the North American Society of Pacing and Electrophysiology, *J. Am. Coll. Cardiol.* 1995 Aug. 26(2): 555-73.

### Group Four of False Claims

135.    Group Four consists of claims in which the respective Defendants reported cardiac arrest or ventricular fibrillation and the patient was diagnosed with acute myocardial infarction initial episode and/or underwent revascularization.

136.    Ms. Ford evaluated such claims under Indication Number 1 of the 1999, 2003, and 2005 National Coverage Determination which states, "Documented episode of cardiac arrest due to ventricular fibrillation (VF), not due to a transient or reversible cause."

137.    Major scientific studies which have addressed the efficacy of ICDs among patients who experienced ventricular fibrillation/cardiac arrest or sustained ventricular tachycardia have excluded patients who suffered an acute myocardial infarction within 72 hours of such arrest or fibrillation.

138.    In its 2003 Decision Memorandum addressing Medicare coverage for ICDs, CMS noted that in the CASH study which addressed the efficacy of ICDs among patients who survived cardiac arrest secondary to "sustained documented arrhythmias," "patients with cardiac arrest within 72 hours of acute myocardial infarction were among those excluded." *Id*. at p. 13.

139.    The reasons for this exclusion are well-established: acute myocardial infarction commonly triggers transient or reversible ventricular fibrillation or cardiac arrest.

140.    In 69 percent of the claims within Group Four the patient was diagnosed with acute myocardial infarction. Among these patients with acute myocardial infarction, 95 percent had no prior or old myocardial infarction according to the diagnostic codes reported by the respective Defendants to CMS.  Among the few patients with

a prior or old myocardial infarction, the respective Defendants reported and coded that in 63 percent of these patients, the "healed or old myocardial infarction" was "currently presenting no symptoms.

141.  In only 11 percent of these claims within Group Four in which the patient experienced acute myocardial infarction did the respective Defendants report that the patient underwent counter shock or electrical cardioversion. The routine response to cardiac arrest or ventricular fibrillation is electrical cardioversion or shock treatment.

142.  Among the claims within Group Four in which the patient was diagnosed with acute myocardial infarction, in only 20 percent of these claims did the respective Defendants report performing an EP study on the patient and many of such EP studies were likely performed as a part of intra-operative testing of ICD, not before implantation. In less than 2 percent of the EP studies reported within the patients diagnosed with acute myocardial infarction within Group Four did the Defendants report performing an EP mapping study. According to the American College of Cardiology and American Heart Association Guidelines for Clinical Intracardiac Electrophysiological and Catheter Ablation Procedures, if the cardiac arrest occurs "more than 48 hours after the acute phase of a myocardial infarction in the absence of a recurrent ischemic event," an EP study is indicated.[16] This recommendation issued by the American College of Cardiology and American Heart Association is

---

[16] Zipes DP, DiMarco JP, Gillette PC, Jackman VM, Myerburg RJ, Rahimtoola SH, Ritchie JL, Cheitlin MD, Garson A Jr, Gibbons RJ, et al. Guidelines for Clinical Intracardiac Electrophysiolgical and Catheter Ablation Procedures. A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Clinical Intracardiac Electrophysiologic and Catheter Ablation Procedures), developed in collaboration with the North American Society of Pacing and Electrophysiology, *J. Am. Coll. Cardiol.* 1995 Aug. 26(2): 555-73.

Class I which means "conditions for which there is general agreement that the electrophysiological study provides information that is useful and important for patient treatment." The absence of an EP study being performed in the vast majority of these patients supports the conclusion that the cardiac arrests were not remote in time to the patients' acute myocardial infarctions or disassociated with the patients' acute myocardial infarctions.

143.   Among the Group Four claims, 34 percent of these patients were diagnosed with acute myocardial infarction and underwent revascularization procedures with no reported finding of a prior or old myocardial infarction. These patients were diagnosed with the leading common transient or reversible cause of ventricular fibrillation or cardiac arrest (acute myocardial infarction) and underwent a surgical procedure which potentially reverses their ischemic causes of fibrillation, yet they still received an ICD in the same admission. These patients within Group Four undergoing revascularization and diagnosed with acute myocardial infarction had no prior or old myocardial infarction reported by the Hospital Defendants, providing further support for the efficacy of revascularization to reverse potentially the causes of the patient's ventricular fibrillation or cardiac arrest.  Less than 4 percent of such patients had undergone a prior revascularization procedure according to specific codes submitted by the respective Defendants.

144.   The claims representing patients diagnosed with AMI initial episode and undergoing revascularization within Group Four are not covered under Indication One of the National Coverage Determination. 94 percent of these patients did not undergo electrical cardioversion or counter shock as reported by the respective

Defendants, calling into question whether they experienced cardiac arrest or ventricular fibrillation. All of these patients were diagnosed with the leading transient and reversible cause of ventricular fibrillation or cardiac arrest and underwent a revascularization procedure which potentially reverses such ischemic causes of ventricular fibrillation. The National Coverage Determination Indication One only provides coverage for an ICD device if the patient experiences a "[d]ocumented episode of cardiac arrest due to ventricular fibrillation (VF), not due to a transient or reversible cause."

145.   Among the Group Four claims, another subgroup of these claims was diagnosed with acute myocardial infarction and did not undergo revascularization. According to the respective Defendants' coding reported to CMS, 95 percent of these patients had no prior or old MI.  99 percent of these patients did not undergo an EP mapping study.  82 percent of these patients did not receive counter shock or electrical cardioversion treatment.  These patients were diagnosed with the leading common transient or reversible cause of ventricular fibrillation or cardiac arrest (acute myocardial infarction), yet they still received an ICD in the same relatively short hospital admission and such procedures were billed to the Medicare Program as covered charges.

146.   Among the Group Four claims, another subgroup of patients underwent revascularization procedures with no reported finding of acute myocardial infarction. 89 percent of these patients had no reported prior or old myocardial infarction. 92 percent of these patients had not undergone a prior revascularization procedure according to the clinical codes reported by the respective Defendants. 99.7 percent of

these patients did not undergo an EP mapping study according to the Defendant Hospitals' reported codes to CMS. 94 percent of these patients did not receive electrical cardioversion or counter shock treatment. These patients underwent a surgical procedure which potentially reverses ischemic causes of fibrillation, yet they still received an ICD in the same hospital admission and such ICD was billed to the Medicare Program as a covered charge.

**The Respective Defendants Have Evidence of False Claims in Their Possession**

147.   When the Second Amended Complaint is served on a particular Defendant, Relators will provide a detailed separate list of the false claims submitted by that Defendant to the Medicare Program for ICD procedures excluded from Medicare coverage.  Such list will contain the same detailed information for each claim as identified in the Exhibits 1-9 to the Second Amended Complaint for fiscal years 2002-2010 but will be limited to the false claims at issue submitted by that Defendant.

148.   Given the large number of procedures involved, it would be unwieldy and would serve no useful purpose for each of the claims to be discussed individually in this Second Amended Complaint. To detail each ICD procedure would unreasonably increase the length of the Second Amended Complaint. Relators incorporate Exhibits 1 through 9 which are on file under seal with the Court and which provide detailed information concerning each false claim for each of the years 2002-2010.

149.   With respect to violations of the National Coverage Determinations governing ICD procedures, the respective Defendants have evidence in their possession. They

have records of the UB-92 and UB-04 claim forms for interim payments submitted to the Medicare Program and the diagnostic and procedure codes surrounding each ICD procedure and submitted for each hospital admission for each Medicare patient. They have records of payments from the Medicare Program corresponding to the UB-92 and UB-04 claim forms. They have copies of their annual cost reports submitted to CMS. They further have the medical charts which should be consistent with the diagnostic and procedure codes certified as accurate and submitted to the Medicare Program for each admission in which a Medicare patient received an ICD.

### Additional Damages to the Medicare Trust Fund

150.   Potential complications from such ICD devices are significant and represent increased damages to the Medicare Program. The American College of Cardiology and American Heart Association have recognized: "Problems associated with ICD therapy include inappropriate shock discharge, mostly for AF with rapid ventricular response, defibrillator storm with appropriate recurrent discharge for recurrent ventricular tachyarrhythmais or inappropriate discharge for a multiplicity of reasons, infections related to device implantation, and exacerbation of [heart failure] when a high percentage of the heartbeats are paced from the RV apex, especially when ventricular function is already compromised." [17]

---

[17] Epstein AD, DiMarco JP, Ellenbogen KA, Estes NAM III, Freedman RA, Gettes LS, Gillinov AM, Gregaoratos G, Hammitl SC, Hayes Dl, Hlatky MA, Newby LK Page RL, Schoenfiel MH, Silka MJ, Stevenson LW, Sweeney MO, ACC/AHA/HRS 2008 Guidelines for Device-Based Therapy of Cardiac Rhythm Abnormalities: A Report of the American

151.   In its 2008 Guidelines, The American College of Cardiology and American Heart Association stated, "Conventional ICD therapy in any form may be associated with worsening heart failure, VT, VF, and non-cardiac death that can be related to the adverse effects of RVA pacing."[18]

152.   In its 2005 Decision Memorandum for Implantable Defibrillators (CAG-00157R3), CMS stated, "Since ICDs only treat ventricular tachyarrhythmias, do not prevent death from other cardiac or non-cardiac causes, and may cause adverse events, such as inappropriate shocks and worsening heart failure, they should not be perceived as or projected to be an ideal technology that eliminates significant health risks for patients with heart failure."

153.   The damages calculations provided by Relators to the Department of Justice do not include damages to the Medicare Trust Fund from false claims paid to individual physicians and physician groups for ICD procedures excluded from Medicare coverage.   Relators are not yet able to identify the individual physicians who have submitted and been paid for the false claims for the ICD procedures identified in Exhibits 1, 2, 3, 4, 5, 6, 7, 8 and 9 which are on file under seal with the Court and incorporated herein.   Such claims by physicians also constitute false claims for

College of Cardiology/ American Heart Association Task Force on Practice Guidelines, *J. Am. Coll. Cardiol.*  2008; Vol. 51, e1-62, at e43.

[18] Epstein AD, DiMarco JP, Ellenbogen KA, Estes NAM III, Freedman RA, Gettes LS, Gillinov AM, Gregaoratos G, Hammitl SC, Hayes Dl, Hlatky MA, Newby LK Page RL, Schoenfiel MH, Silka MJ, Stevenson LW, Sweeney MO, ACC/AHA/HRS 2008 Guidelines for Device-Based Therapy of Cardiac Rhythm Abnormalities: A Report of the American College of Cardiology/ American Heart Association Task Force on Practice Guidelines, *J. Am. Coll. Cardiol.*  2008; Vol. 51, e1-62, at e43.

procedures excluded from Medicare coverage for which the United States is entitled to recover under the False Claims Act.

154.   The damages calculations provided in Exhibits 1-9 also do not include false claims for ICD procedures excluded from coverage under the federal-state Medicaid programs and the federal TRICARE-CHAMPUS program.

## Each False Claim Represents the Absence of the Requisite Advance Beneficiary Notice to a Medicare Patient

155.   The false claims at issue represent situations in which Medicare patients were not advised that the Medicare Program excludes coverage for such ICD procedures and the reasons for such exclusions. The laws and regulations addressing advance beneficiary notices ("ABN") to Medicare patients are based in part on the important policy of providing information to Medicare patients so that they can make an informed decision prior to the treatment or procedure which is not covered by the Medicare Program.

*156.*   The Medicare Claims Processing Manual Section 40.3 states, "The purpose of the ABN is to inform a Medicare beneficiary, before he or she receives specified items or services that otherwise might be paid for, that Medicare certainly or probably will not pay for them on that particular occasion." "The ABN also allows that beneficiary to make an informed consumer decision whether or not to receive the items or services for which he or she may have to pay out of pocket or through other insurance." *Id.*  In addition, the ABN allows "the beneficiary to participate in his/her own health care treatment decisions by making informed consumer decisions." *Id.*

157.  In the presence of the governing National Coverage Determination, advance beneficiary notices to Medicare patients receiving ICD devices under these clinical conditions were mandatory. The Medicare Claims Processing Manual Section 40.3 states, "The provider, practitioner, or supplier must issue an ABN each time, and as soon as, it makes the assessment that Medicare payment certainly or probably will not be made." "A beneficiary must be notified far enough in advance of an event about which a decision must be made by the beneficiary (e.g., receiving medical service) so that the beneficiary can make a rational, informed consumer decision without undue pressure." (Medicare Claims Processing Manual Section 40.3.3). If the provider has "some genuine doubt regarding the likelihood of Medicare payment," an ABN should be issued to the patient. (Medicare Claims Processing Manual Section 40.3.6.2). "The following are statutory provisions requiring delivery of the ABN…. §1862(a)(1) of the [Social Security] Act (not reasonable and necessary…" (Medicare Claims Processing Manual Section 50.3.1).

158.  The Medicare Claims Processing Manual confirms that the "ABN must specify the services and a genuine reason that denial by Medicare is expected." (Medicare Claims Processing Manual Section 40.3.6.1). "To be acceptable, the ABN must give the beneficiary a reasonable idea of why the notifier is predicting the likelihood of Medicare denial so that the beneficiary can make an informed consumer decision whether or not to receive the service and pay for it personally." (Medicare Claims Processing Manual Section 40.3.8).  On the ABN form, "notifiers must explain, in beneficiary friendly language, why they believe the items or services described in

Blank (D) may not be covered by Medicare." (Medicare Claims Processing Manual Section 50.6.3).

159.   The Medicare Claims Processing Manual recognizes that the "[c]riteria for determining whether a provider had knowledge or should have had knowledge that services or items would be denied are in regulations at 42 C.F.R. § 411.406, which cites various forms and methods of notification that provide sufficient evidence that the provider knew or should have known that the services or items would be denied." (Medicare Claims Processing Manual Section 40.1.2).   That federal regulation states in pertinent part, "**It is clear that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage on the basis of the following…Federal Register publications containing notice of national coverage decisions or of other specifications regarding noncoverage of an item or service.**" 42 C.F.R. § 411.406(e)(2) (emphasis added).

160.   A physician or hospital and patient may agree to implant an ICD in conditions under which Medicare excludes coverage. But the physician or hospital may not seek or collect payment from the Medicare Program for such procedures. Instead, the hospital or physician may receive payment from the patient if the hospital or physician has provided the patient with an ABN. If a physician or hospital wishes to implant an ICD in a situation excluded from Medicare coverage and if the physician or hospital wishes to be paid for such procedure by the patient, the physician or hospital must give the patient the requisite written Advance Beneficiary Notice as established in 42 C.F.R. § 411.408 (f) (1). If the physician or hospital does not

provide such written notice, including "the physician's reasons for believing Medicare payment will be denied," then the physician or hospital must refund any payments collected from the patient or face sanctions under 42 C.F.R. § 411.408 (g).

### Defendants' Liability under the False Claims Act

161.   The False Claims Act establishes liability, *inter alia,* for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1); "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government," 31 U.S.C. § 3729(a)(2); or "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7).

162.   The False Claims Act defines "knowing" and "knowingly" as having "actual knowledge of the information," or acting in "deliberate ignorance of the truth or falsity of the information" or acting in "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).

163.   Under the False Claims Act, "no proof of specific intent to defraud is required." 31 U.S.C. § 3927(b).

164.   Under the False Claims Act, the term "claim…means any request or demand, whether under a contract or otherwise, for money or property…that is presented to an officer, employee or agent of the United States or…is made to a contractor, grantee or other recipient, if the money or property is to be spent or used on the

Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided an portion of the money or property requested or demanded…" 31 U.S.C. § 3729 (b)(2)(A).

165.   The United States would not have paid the claims submitted by the respective Defendants if the Defendants had disclosed the fact that the ICD procedures at issue were not covered under Medicare's National Coverage Determinations.

166.   The Defendants' failure to disclose the non-covered charges on the UB-92 and UB-04 Forms and in the Cost Reports was factually false.

167.   The United States Supreme Court has confirmed that protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law.

168.   In submitting their claims, Defendants were obligated to seek payment only for "covered charges" or those procedures and services that were covered under the Medicare Program. In seeking and obtaining payments for ICD procedures that were excluded from coverage under the governing National Coverage Determination, the claims were legally false.

169.   With respect to each claim for an ICD procedure which was not covered by the National Coverage Determination, the Defendant responsible for such claim either (1) had actual knowledge of the information; or (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information.

170.   A hospital defendant which denies actual knowledge must claim ignorance. A defendant's denial of "actual knowledge" will not excuse it from liability under the False Claims Act.

171.   The National Coverage Determination governing ICDs was extensively publicized to hospitals participating in Medicare. For each of the relevant years CMS organized and published the National Coverage Determinations into 4 Parts with the Table of Contents for each Part.  On the first Table of Contents for Part 1, there is a section for "Cardiovascular System." Within that Section 20, there is only one NCD titled  "Implantable Automatic  Defibrillators" listed  on  the  Table  of Contents. That NCD is Section 20.4 in the current Medicare National Coverage Determinations Manual.

172.   For a hospital choosing to engage in the business of implanting ICDs in Medicare patients, there is only one National Coverage Determination to follow with respect to Medicare coverage and payment for such ICD procedures.

173.   The governing National Coverage Determination contains express and absolute conditions of coverage. The language in the NCD is "patients must not have" certain conditions. If such conditions exist, there is no Medicare coverage for an ICD procedure.

174.   Hospitals are  bound  by  law  to  comply  with  the  National  Coverage Determinations. Fiscal intermediaries may not authorize exceptions to the Medicare National Coverage Determination which govern the ICD procedures at issue in this

case.[19] The Medicare Coverage Issues Manual Transmittal 173 states that the National Coverage Determinations are "binding on all carriers, intermediaries, peer review organizations, health maintenance organizations, competitive medical plans, and health care prepayment plans." "In addition, an Administrative Law Judge may not review an NCD." *Id.* As a matter of law, each hospital was required to know the contents of the binding National Coverage Determinations governing Medicare coverage and payments for ICD procedures.

175.   42 C.F.R. § 411.406 (e)(2) provides, "**It is clear that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage on the basis of the following…Federal Register publications containing notice of national coverage decisions or of other specifications regarding noncoverage of an item or service.**" (Emphasis added). That federal regulation establishes criteria for determining that a provider knew that services were excluded from coverage as not reasonable and necessary. As a matter of federal law, providers are deemed to know the requirements of Medicare's National Coverage Determinations.

---

[19] The Medicare Program Integrity Manual § 13.1.1 states: "The contractor shall apply NCDs when reviewing claims for services addressed by NCDs." "When making individual claim determinations, contractors have no authority to deviate from NCD if absolute words such as 'never' or 'only if' are used in the policy." (*See* Medicare Program Integrity Manual attached hereto as Ex. 5). The National Coverage Determination at issue uses such absolute words. "**Patients must not have…had a coronary artery bypass graft (CABG) or percutaneous transluminal coronary angioplasty (PTCA) within past 3 months.**" "**Patients must not have…   had an enzyme-positive MI within the past 40 days.**" "**Patients must not have… clinical symptoms or findings that would make them a candidate for coronary revascularization.**" (emphasis added).

### Each False Claim Represents Multiple False Statements and False Records Submitted to Federal Healthcare Programs

#### False Certifications in the UB-92 and UB-04 Claim Forms

176.   Each false claim at issue in this action represents multiple false submissions to the Medicare Program by the respective Defendants.

177.   As mentioned above, upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services provided to those beneficiaries during their hospital stays. *See* 42 C.F.R. §§ 413.1, 413.60, 413.64.   Hospitals submit patient-specific claims for interim payments electronically on a CMS Form UB-92 or the UB-04 Form which replaced the UB-92 Form in March of 2007.

178.   For each of the years in question, on the UB-92 and UB-04 forms there was and is a column bearing the heading "NON-COVERED CHARGES" in which the hospital is required to list charges not covered by Medicare.

179.   The respective hospitals failed to list the ICD procedures at issue as "non-covered charges" on the UB-92 and UB-04 Forms. They repeatedly sought and received payments for ICD procedures as "covered charges" when such procedures were not covered under the governing National Coverage Determination.

180.   Both the UB-92 and UB-04 Forms contain explicit certifications of accuracy. The UB-92 contains the following notice in bold capital letters: "ANYONE WHO MISREPRESENTS OR FALSIFIES ESSENTIAL INFORMATION REQUESTED

BY THIS FORM MAY UPON CONVICTION BE SUBJECT TO FINE AND IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW."

181.   The UB-92 Form also requires the provider's representative to "certify the certifications on the reverse apply to this bill and are made a part hereof." Such certifications include the following:

- "This claim, to the best of my knowledge, is correct and complete and in conformance with the Civil Rights Act of 1964 as amended."

- "I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claim, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

- "For CHAMPUS purposes: This is to certify…the information submitted as part of this claim is true, accurate, and complete, and, the services shown on this form were medically indicated and necessary for the health of the patient."

182.   The UB-04 Form contains the following notice in bold capital letters: "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/PR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

183.   The UB-04 Form requires the provider to certify the following:

- "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

- "For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws."

- "For TRICARE Purposes: The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically [sic] and appropriate for the health of the patient."

### False Certifications in the Annual Cost Reports

184.  As mentioned above, every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator. For each of the years in question, the responsible officer or employee of each hospital was required to certify the following on the annual Cost Report:

> To the best of my knowledge and belief, it (the Hospital Cost Report) is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

> I further certify that I am familiar with the laws and regulations regarding

the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

185.   The Hospital Cost Report also contains the following notice: "Misrepresentations or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law."

186.   If a hospital wishes to contest charges which are non-covered, Medicare rules require the hospital to calculate the reimbursement impact (or "settlement" impact) of such non-covered charges separately on their annual Cost Reports and individually disclose such amounts on line 30 of worksheet E, Part A (inpatient) and Line 36 of E, Part B (outpatient) in accordance with CMS Pub. 15-II, section 115.2.

187.   "Non-covered" charges should not be included with "covered" charges in the Cost Report. There are multiple worksheets and columns on the Cost Report where inpatient and outpatient "covered" charges are required to be listed. The respective Defendants included non-covered charges for the ICD procedures at issue intermingled with covered charges on multiple Cost Report pages, thereby distorting various Cost Report calculations and settlements.

188.   The Medicare Program depends upon the truthfulness and accuracy of providers in submitting claims and completing their cost reports. Providers know this fact.

189.   The United States would not have paid the claims filed by Defendants if the Defendants had disclosed the fact that the ICD procedures at issue were not covered

under Medicare's National Coverage Determinations.

190.   The respective Defendants' failures to disclose the non-covered ICD procedures

on the UB-92 or UB-04 forms and in their annual Cost Reports submitted to CMS

constitute false claims and false certifications.

## **This Action is Not Subject to the Public Disclosure Defense**

191.   Prior to the filing of this action, there was no public disclosure of the allegations

at issue against any of the Defendants.

192.   On March 23, 2010, the President of the United States signed the Patient

Protection and Affordability Care Act, Pub. L. 111-148, 124 Stat. 119, which

broadened the reach of the False Claims Act. Under the amended False Claims Act,

the public disclosure defense is no longer a jurisdictional bar. Rather, it is an

affirmative defense that automatically fails if opposed by the government.

193.   The claims at issue in this action arose before and after the amendments to the

False Claims Act in March of 2010.   Under the False Claims Act before and after

the 2010 Amendment, there was no public disclosure as defined by the Act which

could bar this action.

194.   31 U.S.C. § 3730(4)(A), as amended in March of 2010,  provides as follows,

> (4)(A) The court shall dismiss an action or claim under this section, unless
> opposed by the Government, if substantially the same allegations or
> transactions as alleged in the action or claim were publicly disclosed (i) in
> a Federal criminal, civil, or administrative hearing in which the
> Government or its agent is a party; (ii) in a congressional, Government
> Accountability Office, or other Federal report, hearing, audit, or
> investigation; or
> (iii) from the news media, unless the action is brought by the Attorney
> General or the person bringing the action is an original source of the
> information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

195.   Even in the presence of a public disclosure as defined in the amended False Claims Act, the complaint is not subject to dismissal if the whistleblower is an "original source."

196.   Under the amended False Claims Act, "original source" is redefined. Previously, an "original source" must have had "direct and independent knowledge of the information on which the allegations are based," *and* voluntarily provided the information to the Government before filing suit based on such information. As amended, an "original source" must either: (i) prior to a public disclosure, have voluntarily disclosed to the Government the information on which allegations or transactions in the claim are based, *or* (ii) have knowledge that is independent of, and that materially adds to, the publicly disclosed allegations or transactions, and have voluntarily provided the information to the Government before filing an action.

197.   As amended, the second clause of 31 U.S.C. § 3730(d)(4)(B) eliminates the requirement that the whistleblower have "direct and independent knowledge," by instead referring only to "knowledge" of the information that is "independent of" and that "materially adds to" the previously disclosed information about the allegations or transactions.

198.   The pre-1986 jurisdictional bar of the False Claims Act prohibited a relator from continuing with a suit merely if the information contained in the suit was located somewhere in the government's files. That law was abolished by Congress in 1986.

199.   In 1986, Congress narrowed the jurisdictional bar to focus on those cases where there was evidence not only that the government had the information in its possession, but that it was already acting upon the information (i.e., when allegations have been disclosed through a government audit, investigation or report), or when the government is capable of acting upon allegations disclosed through the news media or through a hearing such as other litigation.

200.   In March of 2010, Congress eliminated the jurisdictional bar altogether. The public disclosure defense is no longer a jurisdictional bar. Rather, it is an affirmative defense that automatically fails if opposed by the government.

201.   Prior to the amended public disclosure provisions, federal courts of appeal developed and applied a three-part test to determine whether a qui tam action was jurisdictionally barred by public disclosures. One Circuit Court has described the public disclosure requirement as follows:

> If $X + Y = Z$, Z represents the allegation of fraud and X and Y represent its essential elements. To disclose the fraudulent transaction publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, i.e., the conclusion that fraud has been committed.

202.   There has been no such public disclosure in this action. Persons reading the millions of codes within MedPAR cannot infer any false claims against the Medicare Program. There is no allegation of any fraud or false claims within MedPAR which is composed entirely of innocuous numeric codes as addressed above. There is no disclosure of fraudulent transactions within MedPAR itself.

203.   The coding numbers within MedPAR are submitted by the hospitals treating Medicare beneficiaries. The coding numbers are not a federal or governmental report or any inquiry or investigation or report by the government. They are simply numerical codes submitted by the hospitals treating Medicare beneficiaries.

204.   MedPAR simply lists codes which represent claims to the Medicare Program arising from inpatient admissions of Medicare beneficiaries. MedPAR does not reveal whether the claims were truly covered by the Medicare Program. MedPAR does not reveal whether the claims are covered by any National Coverage Determination applicable to particular clinical conditions. The detection and revelation of the false claims at issue originated entirely from Ms. Ford's experience, knowledge, and extensive analyses.

205.   Ms. Ford and Mr. Schuhmann did not use any information or documents obtained under the Freedom of Information Act. Relators did not make any request under the Freedom of Information Act.

206.   The millions of procedure codes and diagnostic codes within MedPAR are not available or disclosed to the general public. Rather CMS has established restrictions on access to the procedure and diagnostic codes for each inpatient admission of Medicare beneficiaries and Ms. Ford had access to such codes under a specific agreement with CMS discussed above.

207.   Ms. Ford's knowledge of the false claims at issue arose from her own experience and knowledge gained inside the cardiovascular industry and her personal investigation. Her knowledge did not arise from the work or efforts of others.

208.   The allegations of this action as to any of the Defendants were never publicly disclosed **in any source** prior to Relators filing this action.

209.   The allegations of this action were never publicly disclosed in any of the specific sources enumerated in the False Claims Act.

210.   The purpose of the public disclosure rule and the original source exception is to achieve the twin goals of encouraging qui tam actions to fight false claims against the government while rejecting truly parasitic suits based on prior public disclosure of the fraud.

211.   Knowledge of the misrepresented state of affairs---which does not necessarily entail knowledge of the fact of misrepresentation---is usually in the possession of the government. Publication of the facially valid documents, already in the government's pocket, cannot by itself be sufficient to defeat qui tam jurisdiction. The entire qui tam regime is premised on the idea that the government's knowledge of claims against the Federal Treasury (without knowledge that they are misrepresented) does not in itself translate into effective enforcement of the laws against false claims.

212.   The false nature of a specific transaction involving the defendant must have been publicly disclosed through the enumerated three sources before the former jurisdictional bar is invoked. Disclosure of the general subject matter of the transaction involved without disclosure of the false nature of the transaction does not constitute public disclosure under the False Claims Act.

213.   A complete and thorough investigation of false claims against the federal government typically involves review of documents or other information in the government's possession or potentially in the public domain.

214.   Absent public disclosure within the specific definition set out in the statute, there is no requirement that the relator be an original source. Here there has been no public disclosure of the allegations of false claims as to any Defendant. Nevertheless, Ms. Ford would satisfy the original source exception.

215.   To determine the scope of false claims arising from the implantation of ICDs, Ms. Ford used innocuous procedure and diagnostic codes submitted by hospitals to the Medicare Program and conducted a complex independent investigation.

216.   Through years of consulting inside the industry of cardiovascular devices and the clinical use of such devices, Ms. Ford was entirely responsible for detecting and exposing the major problem of compliance with the National Coverage Determination governing ICD procedures.

217.   Knowledge gained directly and independently by a relator in the course of a joint investigation may also be said to have been learned directly and independently by her co-relator.

218.   The former original source provisions required the relator to possess direct and independent knowledge of the information underlying the allegation, rather than direct and independent knowledge of the transaction itself.

219.   The information underlying the central allegation that Defendants have billed the Medicare Program and been paid for ICDs which are not covered by the National Coverage Determination is entirely the work product of Ms. Ford. Through her years

of experience consulting inside the cardiovascular industry, she has direct and independent knowledge of this information underlying the central allegation of this action. She is not required to have eyewitness knowledge of every surgical procedure to implant an ICD at issue.

220. Ms. Ford obtained her knowledge through her own experience, labor, and investigation and independent of any alleged public disclosure.

221. From reviewing hundreds of medical charts involving implantation of ICDs in Medicare patients, Ms. Ford had direct and independent knowledge that ICDs were being billed to the Medicare Program as "covered charges" in clinical conditions which were not covered by the governing National Coverage Determination.

222. She had direct and independent knowledge that advance beneficiary notices were not being provided to Medicare patients despite the fact that ICD procedures were not covered by the governing National Coverage Determination.

223. She had direct and independent knowledge that hospitals and physicians were commonly representing such ICD procedures were covered services in their claims to the Medicare Program when in fact they were not covered by the governing National Coverage Determination.

224. That knowledge motivated Ms. Ford to conduct an expanded investigation which included review of millions of diagnostic and procedure codes submitted by hospitals in their claims to the Medicare Program.

225. Ms. Ford studied and synthesized such diagnostic and procedure codes during the course of her independent investigation. In her investigation, Ms. Ford used innocuous numerical codes within MedPAR and completed the equation with

information independent of any alleged pre-existing public disclosure.  It was only through Ms. Ford's extensive independent investigation, deductions, and efforts that she discovered and exposed the false claims against the Medicare Program. This case would not exist but for Ms. Ford's extensive experience and knowledge gained inside the clinical cardiovascular industry and her extensive efforts which spanned multiple years.

**FIRST CAUSE OF ACTION**
**False Claims Act; Presentation of False Claims for Payment or Approval**
**(31 U.S.C. § 3729(a) (1) (A))**

226.   Relators repeat and reallege the foregoing paragraphs as if fully set forth herein.

227.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(B).

228.   The respective Defendants knowingly presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

229.   By virtue of the false claims made by the respective Defendants to Federal Healthcare Programs, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## SECOND CAUSE OF ACTION

**False Claims Act:  Making or Using False Record or Statement Material to False Claim**
**(31 U.S.C. § 3729(a)(1)(B))**

230.   Plaintiffs repeat and reallege the foregoing Paragraphs as if fully set forth herein.

231.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

232.   The respective Defendants knowingly made, used, or caused to be made or used false records or statements material to the false claims at issue. With respect to the ICD procedures at issue excluded from Medicare coverage, the respective Defendants submitted false records and made false statements when initially submitting the claims for interim payments to Federal Healthcare Programs and they submitted false records and false statements in their annual Cost Reports to CMS. The respective Defendants' conduct resulted in false claims being paid by the United States.

233.   By virtue of the false records or false statements made by the Defendants, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**THIRD CAUSE OF ACTION**

**False Claims Act; Conspiring to Submit False Claims**
**(31 U.S.C. § 3729(a) (1)(C))**

234.   Plaintiffs repeat and reallege the foregoing Paragraphs as though fully set forth herein.

235.   In pertinent part, the False Claims Act establishes liability for "any person who....conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

236.   The John Doe Defendants include physicians and other individuals who participated in implanting and billing Federal Healthcare Programs for the ICDs at issue in contravention of the National Coverage Determination. The Defendants and the John Doe Defendants acted in concert, by agreement, and in conspiracy to submit false claims to Federal Healthcare Programs for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(1)(C).

237.   By virtue of the conspiracy, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**FOURTH CAUSE OF ACTION**

**Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)**
**(1)(B)**

238.   Relators repeat and re-allege the foregoing Paragraphs as if fully set forth herein.

239.   In pertinent part, the False Claims Act establishes liability for "any person who...knowingly makes, uses, or causes to be made or used, a false record or

statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

240.   The governing National Coverage Determination contains explicit conditions of coverage and payment for ICD procedures on Medicare patients. The National Coverage Determinations are binding on all providers participating in the Medicare Program.

241.   With respect to each false claim, the respective Defendants expressly represented and certified that the ICD procedure at issue should not be listed as "non-covered charges." With respect to each ICD procedure billed to the Medicare Program, the respective Defendants implicitly certified that the procedure complied with the express conditions of coverage and payment established in the binding National Coverage Determination. The express and implied certifications by the respective Defendants were false.

242.   By virtue of the false claims made by Defendants, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## FIFTH CAUSE OF ACTION

**Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G)**

243.   Relators repeat the allegations of the foregoing paragraphs as if fully stated herein.

244.   The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The term "obligation" is

defined to include "an established duty, whether or not fixed, arising from...the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

245.  With respect to the ICD procedures at issue excluded from Medicare coverage, the respective Defendants have submitted false claims which caused overpayments from the Medicare Program and they have knowingly retained such overpayments in violation of the False Claims Act.

246.  By virtue of the respective Defendants' causing and retaining overpayments from the Medicare Program and other Federal Healthcare Programs, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYERS FOR RELIEF

247.  WHEREFORE, on behalf of the United States, Relators request and pray that judgment be entered against the respective Defendants under the False Claims Act in the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, for a qui tam relators' share as specified by 31 U.S.C. § 3730, for attorneys fees, costs and expenses as provided by 31 U.S.C. § 3730, and for all such further legal and equitable relief as may be just and proper.

**JURY TRIAL IS HEREBY DEMANDED.**

Respectfully submitted, this ___ of August, 2011.

THEODORE J. LEOPOLD, ESQ.
Florida Bar No. 705608
Leopold-Kuvin, PA
2925 PGA Blvd
Suite 200
Palm Beach Gardens, Fl 33410
tleopold@leopoldkuvin.com
Telephone (561)935-4801
Fax (561)515-1401


BRYAN A. VROON, ESQ.
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1718 Peachtree Street, Suite 1088
Atlanta, Georgia  30309
Telephone: (404) 607-6712
Facsimile:  (404) 607-6711
bvroon@vroonlaw.com


Edward D. Robertson, Jr.
Anthony DeWitt
BARTIMUS, FRICKLETON,
ROBERTSON & GORNY, PC
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454 (Voice)
573-659-4460 (Facsimile)
(Pro hac vice motions to be submitted)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing **Qui Tam Relators' Second Amended Complaint Under 31 U.S.C. §3729, Federal False Claims Act, Exhibit A to the Second Amended Complaint, and Exhibit 8 to the Second Amended Complaint** by certified mail, return receipt requested, addressed as follows:

JEFFREY W. DICKSTEIN
United States Attorney's Office for the
Southern District of Florida
Florida Bar No. 434892
99 NE 4th Street, Suite 300
Miami, Florida 33132
TEL: (305) 961-9453
FAX: (305) 536-4101

JOYCE R. BRANDA
JAMIE ANN YAVELBERG
AMY L. EASTON
Attorneys, Civil Division
U.S. Department of Justice
P.O. Box 261, Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 353-2685
Fax: (202) 514-0280

Counsel for the United States

This _____ day of August, 2011.

Ted Leopold