**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 08-20071-CIV-HUCK/SIMONTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, | ) | |
| LEATRICE FORD and THOMAS SCHUHMANN. | ) | |
| | ) | |
| Relators | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ABBOTT NORTHWESTERN HOSPITAL; | ) | **TO BE FILED IN CAMERA** |
| *et al.* | ) | **AND UNDER SEAL** |
| (List of remaining Defendants to this action | ) | |
| is attached as Exhibit A and incorporated in the | ) | |
| caption of this action) | ) | |
| | ) | |
| Defendants. | ) | |

---

<u>**RELATORS' THIRD AMENDED COMPLAINT UNDER 31 U.S.C. §3729, FEDERAL FALSE CLAIMS ACT**</u>

Table of Contents

**Introduction** .......................................................................................................... 3

**Jurisdiction and Venue** ......................................................................................... 4

**Introduction to the Medicare Program's National Coverage Determinations Governing Payments for ICD Procedures** ......................................................... 8

**The Defendants Have Submitted Factually False Claims to Federal Healthcare Programs** 12

**Introduction to Leatrice Ford's Experience, Knowledge, and Investigation as an Industry Insider** ...................................................................................................... 19

**The Four Groups of False Claims Identified by Ms. Ford Which Represent ICD Procedures Excluded from Medicare Coverage** ................................................ 28

    **Group One of False Claims** ............................................................................ 28

Group Two of False Claims .......................................................................... 37

Group Three of False Claims ...................................................................... 42

Group Four of False Claims ........................................................................ 44

The Respective Defendants Have Evidence of False Claims in Their Possession ................. 49

Additional Damages to the Medicare Trust Fund .................................................. 50

Each False Claim Represents the Absence of the Requisite Advance Beneficiary Notice to a
Medicare Patient ................................................................................ 52

Defendants' Liability under the False Claims Act ................................................ 54

Each False Claim Represents Multiple False Statements and False Records Submitted to
Federal Healthcare Programs ..................................................................... 58

False Certifications in the UB-92 and UB-04 Claim Forms ...................................... 59

False Certifications in the Annual Cost Reports .............................................. 61

This Action is Not Barred by the Public Disclosure Defense ...................................... 63

The Diagnoses and Procedure Codes Submitted by Hospitals to CMS Do Not Constitute
Any of the Specific Sources of Potential Public Disclosure Enumerated in the False
Claims Act ...................................................................................... 63

Over Two Billion Numeric Codes in a Vast Database Did Not Alert the Government to
the False Claims at Issue ....................................................................... 66

First Cause of Action---Presentation of False Claims for Payment or Approval(31 U.S.C. §
3729(a)(1)(A)) .................................................................................. 68

Second Cause of Action---Making or Using False Record or Statement Material to False
Claim(31 U.S.C. § 3729(a)(1)(B)) ................................................................ 68

Third Cause of Action---Conspiring to Submit False Claims(31 U.S.C. § 3729(a)(1)(C)) ... 69

Fourth Cause of Acton---Submission of Express and Implied False Certifications(31 U.S.C.
§ 3729(a)(1)(B)) ................................................................................ 70

Fifth Cause of Action---Knowingly Causing and Retaining Overpayments(31 U.S.C. §
3729(a)(1)(G)) .................................................................................. 71

Prayers for Relief .............................................................................. 72

Relators Leatrice Ford and Thomas Schuhmann, by and through their counsel of record, state

their Third Amended Complaint to the Court as follows:

## Introduction

1.  Based on extensive review of scientific studies and concerns for patient safety, the Centers for Medicare and Medicaid Services (CMS) has consistently, clearly, and absolutely excluded coverage for implantable cardioverter-defibrillator (ICD)[1] procedures in three groups of patients relevant to this Third Amended Complaint: (1) patients who have undergone coronary artery bypass graft surgery or percutaneous transluminal coronary angioplasty within the past 3 months; (2) patients with clinical symptoms or findings that would make them candidates for coronary revascularization; and (3) patients who have suffered an acute myocardial infarction within the past 40 days. Under Section 1862(a) (1) of the Social Security Act, CMS has issued National Coverage Determinations which exclude such implants from Medicare coverage with limited exceptions.

2.  Despite such exclusions from Medicare coverage, the respective Defendants have repeatedly submitted claims for ICD procedures excluded from Medicare coverage under the governing National Coverage Determination. In connection with each claim, the respective Defendants have submitted false statements, false records, and false certifications to the Medicare Program.

3.  Based on the determinations of the Medicare Coverage Advisory Committee

---

[1] Implantable cardioverter-defibrillators are electronic devices designed to detect and treat tachyarrhythmias or fast heart rates. Implanted under the skin in the upper abdomen, the defibrillator is connected with lead wires to two defibrillation electrodes placed surgically in or around the heart. The defibrillator is designed to interrupt the abnormal rhythm, allowing the normal rhythm to resume. Sensors inside the defibrillator monitor the heart. If a sensor detects an irregularity, such as fibrillation, the defibrillator is programmed to deliver a strong electric shock directly to the heart.

composed of independent medical experts and based on the findings of published controlled scientific studies, CMS has established the conditions of Medicare coverage governing ICD procedures. CMS has published such conditions of coverage in National Coverage Determinations binding on all medical providers. Such National Coverage Determinations govern payments for ICD procedures on Medicare patients.

4. Each Defendant Hospital has executed at least one provider agreement with CMS in which it agreed to be bound by the laws, regulations and program instructions of the Medicare Program.

5. The vast majority of ICD procedures in the United States have complied with Medicare's National Coverage Determinations. Yet a significant number of ICD procedures have been billed to and paid by the Medicare Program in contravention of the governing National Coverage Determination. Each violation represents a Medicare patient who underwent an invasive surgical procedure to implant an ICD in clinical conditions which CMS has determined are not covered by Medicare. Such violations have caused substantial damages to the Medicare Trust Fund.

**Jurisdiction and Venue**

6. This is an action to recover damages and civil penalties on behalf of the United States arising out of the false claims presented for payment by the respective Defendants to Federal Healthcare Programs, including the Medicare Program. This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known

as the False Claims Act, which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under the Act.

7.  The False Claims Act was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 (FERA), enacted May 20, 2009. "The amendments made by this section shall take effect on the date of enactment of the Act and shall apply to conduct on or after the date of enactment, except that (1) subparagraph (B) of section 3729 (a) (1), as added by subsection (a) (1) shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act (31 U.S.C. § 3729) that are pending on or after date..." FERA, § 4(f). The conduct in this Third Amended Complaint occurred both before and after the enactment of FERA. This Third Amended Complaint will predominantly reference post-FERA numbering for 31 U.S.C. § 3729(a) of the False Claims Act.

8.  On March 23, 2010, the President of the United States signed the Patient Protection and Affordability Care Act, Pub. L. 111-148, 124 Stat. 119, which includes several provisions which broaden the reach of the False Claims Act. The claims at issue in this action arose before and after the amendments to the False Claims Act in March of 2010.

9.  Section 3732(a) of the False Claims Act provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

10. Florida is the leading state in terms of the location of hospitals which have submitted the highest amount of false claims to the United States for ICD procedures excluded

from Medicare coverage between 2002 and 2010.

11. An action for violation of the False Claims Act may be brought by the Attorney General under 31 U.S.C. § 3730(a) or by private persons under the qui tam provisions of 31 U.S.C. § 3730(b).

12. A list confirming the Defendants to this Third Amended Complaint is attached hereto as Exhibit A and incorporated herein in its entirety. All of these Defendants were originally named as Defendants to this action when the original Complaint was filed under seal in January of 2008.

13. This Third Amended Complaint asserts claims that arose out of the conduct, transaction, or occurrences set out in the original Complaint filed under seal in January of 2008.

14. The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345. The Court may exercise personal jurisdiction over the Defendants under 31 U.S.C. § 3732(a) because at least one of the Defendants resides or transacts business in this District or has committed acts proscribed by 31 U.S.C. § 3729, *et seq*, in this District.

15. Senate Report 99-345 explains the 1986 amendment of the venue provision in 31 U.S.C. § 3732. The "new section 3732 of title 31 [was added] to modernize the jurisdiction and venue provisions of the False Claims Act, by recognizing the existence of multi-defendant and multi-district frauds against the Government." S. Rep. No. 99-345, at 32 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5297. "Multiple suits, of course, increase the cost to the Government to pursue these cases and have a comparable impact upon the judicial resources required for a complete

adjudication.  This expansion of jurisdiction and venue is made with a view to more effective litigation by the Government as well as convenience and fairness." *Id.*

16. Further, the consolidation of all the Defendants in this single action is proper because of common questions of law and fact, which include the national enforcement of the National Coverage Determination governing ICD procedures for Medicare patients under the common clinical conditions addressed in this action.

17. The consolidation of this action in a single forum permits the United States Department of Justice to investigate, determine intervention, make national enforcement decisions, and prosecute this action without the administrative expense and burden of managing hundreds of duplicative proceedings across the United States over the identical common issue of enforcing the uniform National Coverage Determination governing ICD procedures for Medicare patients.  The consolidation of this action in a single forum saves judicial resources and prevents duplicative proceedings over the identical federal issue from clogging the dockets of federal courts across the United States.

18. The claims at issue also concern common participants nationwide. Although the Defendant hospitals and their physicians bear primary responsibility under the False Claims Act, during each of the years in question, representatives of the three major device manufacturers customarily participated in each surgery to implant ICDs. Such manufacturer representatives had or should have had detailed knowledge of the governing National Coverage Determination and the clinical conditions under which the Medicare Program excludes coverage for ICD procedures. The procedures in contravention of the governing National Coverage Determination were performed in

the presence of and with the assistance of the device manufacturers' representatives who were common participants in the respective ICD procedures at issue.

19. There are additional John Doe Defendants who are likewise liable to the United States under the False Claims Act for causing or contributing to the submission of claims for payment to the Medicare Program and other Federal Healthcare Programs arising from ICD procedures excluded from coverage. Such John Doe Defendants include physicians, physician groups, and medical providers under federal-state Medicaid programs and under the federal TRICARE-CHAMPUS program.

### Introduction to the Medicare Program's National Coverage Determinations Governing Payments for ICD Procedures

20. Congress established the Medicare Program by enacting Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U.S.C. § 1395 *et seq.* (1982), which provides federally funded health insurance for the aged and disabled. Congress restricted the scope of the program by precluding reimbursement for any "items or services . . . [which] are not reasonable and necessary for the diagnosis or treatment of illness or injury. . . ." 42 U.S.C.A. § 1395y (a) (West Supp. 1989).

21. The Medicare Act contains an express condition of payment---"no payment may be made [under the Medicare Act] for any expenses incurred [that] are not reasonable and necessary for the diagnosis or treatment of illness or injury. . . ." 42 U.S.C. § 1395y (a)(1)(A).

22. Under 42 U.S.C. § 1395ff(a), the Secretary of Health and Human Services is authorized to define which services are "reasonable and necessary." The Secretary has defined which services are "reasonable and necessary" through regulations,

rules, and National Coverage Determinations published in manuals provided to providers.

23. The Medicare Act vests the Secretary of Health and Human Services with final authority to determine whether individual claimants are entitled to benefits "in accordance with regulations prescribed by him." 42 U.S.C.A. § 1395ff (a).

24. The Secretary adopts National Coverage Determinations ("NCD") to exclude from Medicare coverage certain items and services determined to be not "reasonable and necessary." *See* 42 U.S.C. § 1395ff (f)(1)(B). An NCD is a determination by the HHS Secretary with respect to whether a particular item or service is covered nationally by the Medicare Program. *See* 42 U.S.C. § 1395ff (f)(1)(B). All Medicare providers are legally bound by National Coverage Determinations. *See* 42 C.F.R. § 405.1060(a)(4).

25. In 1986, CMS issued a Medicare National Coverage Determination providing limited coverage for implantable defibrillators. Since 1986, CMS has expanded coverage under certain conditions with revisions to the National Coverage Determination in 1991, 1999, 2003, and 2005.

26. Effective July 1, 1999, CMS permitted Medicare coverage for ICD procedures only under the following conditions:

- Documented episode of cardiac arrest due to ventricular fibrillation (VF), not due to a transient or reversible cause;
- Documented sustained ventricular tachyarrhythmia (VT), either spontaneous or induced by an electrophysiology (EP) study, not associated with an acute myocardial infarction (MI) and not due to a transient or reversible cause;
- Documented familial or inherited indications with a high risk of life-threatening VT, such as long QT syndrome or hypertrophic cardiomyopathy. See Medicare Coverage Issues Manual § 35-85.

9

27. Between July 1, 1999 and October 1, 2003 when the amended National Coverage Determination Transmittal 173 became effective, the Medicare Program covered ICDs only when a patient (Indication 1) suffered "cardiac arrest due" to VF, "not due to a transient or reversible cause," (Indication 2) had documented sustained VT "not associated with an acute myocardial infarction" and "not due to a transient or reversible cause," or (Indication 3) had documented familial or inherited indications with a high risk of life-threatening VT. [2]

28. On August 22, 2003, CMS issued Coverage Issues Manual Transmittal 173 which became effective October 1, 2003. Transmittal 173 revised Section 35-85 governing implantable automatic defibrillators and added two indications to the earlier three covered indications. Effective for services performed on or after October 1, 2003, Covered Indications Numbers 4 and 5 are as follows:

> [Indication 4]. Coronary artery disease with a documented prior MI, a measured left ventricular ejection fraction 0.35, and inducible, sustained VT or VF at EP study. (The measured MI must have occurred more than 4 weeks prior to defibrillator insertion. The EP study must be performed more than 4 weeks after the qualifying MI.);

> [Indication 5]. Documented prior MI and a measured left ventricular ejection fraction 0.30 and QRS duration of 120 milliseconds.

29. With respect to Coverage Indication Number 5, patients must not have:

    i. New York Heart Association classification IV;
    ii. Cardiogenic shock or symptomatic hypotension while in stable baseline rhythm;
    iii. "[h]ad a coronary artery bypass graft (CABG) or percutaneous transluminal coronary angioplasty (PTCA) within past three months,"
    iv. "[h]ad an enzyme-positive MI within the past month," or "[c]linical symptoms or findings that would make them a candidate for coronary revascularization;"

---

[2] Familial or inherited indications with a high risk of life-threatening VT are not at issue in the Medicare claims addressed in this action.

v. or "Any disease, other than cardiac disease (e.g., cancer, uremia, liver failure) associated with a likelihood of survival less than 1 year.
*See* Medicare Coverage Issues Manual, Transmittal 173.

30. Under both Coverage Indications 4 and 5, there is no Medicare coverage for an ICD procedure within four weeks of an acute myocardial infarction.

31. Transmittal 173 was effective between October 1, 2003 and January 27, 2005. CMS issued the 2003 National Coverage Determination based on expert review of published scientific data, including multiple randomized and controlled clinical trials.

32. Effective January 27, 2005, based on updated review of published controlled scientific studies, CMS issued Transmittal 29 which revised the National Coverage Determination governing ICD procedures. Transmittal 29 added three additional covered indications to the 2003 National Coverage Determination. Those additional indications were numbered 6-8.

33. With respect to Indications 3-8, Transmittal 29 also confirmed the same exclusions from coverage as applied to Indication Number 5 of the 2003 National Coverage Determination: **"Patients must not have…"**

(1) "[had] a CABG or PTCA within the past 3 months,"
(2) "an acute MI within the past 40 days,"
or (3) "clinical symptoms or findings that would make them a candidate for coronary revascularization."

34. In the 2005 Transmittal from CMS, the time period after an acute MI in which such ICD procedures were excluded from Medicare coverage was extended from 30 days to 40 days.

35. Despite the absolute language in the NCD which states that "patients must not have an acute MI within the past 40 days" or bypass surgery/angioplasty "within the past 3 months" or be candidates for coronary revascularization, the respective Defendants have repeatedly submitted claims for payment for ICD procedures in contravention of the Medicare coverage conditions.

36. Specifically, the National Coverage Determination excludes coverage for ICD devices in numerous circumstances surrounding an acute myocardial infarction. Under Indications 3-9 of the 2005 National Coverage Determination, there is no coverage for an ICD within 40 days of an acute myocardial infarction. The language of the NCD is absolute in precluding coverage in this circumstance. The reason for such exclusions from Medicare coverage is the scientific studies have consistently demonstrated that ICDs implanted soon after an AMI do not offer patient benefit and may cause patient harm. Such harm includes worsening heart failure as the damaged heart is healing and recovering after an AMI and increased rates of death from causes other than arrhythmias.

### The Defendants Have Submitted Factually False Claims to Federal Healthcare Programs

37. As detailed below, the Defendants submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

38. To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries are typically insurance companies responsible for processing and paying Medicare claims and auditing cost reports.

39. Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services provided to those beneficiaries during their hospital stays. *See* 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments electronically on a CMS Form UB-92 or the UB-04 Form which replaced the UB-92 Form in March of 2007.

40. For each of the years in question, on the UB-92 and UB-04 forms there was a column bearing the heading "NON-COVERED CHARGES" in which the Defendant hospitals were required to list charges not covered by the Medicare Program.

41. The respective Defendants failed to list the ICD procedures at issue as "non-covered charges" on the UB-92 and UB-04 Forms.  They repeatedly sought payments for the ICD procedures at issue as covered "charges" despite the fact that the procedures were explicitly excluded from coverage under the governing National Coverage Determination.

42. Both the UB-92 and UB-04 Forms contain explicit certifications of accuracy. The UB-92 contains the following notice in bold capital letters: "ANYONE WHO MISREPRESENTS OR FALSIFIES ESSENTIAL INFORMATION REQUESTED BY THIS FORM MAY UPON CONVICTION BE SUBJECT TO FINE AND IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW."

43. The UB-92 Form also requires the provider's representative to "certify the certifications on the reverse apply to this bill and are made a part hereof." Such certifications include the following:

13

- "This claim, to the best of my knowledge, is correct and complete and in conformance with the Civil Rights Act of 1964 as amended."

- "I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claim, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

- "For CHAMPUS purposes: This is to certify...the information submitted as part of this claim is true, accurate, and complete, and, the services shown on this form were medically indicated and necessary for the health of the patient."

44. The UB-04 Form contains the following notice in bold capital letters: "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

45. The UB-04 Form requires the provider to certify the following:

- "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

- "For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws."

- "For TRICARE Purposes: The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically [sic] and appropriate for the health of the patient."

## False Certifications in the Annual Cost Reports

46. As a prerequisite to federal payments, the Medicare Program requires hospitals to annually submit form CMS-2552 (formerly called an HCFA-2552), more commonly known as the hospital cost report.  Hospital cost reports are the final claim that a provider submits to the fiscal intermediary for items and services provided to Medicare beneficiaries.

47. After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of reimbursement the provider claims it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* C.F.R. § 405.1801(b)(1).  The Medicare Program relies upon the hospital cost report to determine whether the provider is entitled to more payments than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare.  42 C.F.R. §§ 405.1803, 413.50 and 413.64(f)(i).

48. During the year, providers submit claims to their assigned fiscal intermediaries for reimbursement, based upon hospital utilization by Medicare beneficiaries. 42 C.F.R.

15

§§ 413.1, 413.60, 413.64. Providers receive interim payments on these claims. Within a specified time after the end of their fiscal years, hospitals must submit their cost reports to their fiscal intermediary so that the intermediary can make a year-end adjustment to the interim payments, as needed. 42 C.F.R. § 413.20(b). Cost reports are the final claim that a provider submits to its intermediary for items and services provided to Medicare beneficiaries.

49. Cost reports contain important detailed financial and statistical data and form the basis for the Medicare Program's determination whether the provider is entitled to more reimbursement than already paid, or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

50. The Medicare Program determines payments for inpatient hospital services based on the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s or UB-04s) during the course of the fiscal year.  On the hospital cost report, the Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider.  This total determines the Medicare Program's liability for services provided to Medicare beneficiaries during the course of a fiscal year.  From this sum, the payments made by the Medicare Program to the provider during the year are subtracted to determine the amount due to the Medicare Program or the amount due to the hospital.

51. Each hospital cost report contains a "Certification" which must be signed by the chief administrator of the provider or a responsible designee of the administrator. For each of the years in question, the responsible officer or employee of each hospital Defendant was required to certify the following on the annual cost report:

   i.  To the best of my knowledge and belief, it (the Hospital Cost Report) is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

   ii. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

52. The hospital cost report also contains the following notice: "Misrepresentations or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law."

53. A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

   Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a  . . . concealment or

17

failure . . . be guilty of a felony.

54. If a hospital wishes to contest charges which are non-covered under the Medicare Program, Medicare rules require the hospital to calculate the reimbursement impact (or "settlement" impact) of such non-covered charges separately on its annual cost reports and individually disclose such amounts on line 30 of worksheet E, Part A (inpatient) and Line 36 of E, Part B (outpatient) in accordance with CMS Pub. 15-II, section 115.2.

55. "Non-covered" charges should not be included with "covered" charges in the cost report. There are multiple worksheets and columns on the cost report where inpatient and outpatient "covered" charges are required to be listed.

56. Despite the coverage exclusions established in the National Coverage Determination, the respective Defendants included non-covered charges for the ICD procedures at issue intermingled with covered charges on multiple cost report pages, thereby distorting various cost report calculations and settlements.

57. The Medicare Program depends upon the truthfulness and accuracy of providers in submitting claims and completing their cost reports. This fact is well known to providers participating in the Medicare Program.

58. Cost reports are generally due to be filed and were filed within 5 months after the end of each fiscal year. This deadline may be extended upon request. Therefore, the respective Defendants' cost reports for fiscal year 2002 would generally have been filed in late 2002 or early 2003.  The respective Defendants' cost reports for fiscal year 2003 would generally not have been filed until late 2003 or early 2004. The same is true for each subsequent fiscal year.

59. CMS issues a Notice of Provider Reimbursement based on the financial data submitted in the cost reports by each hospital for each fiscal year. In accordance with 42 C.F.R. § 415.1885, a cost report may be reopened within three (3) years of the Notice of Program Reimbursement (NPR) date.  The federal regulations establish that the cost report may be reopened due to false claims or if the provider has provided inaccurate cost report data. Thus, even after the submission of their cost reports each year to CMS, the respective Defendants had ongoing duties and opportunities to request the reopening of their previous cost reports which contained false information submitted to Federal Healthcare Programs.

60. The Defendants' inclusion of charges for the ICD procedures at issue as "covered charges" and their failure to disclose the non-covered ICD procedures on the UB-92 and UB-04 Forms and in their cost reports submitted to CMS were factually false.

61. The United States would not have paid the claims filed by the Defendants if the respective Defendants had disclosed the fact that the ICD procedures at issue were not covered under Medicare's National Coverage Determinations.

**Introduction to Leatrice Ford's Experience, Knowledge, and Investigation as an Industry Insider**

62. Leatrice Ford is a registered nurse and a certified coding specialist.  She has worked in the cardiovascular field since 1976 as both a clinician and as a consultant.

63. As a nurse clinician, Ms. Ford has extensive experience with the clinical management and treatment of cardiac diseases. She has worked as a nurse in the coronary care unit at three different hospitals and served as the clinical coordinator of a cardiac surgery program in Owensboro, KY.

64. In 1992, Ms. Ford began consulting with hospitals. She worked for three national health data consulting companies before forming her own company, ConsultCare Partners, LLC, which is a healthcare consulting company offering cardiovascular program analyses, Medicare compliance evaluations, and strategies to improve documentation, coding, and billing processes.

65. In 2004 she received the highest coding certification from the American Health Information Management Association as a certified coding specialist.

66. Since 1992 she has consulted with over 100 hospitals to reduce costs, improve quality, and ensure documentation to support Medicare coding and billing compliance. She frequently reviewed hospital billing records and medical charts to confirm that the services billed were accounted for in the patient record and in compliance with Medicare rules.

67. Ms. Ford's consulting engagements have included:

   • Conducting regular quality reviews for hospitals to confirm certain patient care was delivered appropriately and to ensure that complications were kept to a minimum. Ms. Ford's focus was cardiac surgery and interventional cardiology cases.
   • Making recommendations for improvement when patient care was compromised.
   • Reviewing records for appropriate documentation to support medical necessity of cardiac procedures under Medicare rules and regulations, including coronary stenting, coronary bypass surgery, permanent pacemaker insertion and implantation of automatic implantable cardioverter defibrillators.
   • Comparing billing and coding with the patient medical chart to ensure accuracy and Medicare compliance.
   • Educating physicians on the proper documentation of medical necessity when appropriate.

68. For approximately the last ten years, Ms. Ford's work with hospitals has focused on the appropriate use and billing of coronary stents, pacemakers, and automatic implantable cardioverter-defibrillators. As part of her work with hospitals, Ms. Ford

has regularly reviewed medical charts of Medicare patients receiving ICDs. In the course of her work, she has reviewed hundreds of medical charts of Medicare patients who received an ICD.

69. While reviewing medical charts over multiple years, Ms. Ford found disconcerting and persistent patterns of Medicare patients receiving ICDs under clinical conditions excluded from Medicare coverage.  Ms. Ford learned from reviewing specific patient records and hospital billing records that ICDs were being implanted and billed to the Medicare Program as covered charges at certain facilities in contravention of the National Coverage Determinations discussed above.

70. In every medical chart reviewed by Ms. Ford which evidenced an ICD device placed and billed to the Medicare Program, Ms. Ford also saw evidence that a sales representative employed by one of the three major device manufacturers participated and assisted the surgeon in the procedure. With respect to each chart reviewed by Ms. Ford, the physician implanted the ICD at issue with the assistance of hospital staff and a sales representative employed by the respective device manufacturer.

71. Ms. Ford's concern for patient safety, her training and understanding of the scientific bases supporting the National Coverage Determination, and her focus on Medicare compliance led her to continue investigating the issue. Because of her expertise in claims coding, she knew how specific clinical diagnoses and procedures should be coded and billed to Medicare and other payers.  Combining her knowledge gained reviewing patient medical records and her knowledge of coding and Medicare coverage conditions, she determined that she could identify ICD procedures

excluded from Medicare coverage through methodical extensive analyses of the diagnostic and procedure codes submitted by hospitals to CMS.

72. To report a particular medical condition or medical procedure, CMS has implemented a system of numerical codes. Such numerical codes submitted by hospitals are used by CMS to determine payments to hospitals for services to Medicare patients. There are thousands of diagnostic and procedure codes used within the Medicare Program and these codes submitted by hospitals for payment are highly specific to patient conditions and procedures.

73. MedPAR contains numerical codes submitted by hospitals for inpatient admissions of Medicare patients in the United States. Each patient admission contains up to nine diagnostic codes, up to six procedure codes, claim costs and charges, the DRG, the length of stay, and multiple other admission-specific parameters submitted by Medicare providers.

74. The full annual MedPAR data file typically has 14 million to 16 million lines of numeric codes submitted by Medicare providers. The MedPAR file contains numeric codes submitted by Medicare providers with respect to approximately 12 million inpatient admissions each fiscal year. With up to 6 diagnoses codes and 9 procedure codes for each admission,[3] there are up to approximately 180 million numeric codes submitted by hospitals each year signifying specific diagnoses and procedures for inpatient admissions of Medicare patients. Buried within this massive database of millions of numeric codes submitted by Medicare providers are the diagnoses and procedure codes related to the ICD procedures at issue.

_____

[3] FY 2010 MedPAR expanded the 6 diagnosis codes to 25 codes and the 9 procedure codes to 25 codes.

22

75.  The millions of procedure and diagnostic codes submitted by hospitals to CMS are not available or disclosed to the general public. Rather CMS has established restrictions on access to such detailed codes for each patient admission and Ms. Ford had access to such codes submitted by hospitals under a specific confidentiality agreement with CMS.

76.  CMS has authority to grant restricted and confidential access to the limited data set files of Medicare claims for research projects with the "potential to improve the quality of life for Medicare beneficiaries or improve the administration of the program, including payment related projects."

77.  Under her Data Use Agreement with CMS, Ms. Ford "shall not use, disclose, release, show, sell, rent, lease, loan or otherwise grant access to the limited data set files specified in section 4 of this Agreement, except as expressly permitted by this Agreement or otherwise required by law." (Data Use Agreement, ¶ 7).

78.  The Data Use Agreement contains multiple provisions requiring Ms. Ford to protect the confidentiality of the limited data set files.

> The User agrees to establish appropriate administrative, technical, and physical safeguards to protect the confidentiality of the limited data set file(s) and to prevent unauthorized use or access to it. The safeguards shall provide a level and scope of security that is not less than the level and scope of security established by the Office of Management and Budget (OMB) in OMB Circular No. A–130, Appendix III—Security of Federal Automated Information Systems http://www.whitehouse.gov/omb/circulars/a130/a130.html), which sets forth guidelines for security plans for automated information systems in Federal agencies. The User acknowledges that the use of unsecured telecommunications, including the Internet, to transmit individually identifiable or deducible information derived from the limited data set file(s) specified in section 4 is prohibited. Further, the User agrees that the limited data set file(s) must not be physically moved or electronically transmitted in

any way from the site indicated in section 15 without prior written approval from CMS.

(Data Use Agreement, ¶ 9)

The User shall promptly report to CMS any use or disclosure of the information not provided for by this Data Use Agreement of which it becomes aware. CMS in its sole discretion may require the User to: (a) promptly investigate and respond to CMS concerns regarding any alleged disclosure; (b) promptly resolve any problems identified by the investigation; (c) submit a corrective action plan with steps designed to prevent any future unauthorized disclosures; and/or (d) require that all limited data set files be immediately returned…

(Data Use Agreement, ¶ 11)

The User acknowledges that penalties under §1106(a) of the Social Security Act [42 U.S.C. § 1306(a)], including possible imprisonment, may apply with respect to any disclosure of information in the files(s) that is inconsistent with the terms of the Agreement….

(Data Use Agreement, ¶ 12)

By signing this Agreement, the User agrees to abide by all provisions set out in this Agreement for protection of the limited data set file(s) specified in section 4, and acknowledges having received notice of potential criminal, civil, and/or administrative penalties for violation of the terms of the Agreement.

(Data Use Agreement, ¶ 13)

79. Through months of work spanning multiple years, Ms. Ford investigated and analyzed how frequently hospitals have billed the Medicare Program for ICD procedures under clinical conditions that patients "must not have" for Medicare coverage under the National Coverage Determination.

80. Analyzing the procedure and diagnoses codes submitted by hospitals from approximately 12 inpatient admissions of Medicare patients per fiscal year in 2002,

24

2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010, Ms. Ford identified all patients who received a defibrillator system (generator and leads) using the ICD9 procedure codes 37.94, implantation or replacement of automatic cardioverter defibrillator, total system (AICD) or 00.51 implantation of cardiac resynchronization defibrillator, total system (RT-D).

81. Of those patients receiving ICD systems, Ms. Ford analyzed all of the nine diagnosis fields for the ICD9 diagnosis code 410.x1 (x can be any number 0-9) for acute myocardial infarction initial episode (indicating the first treatment of an acute MI).

82. To identify patients who had a coronary revascularization, Ms. Ford queried the same defibrillator patients and identified patients who also had one of the following ICD9 procedure codes.

    00.66 Percutaneous coronary angioplasty (new in 2006)

    36.01 Percutaneous coronary angioplasty (PCTA) single vessel without mention of thrombolytic agent (2005)

    36.02 Single vessel PTCA with mention of thrombolytic agent (2005)

    36.03 Open coronary angioplasty

    36.05 Multiple vessel PTCA with or without mention of thrombolytic agent

    36.06 Insertion of non drug eluting coronary artery stent

    36.07 Insertion of drug eluting coronary artery stent

    36.09 Other removal of coronary artery obstruction

    36.1X (0-9) Bypass anastomosis for heart revascularization

    36.2 Heart revascularization by arterial implant

    36.3X Other heart revascularization

83. For Fiscal Years 2002-2010, Ms. Ford systematically searched in excess of 100 million hospital admissions of Medicare patients for specific diagnoses and

procedure codes submitted by hospitals. She will perform the same analyses for fiscal years 2011 and 2012. After identifying patient admissions in which a Medicare patient received an ICD in the same admission as being diagnosed with an AMI initial episode or undergoing a revascularization procedure, Ms. Ford then studied all of the diagnostic and procedure codes submitted by the respective Defendants for each of these inpatient admissions. Her extensive analyses of all diagnosis and procedure codes for each admission lead her to identify and organize the false claims into four major groups discussed below.

84. After identifying claims for ICD procedures that the Defendants billed to Medicare despite such procedures being excluded from Medicare coverage under the National Coverage Determinations discussed above, Ms. Ford provided this information to her colleague and Co-Relator, Mr. Tom Schuhmann, who has assisted her in her investigation.

85. Mr. Schuhmann then determined the correct Medicare reimbursement amounts if properly billed. Mr. Schuhmann calculated the differences between the correct reimbursement amounts and the actual reimbursement amounts paid to each of the respective Defendants for each false claim representing an ICD placement procedure excluded from Medicare coverage in Fiscal Years 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010. Mr. Schuhmann designed and implemented computer programs to perform these extensive calculations which are described in more detail in his confidential Disclosures to the Department of Justice.

86. Based on the extensive analyses conducted by Ms. Ford, Relators prepared the Charts attached to the First Amended Complaint as Exhibits 1, 2, 3, 4, and 5 for

Fiscal Years 2002-2006, the subsequent charts filed with the Court's permission as Exhibit 6 and 7 for Fiscal Years 2007 and 2008, and the charts listing false claims for ICD procedures in Fiscal Years 2009 and 2010 filed as Exhibits 8 and 9. The filed charts list each false claim at issue submitted by the respective Defendants to the Medicare Program in Fiscal Years 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010 by MedPAR identification number in numerical order. Each of these false claims represents an ICD procedure which was billed to and paid by the Medicare Program despite the fact that the ICD procedure was excluded from Medicare coverage under the National Coverage Determinations.  All Exhibits 1-9 and the detailed information provided in all Exhibits 1-9 with respect to each false claim submitted by the respective Defendants are hereby incorporated into this Third Amended Complaint.

87.    With respect to each false claim for each Fiscal Year 2002-2010 and each false claim within each of the four major groups discussed below, Ms. Ford has provided the Department of Justice with the patient reference number, the hospital provider number, the billed DRG, the corrected DRG (except for 2008), the covered days for the hospitalization, the covered charges, the fiscal intermediary number, the amount billed by the hospital to Medicare, the amount that should have been billed by each hospital if the hospital had complied with the National Coverage Determination excluding the ICD procedures from coverage, and the minimum amount that the hospital was overpaid by Medicare for each false claim.

88. At the time of service of this Third Amended Complaint with respect to a particular Defendant, Relators will provide similar lists of the false claims at issue submitted

by that particular Defendant to be served with the Third Amended Complaint on that Defendant.

### The Four Groups of False Claims Identified by Ms. Ford Which Represent ICD Procedures Excluded from Medicare Coverage

89.  As mentioned above, Ms. Ford performed extensive analyses of all diagnostic and procedure codes as reported by each hospital for each admission involving an ICD procedure performed in the same admission as the patient was diagnosed with AMI initial episode (indicating the first treatment of an AMI) or underwent a revascularization procedure or both.  In submitting diagnostic and procedure codes to the Medicare Program for each hospital admission of a Medicare patient, the respective Defendants certified the accuracy and truthfulness of such information. Accurate coding by hospitals is critical to the Medicare Program.  Such codes are used by the Medicare Program to determine the amounts of federal payments to the hospital for each admission of a Medicare patient.

### Group One of False Claims

90. The first group represents ICD devices placed in patients in whom the respective hospital Defendants did not find and code ventricular tachycardia, ventricular fibrillation, or cardiac arrest.  In each case an ICD device was implanted in the same short hospital admission as each patient was diagnosed with acute myocardial infarction initial episode (indicating the first treatment of an acute MI) or underwent a revascularization procedure or both.

91. According to the diagnostic and procedure codes reported by the respective Defendants to CMS, only approximately 1.4 percent of the patients within Group One underwent counter shock or electrical cardioversion. This fact provides further evidence that the patients undergoing ICD procedures within Group One did not experience sustained ventricular tachycardia or ventricular fibrillation or cardiac arrest. The routine response to sustained ventricular tachycardia or ventricular fibrillation which presents hemodynamic compromise to a patient is electrical cardioversion or shock treatment. That did not happen in nearly 99 percent of these patients within Group One.

92. Furthermore, only 1 percent of these patients within Group One underwent an EP mapping study according to the procedures reported by the respective Defendants to CMS. According to the American College of Cardiology and American Heart Association Guidelines for Clinical Intracardiac Electrophysiological and Catheter Ablation Procedures, an EP study is indicated in "patients with sustained VT."[4] The absence of an EP mapping study being performed in 99 percent of these patients further supports the conclusion that the patients did not experience sustained ventricular tachycardia.

93. Without finding sustained ventricular tachycardia, ventricular fibrillation or cardiac arrest, there is no possible coverage for an ICD under Indication Number 1 or

---

[4] Zipes DP, DiMarco JP, Gillette PC, Jackman VM, Myerburg RJ, Rahimtoola SH, Ritchie JL, Cheitlin MD, Garson A Jr, Gibbons RJ, et al. Guidelines for Clinical Intracardiac Electrophysiolgical and Catheter Ablation Procedures. A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Clinical Intracardiac Electrophysiologic and Catheter Ablation Procedures), developed in collaboration with the North American Society of Pacing and Electrophysiology, *J. Am. Coll. Cardiol.* 1995 Aug. 26(2): 555-73.

Indication Number 2 of the National Coverage Determination as established in 1999, 2003, and 2005.

94. From the 2005 National Coverage Determination, only Indications 3-9 could provide potential Medicare coverage. Yet with respect to every Indication 3-9 of the 2005 National Coverage Determination, patients "**must not**" have (1) "a CABG or PTCA within the past 3 months," (2) "an acute MI in the past 40 days," or (3) "clinical symptoms or findings that would make them a candidate for coronary revascularization."

95. With respect to this Group One, in each false claim, the respective Defendants reported that the patients suffered an acute myocardial infarction initial episode (indicating the first treatment of an acute MI) and/or underwent a cardiac revascularization procedure in the same hospital admission with an average length of stay within this Group of 11.27 days. Under the 1999, 2003, and 2005 National Coverage Determinations, CMS has excluded coverage for ICD procedures under these conditions.

96. These claims for ICD procedures could not be covered under Indication Number 1 or Indication Number 2 because the respective Defendants did not find and code ventricular fibrillation, ventricular tachycardia, or cardiac arrest. And these claims for ICD procedures could not be covered under Indication Numbers 3-9 of the 2005 National Coverage Determination because the NCD establishes that patients must not have (1) "a CABG or PTCA within the past 3 months," (2) "an acute MI within the past 40 days," or (3) "clinical symptoms or findings that would make them a candidate for coronary revascularization." Such ICD procedures likewise were not

covered by Medicare under the more restrictive 1999 and 2003 National Coverage Determinations in effect prior to the 2005 NCD.

**Introduction to the Scientific Bases for the National Coverage Determination's Exclusions from Coverage Applicable to Group One**

97. The National Coverage Determination's exclusion of coverage for ICD procedures within 40 days of an acute myocardial infarction is based on numerous scientific studies which have demonstrated that such procedures in the days and weeks following an acute myocardial infarction are not beneficial and are potentially harmful to the heart as it heals and recovers after an AMI. Such harm includes worsening heart failure. The 2005 Decision Memorandum published by CMS concerning ICD coverage confirms, "As demonstrated in DINAMIT, implantation of an ICD within 40 days of an acute myocardial infarction has not been shown to reduce mortality." "Based on the data from DINAMIT, an ICD should not be implanted within 40 days of an AMI." "ICDs have not been shown to improve health outcomes when implanted in patients within 40 days of an AMI and may, in some instances, be harmful in these patients." "Therefore, we have decided to not cover ICD implantation within 40 days of an AMI." (Decision Memorandum for Implantable Defibrillators CAG-00157R3 dated January 27, 2005 at p. 17).

98. In the study cited by CMS, the DINAMIT[5] investigators from 73 surgical sites in 12 countries concluded, "In this randomized trial of high-risk patients who had recently

---

[5] This clinical trial was called the Defibrillator in Acute Myocardial Infarction Trial ("DINAMIT"), a randomized open-label comparison of ICD therapy in 332 patients and no ICD therapy in 342 patients 6 to 40 days after a myocardial infarction. The DINAMIT trial was approved by the institutional review boards of 73 participating investigational sites in 12 countries. The study commenced in April 1998 and follow-up ended in September 2003.

had a myocardial infarction, overall survival was not improved by prophylactic implantation of an ICD." The DINAMIT investigators also noted that a "recent analysis of the MADIT II trial, which also enrolled patients with a previous myocardial infarction, supports the main finding of DINAMIT---that patients who have recently had an infarction do not benefit from ICD."[6]

99. In published 2004 Guidelines for the Management of Patients with ST-Elevation Myocardial Infarction (STEMI), the American College of Cardiology and American Heart Association Task Force stated, "Thus, ejection fraction should be measured **at least 1 month** after STEMI before a decision regarding ICD placement is made."[7]

100.  The 2006 Guidelines published by the American College of Cardiology and American Heart Association confirmed again, "ICD implantation should be deferred until at least 40 d [days] after AMI in patients meeting the above criteria in order to allow time for ventricular function and because ICD therapy has not been demonstrated to improve survival when implanted within 40 days after myocardial infarction."[8]

---

Hohnloser S, Kuck K, Dorian P, et al., "Prophylactic Use of an Implantable Cardioverter-Defibrillator After Acute Myocardial Infarction," *N. Eng. J. Med.* 2004; 351: 2481-8.

[6] *Id.* at 2486-2487 (citing Wilber DJ, Zareba W, Hall WJ, et al, *Time Dependence of Mortality Risk and Defibrillator Benefit After Myocardial Infarction,* Circulation 2004; 109: 1082-4).

[7] ACC/AHA Guidelines for the Management of Patients With ST-Elevation Myocardial Infarction: A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee to Revise the 1999 Guidelines for the Management of Patients With Acute Myocardial Infarction). *Circulation* 2004; 110: e82-e293, p. e194 (emphasis added).

[8]  *See* ACC/AHA/ESC 2006 Guidelines for Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death: A Report of the American College of Cardiology/ American Heart Association and the European Society of Cardiology Committee for Practice Guidelines, *J. Am. Coll. Cardiol.* 2006; 48; e247-e346, p. e283.

101. The IRIS Study published in 2009 further confirms the consensus of studies finding that ICD implantation in the weeks after acute myocardial infarction is not beneficial to patients.[9] Investigators from 92 medical centers or universities participated in this study. The study spanned three years and seven European countries. This "randomized, prospective, open-label, investigator-initiated multicenter trial" tested the "hypothesis that early implantation of an ICD, as compared with optimal medical therapy, would improve survival among patients with acute myocardial infarction and predefined markers of elevated risk." p. 1428. The IRIS investigators from 92 medical centers spanning seven countries concluded "ICD implantation did not convey a prognostic advantage in our study." p. 1433. "In conclusion, we found no evidence that implantation of an ICD improved survival in patients with acute myocardial infarction who received optimal medical therapy and underwent risk stratification based on elevated heart rate on admission, low LVEF, and rapid, non-sustained ventricular tachycardia." p. 1435.

102. In addition to stating that patients receiving an ICD "must not have an acute MI within 40 days," the National Coverage Determination excludes coverage for patients who have "had a coronary artery bypass graft (CABG) or percutaneous transluminal coronary angioplasty (PTCA) within the past 3 months." This specific exclusion from Medicare coverage is also based on numerous scientific studies.

103. The CABG Patch Trial Investigators from 35 medical centers across the United States conducted a controlled trial to determine if "the prophylactic implantation of a

---

[9] Steinbeck G, Anresen D, Seidl K, Brachmann J, Hoffmann E, Wojciechowski, Kornacewicz-Jach Z, et al., *Defibrillator Implantation Early After Myocardial Infarction,* 361 New England Journal of Medicine, 1427-1436 (October 9, 2009).

cardiac defibrillator at the time of bypass surgery would further improve long-term survival in patients at high risk for sudden death who were identified on the basis of either left ventricular ejection fraction below 0.36 and abnormalities on a signal-averaged electrocardiogram."[10] "Survival was not improved by the prophylactic implantation of a defibrillator at the time of elective coronary bypass surgery in patients at high risk for death from ventricular arrhythmia."[11]

104.   The 2006 Guidelines from the American College of Cardiology and American Heart Association confirm, "Evaluation of the need for an ICD and implantation should be deferred until at least 3 months after revascularization procedures (i.e., surgical bypass grafting or percutaneous angioplasty) to allow adequate time for recovery of ventricular function following revascularization."[12] "If obstructive CHD [coronary heart disease] is complicated by ventricular arrhythmias, especially in patients with left main and proximal left anterior descending coronary artery disease, there is a reasonable likelihood that revascularization will reduce the frequency and complexity of the arrhythmias and, in some patients, will eliminate such arrhythmias."[13] "[R]evascularization will reduce the frequency and complexity of the arrhythmias and, in some patients, will eliminate such arrhythmias."[14] "Surgical or

---

[10] Bigger T, "Prophylactic Use of Implanted Cardiac Defibrillators in Patients at High Risk for Ventricular Arrhythmias After Coronary Artery Bypass Graft Surgery," *N. Engl. J. Med.*, 1997; 337:1569-75, p. 1570.
[11] *Id*. at 1572.
[12] ACC/AHA/ESC 2006 Guidelines for Management of Patients with Ventricular Arrhythmias and the Prevention of Sudden Cardiac Death---Executive Summary: A Report of the American College of Cardiology/ American Heart Association and the European Society of Cardiology Committee for Practice Guidelines, *J. Am. Coll. Cardiol.* 2006; 48; e247-e346, e273.
[13]   *Id*. at e273.
[14] *Id*.

percutaneous coronary revascularization with improved coronary blood flow and reduction in myocardial ischemia has favorable antiarrhythmic effects."[15]

105.  The MADIT-II investigators also found "the benefit of ICD therapy is time dependent."[16] "No survival benefit with ICD therapy was shown among patients in whom the device was implanted during the early post-CR [cardiac revascularization] period [less than 6 months]."[17] The benefit of ICDs is "time dependent, and in the current analysis of the MADIT-II study, improved survival was apparent when the ICD was implanted more than six months after CR."[18] "Our findings are consistent with those of the CABG-Patch trial, in which no evidence of improved survival was shown among patients…in whom an ICD was implanted prophylactically at the time of CABG."[19]

106.  The MADIT-II investigators further noted "patients were excluded from enrollment in the MADIT-II study if their most recent CR procedure was performed within three months before enrollment."[20] "Therefore the current results do not include sufficient data on the immediate post-CR period in which an even lower risk

---

[15] *Id.* at e272.
[16] On May 2, 2006, the MADIT-II investigators published their evaluation of the effect of elapsed time from coronary revascularization on the benefit of implantable cardioverter defibrillators and the risk of sudden death. Goldenburg I, Moss A, McNitt S, Zareba W, Hall J, Andrews M, Wilber D, Klein H, Time Dependence of Defibrillator Benefit After Coronary Revascularization in the Multicenter Automatic Defibrillator Implantation Trial (MADIT-II), *J. Am. Coll. Cardiol.,* Vol. 47, No. 9, May 2, 2006: 1811-7.

[17] *Id.* at p.1813.
[18] *Id.* at p.1817
[19] *Id.*
[20] *Id.* at 1816.

of SCD may exist, corresponding to a further reduction in ICD benefit during this time period." [21]

107.   Despite the absolute language of the National Coverage Determinations and the extensive scientific studies supporting such National Coverage Determinations, the respective Defendants have billed Medicare for ICD procedures performed on Medicare patients without a finding of sustained ventricular tachycardia, cardiac arrest, or ventricular fibrillation and in the same short hospital admissions as such patients experienced an acute myocardial infarction initial episode and/or underwent coronary revascularization. [22]

---

[21] *Id.* In the Medicare Coverage Advisory Committee Meeting in 2002, the American College of Cardiology stated, "We support the ICD therapy for MADIT-II indications in this particular subject population." "We recommend strict adherence to the MADIT-II inclusion and exclusion criteria." *See* CMS Decision Memorandum June 6, 2003, p. 21.

[22] Moreover, diagnoses and procedure codes analyzed by Ms. Ford were limited to single admission hospitalizations. Additionally, prior to 2008, MedPAR did not include Medicare managed care claims codes submitted by providers. Further false claims arising from the same violations of the National Coverage Determination by the respective Defendants can be identified through systematic review of claims for ICD procedures submitted by the respective Defendants using the same analyses described by Ms. Ford and evaluating time periods longer than single admission hospitalizations. For example, the National Coverage Determination precludes coverage for ICD procedures within 40 days of an acute myocardial infarction under Indications 3-9 of the 2005 National Coverage Determination. Evaluation of claims for ICD procedures within the 40 day time period after an acute myocardial infarction or the 90 day period after revascularization will also reveal further false claims arising from identical violations of the National Coverage Determination addressed by Relators in this action. Evaluation of Medicare managed claims will also reveal further false claims arising from the identical violations of the National Coverage Determination presented by Relators in this action.

**Group Two of False Claims**

108.   The Second Group of false claims represents cases in which the respective Defendants have reported patient findings of ventricular tachycardia without ventricular fibrillation or cardiac arrest in the same relatively short hospital admission as such patients being diagnosed with acute myocardial infarction initial episode and receiving an ICD device.

109.   These claims within Group Two are not covered under Indication Number 1 of the 1999, 2003 or 2005 National Coverage Determination because there was no reported finding of ventricular fibrillation or cardiac arrest. These claims could not be covered under Indications 3-9 of the 2005 National Coverage Determination because the respective Defendants reported the patients were diagnosed with an acute myocardial infarction initial episode.

110.   Ms. Ford has evaluated these claims under Indication Number 2 of the 1999, 2003, and 2005 National Coverage Determination which states, "Documented sustained ventricular tachyarrhythmia (VT), either spontaneous or induced by an electrophysiology (EP) study, not associated with an acute myocardial infarction (MI) and not due to a transient or reversible cause."

111.   Within the MedPAR system, the numeric code for ventricular tachycardia is not specific to sustained or non-sustained ventricular tachycardia. As discussed below, the clinical codes reported by the respective Defendants indicate that most of these patients within Group Two experienced non-sustained ventricular tachycardia which would not trigger potential coverage of the ICD procedure under Indication Number 2 of the National Coverage Determination.

37

112.   Under the 1999, 2003, and 2005 National Coverage Determinations, the presence of ventricular tachycardia (VT) potentially supports Medicare coverage of an ICD only under the following conditions which all must be present: (1) the VT must be "documented" and "sustained" (2) the sustained VT must not be "associated with acute myocardial infarction," and (3) the sustained VT must not be "due to a transient or reversible cause."

113.   The language "not associated with an acute myocardial infarction" dates back to the 1999 National Coverage Determination. In the 2003 Decision Memorandum from the Centers for Medicaid and Medicare Services (CMS), CMS stated, "There are a number of potential causes of ventricular tachyarrhythmias, including acute myocardial infarction…" CMS Decision Memorandum dated June 6, 2003, p. 2. In the 2003 Decision Memorandum, CMS quoted a published medical review article which stated, "Defibrillators should not be implanted in response to ventricular arrhythmias that have been triggered by myocardial infarction."

114.   The 2002 Guidelines of the American College of Cardiology and the American Heart Association state, "ICD therapy is not recommended for patients in whom a reversible triggering factor for VT/VF can be definitely identified, such as ventricular tachyarrhythmias in evolving AMI or electrolyte abnormalities." (p. 31).

115.   The reasons for this exclusion from Medicare coverage are well-established: acute myocardial infarction commonly triggers transient and reversible ventricular tachycardia.

116.   According to the diagnoses and procedure codes reported by the respective Defendants to CMS, less than six percent of these patients within Group Two

underwent counter shock or electrical cardioversion. This fact suggests that the reported ventricular tachycardia in a substantial number of cases was not sustained. The routine response to sustained ventricular tachycardia which presents hemodynamic compromise to a patient is electrical cardioversion or shock treatment. That did not happen in approximately 94 percent of these patients within Group Two who had reported ventricular tachycardia, indicating that the VT at issue in these patients was not sustained VT. This fact is important because under Indication Number Two of the 1999, 2003 and 2005 National Coverage Determinations, the ventricular tachycardia must be "sustained."

117.   Even if some of these patients did experience sustained ventricular tachycardia, in each of these claims in which the respective hospital Defendants reported a finding of ventricular tachycardia, the hospital also reported a diagnosis of acute myocardial infarction initial episode in the same admission with an average length of stay within Group Two of 10.96 days.

118.   Furthermore, only 1 percent of these patients underwent an EP mapping study according to the procedures reported by Defendants to CMS. According to the American College of Cardiology and American Heart Association Guidelines for Clinical Intracardiac Electrophysiological and Catheter Ablation Procedures, an EP study is indicated in "patients with sustained VT."[23] The absence of an EP mapping

---

[23] Zipes DP, DiMarco JP, Gillette PC, Jackman VM, Myerburg RJ, Rahimtoola SH, Ritchie JL, Cheitlin MD, Garson A Jr, Gibbons RJ, et al. Guidelines for Clinical Intracardiac Electrophysiolgical and Catheter Ablation Procedures. A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Clinical Intracardiac Electrophysiologic and Catheter Ablation Procedures), developed in collaboration with the North American Society of Pacing and Electrophysiology, *J. Am. Coll. Cardiol.* 1995 Aug. 26(2): 555-73.

study being performed in the vast majority of these patients supports the conclusion that the patient did not experience sustained ventricular tachycardia.

119.   There are additional EP studies reported within Group 2, however, the respective Defendants did not report these EP studies as diagnostic mapping studies. Prior to 2007, hospitals sometimes reported and coded an EP study as part of the intra-operative testing of an ICD device. Such EP studies do not represent diagnostic mapping studies used to determine the cause and treatment of ventricular tachycardia or whether a patient should receive an ICD. In 2007, CMS established a separate code to report catheter based invasive EP studies separate from the actual implantation and testing of an ICD.  The 2007, 2008, and 2009 procedure codes submitted by the Defendants confirm that such catheter based invasive EP studies were reportedly performed on only 8.2 percent of the Group Two admissions at issue in such years.

120.   Indication Number Two of the National Coverage Determination states that the patient must have documented sustained ventricular tachycardia "not associated with acute myocardial infarction." These patients within Group Two had diagnosed acute myocardial infarction initial episode in the same hospital admission with an average length of stay within Group Two of 10.96 days. For the reasons identified above, such claims for ICD procedures are not covered under Indication Number 2 of the 1999, 2003, and 2005 National Coverage Determination. Such claims for ICD procedures also do not satisfy the conditions for coverage under any of the other 8 Indications established in the 2005 National Coverage Determination.

121.   Nor do such claims for ICD procedures in prior time periods satisfy the more restrictive conditions of coverage established in the 1999 or 2003 National Coverage Determinations.

122.   In approximately 43 percent of the patients within Group Two, the patient underwent a revascularization procedure. These patients in this revascularization subgroup were diagnosed with the leading common transient or reversible cause of ventricular tachycardia (acute myocardial infarction initial episode) and underwent a surgical procedure which potentially reverses their ischemic causes of VT, yet they still received an ICD in the same admission and such ICD was billed to the Medicare Program as a covered charge.

123.   Approximately 91 percent of these patients undergoing revascularization with a diagnosis of an acute myocardial infarction initial episode had no prior myocardial infarction reported by the Defendants, providing further support for the efficacy of revascularization to reverse potentially the causes of the patient's tachycardia.

124.   Among these patients undergoing revascularization and diagnosed with acute myocardial infarction within Group Two, less than 8 percent of such patients had undergone a prior revascularization procedure according to the diagnoses codes reported by the respective Defendants. This fact also provides further support for the efficacy of revascularization to reverse potentially the causes of the patient's tachycardia.

125.   Approximately 98 percent of these patients in this revascularization subgroup did **not** undergo counter shock treatment according to the procedure codes submitted by the respective Defendants to CMS.

126.   Approximately 99.7 percent of these patients in this revascularization subgroup did not undergo a diagnostic EP mapping study according to the procedure codes reported by the respective Defendants to CMS.

127.   The National Coverage Determination Indication Number 2 states the ventricular tachycardia must be "sustained," must not be "associated with acute myocardial infarction," and must not be "due to any transient or reversible cause." Each of these patients within this revascularization subgroup of Group Two was diagnosed with AMI initial episode and each of these patients underwent a major revascularization procedure which is performed to reverse the ischemic cause of tachycardia.

### Group Three of False Claims

128.   The Third Group of false claims are claims for ICD procedures in which the respective Defendants reported ventricular tachycardia without ventricular fibrillation or cardiac arrest, the patient was not diagnosed with acute myocardial infarction, and the patient underwent revascularization.

129.   As mentioned above, under Indication Number Two of the 1999, 2003, and 2005 National Coverage Determination, the presence of ventricular tachycardia triggers coverage for an ICD procedure only on the following conditions which all must be present: (1) the VT must be documented and sustained; (2) the sustained VT must not be "associated with acute myocardial infarction," and (3) the sustained VT must not be "due to a transient or reversible cause."

130.   The diagnostic and procedure codes submitted by the respective Defendants indicate that the vast majority of these patients within Group Three did not experience sustained VT. In approximately 98 percent of these admissions, the

respective Defendants did not report that the patient underwent counter shock or electrical cardioversion. This fact suggests that the reported ventricular tachycardia was not sustained VT which presented hemodynamic compromise to the patient. As mentioned above, the routine response to sustained ventricular tachycardia which presents hemodynamic compromise to a patient is electrical cardioversion or shock treatment.  That did not happen in approximately 98 percent of the patients with reported ventricular tachycardia in Group Three, indicating that the ventricular tachycardia was not sustained VT which presented hemodynamic compromise to these patients. Under Indication Number Two of the 1999, 2003 and 2005 National Coverage Determination, the patient's ventricular tachycardia must be "sustained."

131.   Among the Group Three claims, each patient underwent a coronary revascularization procedure. These patients underwent a surgical procedure which potentially reverses ischemic causes of ventricular tachycardia, yet they still received an ICD in the same admission with an average length of stay among Group Three of 10.41 days and such procedures were billed to the Medicare Program as covered charges. Over 80 percent of these patients within Group Three undergoing revascularization had no prior myocardial infarction reported by the respective Defendants, providing further support for the efficacy of revascularization to reverse the causes of the patient's reported tachycardia.

132.   Only approximately .5 percent of these patients within Group Three underwent an EP mapping study according to the procedures reported by the respective Defendants to CMS. According to the American College of Cardiology and American Heart Association Guidelines for Clinical Intra-cardiac Electrophysiological and Catheter

Ablation Procedures, an EP study is indicated in "patients with sustained VT."[24] The absence of any EP mapping study suggests that the ventricular tachycardia was not sustained.

133.   Even if some of such patients within Group 3 did experience sustained ventricular tachycardia, each of these patients underwent a major revascularization procedure which is performed to reverse the ischemic causes of tachycardia. The National Coverage Determination only permits coverage of an ICD device if the sustained ventricular tachycardia is not associated with AMI and not "due to any transient or reversible cause." Major revascularization procedures performed without any EP mapping study do not support such a conclusion which is essential for coverage under the National Coverage Determination.

### Group Four of False Claims

134.   Group Four consists of claims in which the respective Defendants reported cardiac arrest or ventricular fibrillation and the patient was diagnosed with acute myocardial infarction initial episode and/or underwent revascularization.

135.   Ms. Ford evaluated such claims under Indication Number 1 of the 1999, 2003, and 2005 National Coverage Determination which states, "Documented episode of cardiac arrest due to ventricular fibrillation (VF), not due to a transient or reversible cause."

---

[24] Zipes DP, DiMarco JP, Gillette PC, Jackman VM, Myerburg RJ, Rahimtoola SH, Ritchie JL, Cheitlin MD, Garson A Jr, Gibbons RJ, et al. Guidelines for Clinical Intracardiac Electrophysiolgical and Catheter Ablation Procedures. A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Clinical Intracardiac Electrophysiologic and Catheter Ablation Procedures), developed in collaboration with the North American Society of Pacing and Electrophysiology, *J. Am. Coll. Cardiol.* 1995 Aug. 26(2): 555-73.

136.   Major scientific studies which have addressed the efficacy of ICDs among patients who experienced ventricular fibrillation/cardiac arrest or sustained ventricular tachycardia have excluded patients who suffered an acute myocardial infarction within 72 hours of such arrest or fibrillation.

137.   In its 2003 Decision Memorandum addressing Medicare coverage for ICDs, CMS noted that in the CASH study which addressed the efficacy of ICDs among patients who survived cardiac arrest secondary to "sustained documented arrhythmias," "patients with cardiac arrest within 72 hours of acute myocardial infarction were among those excluded." *Id.* at p. 13.

138.   The reasons for this exclusion are well-established: acute myocardial infarction commonly triggers transient or reversible ventricular fibrillation or cardiac arrest.

139.   In approximately 69 percent of the claims within Group Four the patient was diagnosed with acute myocardial infarction. Among these patients with acute myocardial infarction, approximately 95 percent had no prior or old myocardial infarction according to the diagnostic codes reported by the respective Defendants to CMS. Among the few patients with a prior or old myocardial infarction, the respective Defendants reported and coded that in approximately 63 percent of these patients, the "healed or old myocardial infarction" was "currently presenting no symptoms.

140.   In only approximately 11 percent of these claims within Group Four in which the patient experienced acute myocardial infarction did the respective Defendants report that the patient underwent counter shock or electrical cardioversion. The routine

response to cardiac arrest or ventricular fibrillation is electrical cardioversion or shock treatment.

141.   Among the claims within Group Four in which the patient was diagnosed with acute myocardial infarction, in only approximately 20 percent of these claims did the respective Defendants report performing an EP study on the patient and many of such EP studies were likely performed as a part of the intra-operative testing of ICD devices, not before implantation. In less than 2 percent of the EP studies reported within the patients diagnosed with acute myocardial infarction within Group Four did the Defendants report performing an EP mapping study. According to the American College of Cardiology and American Heart Association Guidelines for Clinical Intracardiac Electrophysiological and Catheter Ablation Procedures, if the cardiac arrest occurs "more than 48 hours after the acute phase of a myocardial infarction in the absence of a recurrent ischemic event," an EP study is indicated.[25] This recommendation issued by the American College of Cardiology and American Heart Association is Class I which means "conditions for which there is general agreement that the electrophysiological study provides information that is useful and important for patient treatment." The absence of an EP study being performed in the vast majority of these patients supports the conclusion that the cardiac arrests were

---

[25] Zipes DP, DiMarco JP, Gillette PC, Jackman VM, Myerburg RJ, Rahimtoola SH, Ritchie JL, Cheitlin MD, Garson A Jr, Gibbons RJ, et al. Guidelines for Clinical Intracardiac Electrophysiolgical and Catheter Ablation Procedures. A Report of the American College of Cardiology/American Heart Association Task Force on Practice Guidelines (Committee on Clinical Intracardiac Electrophysiologic and Catheter Ablation Procedures), developed in collaboration with the North American Society of Pacing and Electrophysiology, *J. Am. Coll. Cardiol.* 1995 Aug. 26(2): 555-73.

not remote in time to the patients' acute myocardial infarctions or disassociated with the patients' acute myocardial infarctions.

142.    Among the Group Four claims, approximately 34 percent of these patients were diagnosed with acute myocardial infarction and underwent revascularization procedures with no reported finding of a prior or old myocardial infarction. These patients were diagnosed with the leading common transient or reversible cause of ventricular fibrillation or cardiac arrest (acute myocardial infarction) and underwent a surgical procedure which potentially reverses their ischemic causes of fibrillation, yet they still received an ICD in the same admission. These patients within Group Four undergoing revascularization and diagnosed with acute myocardial infarction had no prior or old myocardial infarction reported by the respective Defendants, providing further support for the efficacy of revascularization to reverse potentially the causes of the patient's ventricular fibrillation or cardiac arrest.  Less than 4 percent of such patients had undergone a prior revascularization procedure according to specific codes submitted by the respective Defendants.

143.    The claims representing patients diagnosed with AMI initial episode and undergoing revascularization within Group Four are not covered under Indication One of the National Coverage Determination. Approximately 94 percent of these patients did not undergo electrical cardioversion or counter shock as reported by the respective Defendants, calling into question whether they experienced cardiac arrest or ventricular fibrillation. All of these patients were diagnosed with the leading transient and reversible cause of ventricular fibrillation or cardiac arrest and underwent a revascularization procedure which potentially reverses such ischemic

causes of ventricular fibrillation. The National Coverage Determination Indication One only provides coverage for an ICD device if the patient experiences a "[d]ocumented episode of cardiac arrest due to ventricular fibrillation (VF), not due to a transient or reversible cause."

144.    Among the Group Four claims, another subgroup of these claims was diagnosed with acute myocardial infarction and did not undergo revascularization. According to the respective Defendants' coding reported to CMS, approximately 95 percent of these patients had no prior or old MI.  Approximately 99 percent of these patients did not undergo an EP mapping study. 82 percent of these patients did not receive counter shock or electrical cardioversion treatment.  These patients were diagnosed with the leading common transient or reversible cause of ventricular fibrillation or cardiac arrest (acute myocardial infarction), yet they still received an ICD in the same relatively short hospital admission and such procedures were billed to the Medicare Program as covered charges.

145.    Among the Group Four claims, another subgroup of patients underwent revascularization procedures with no reported finding of acute myocardial infarction. 89 percent of these patients had no reported prior or old myocardial infarction. Approximately 92 percent of these patients had not undergone a prior revascularization procedure according to the clinical codes reported by the respective Defendants. Approximately 99.7 percent of these patients did not undergo an EP mapping study according to the Defendant Hospitals' reported codes to CMS. Approximately 94 percent of these patients did not receive electrical cardioversion or counter shock treatment. These patients underwent a surgical procedure which

potentially reverses ischemic causes of fibrillation, yet they still received an ICD in the same hospital admission and such ICD was billed to the Medicare Program as a covered charge.

**The Respective Defendants Have Evidence of False Claims in Their Possession**

146.   When the Third Amended Complaint is served on a particular Defendant, Relators will provide a detailed separate list of the false claims submitted by that particular Defendant to the Medicare Program for ICD procedures excluded from Medicare coverage.   Such list will contain the same detailed information for each claim as identified in Exhibits 1-9 to the Complaints and Amended Complaints for fiscal years 2002-2010 but will be limited to the false claims at issue submitted by that particular Defendant.

147.   Given the large number of procedures involved, it would be unwieldy and would serve no useful purpose for each of the claims to be discussed individually in this Third Amended Complaint. To detail each ICD procedure would unreasonably increase the length of the Third Amended Complaint. Relators incorporate Exhibits 1 through 9 to the Complaint and Amended Complaints which are on file under seal with the Court and which provide detailed information concerning each false claim for each of the years 2002-2010.

148.   With respect to violations of the National Coverage Determinations governing ICD procedures, the respective Defendants have evidence in their possession. They have records of the UB-92 and UB-04 claim forms for interim payments submitted to the Medicare Program and the diagnostic and procedure codes surrounding each ICD procedure and submitted for each hospital admission for each Medicare patient.

They have records of payments from the Medicare Program corresponding to the UB-92 and UB-04 claim forms. They have copies of their annual cost reports submitted to CMS. They further have the medical charts which should be consistent with the diagnostic and procedure codes certified as accurate and submitted to the Medicare Program for each admission in which a Medicare patient received an ICD.

### Additional Damages to the Medicare Trust Fund

149.   Potential complications from such ICD devices are significant and represent increased damages to the Medicare Program. The American College of Cardiology and the American Heart Association have recognized: "Problems associated with ICD therapy include inappropriate shock discharge, mostly for AF with rapid ventricular response, defibrillator storm with appropriate recurrent discharge for recurrent ventricular tachyarrhythmais or inappropriate discharge for a multiplicity of reasons, infections related to device implantation, and exacerbation of [heart failure] when a high percentage of the heartbeats are paced from the RV apex, especially when ventricular function is already compromised." [26]

150.   In its 2008 Guidelines, The American College of Cardiology and American Heart Association stated, "Conventional ICD therapy in any form may be associated with

---

[26] Epstein AD, DiMarco JP, Ellenbogen KA, Estes NAM III, Freedman RA, Gettes LS, Gillinov AM, Gregaoratos G, Hammitl SC, Hayes Dl, Hlatky MA, Newby LK Page RL, Schoenfiel MH, Silka MJ, Stevenson LW, Sweeney MO, ACC/AHA/HRS 2008 Guidelines for Device-Based Therapy of Cardiac Rhythm Abnormalities: A Report of the American College of Cardiology/ American Heart Association Task Force on Practice Guidelines, *J. Am. Coll. Cardiol.* 2008; Vol. 51, e1-62, at e43.

worsening heart failure, VT, VF, and non-cardiac death that can be related to the adverse effects of RVA pacing."[27]

151.    In its 2005 Decision Memorandum for Implantable Defibrillators (CAG-00157R3), CMS stated, "Since ICDs only treat ventricular tachyarrhythmias, do not prevent death from other cardiac or non-cardiac causes, and may cause adverse events, such as inappropriate shocks and worsening heart failure, they should not be perceived as or projected to be an ideal technology that eliminates significant health risks for patients with heart failure."

152.    The damages calculations provided by Relators to the Department of Justice do not include damages to the Medicare Trust Fund from false claims paid to individual physicians and physician groups for ICD procedures excluded from Medicare coverage.  Relators are not yet able to identify the individual physicians who have submitted and been paid for the false claims for the ICD procedures identified in Exhibits 1, 2, 3, 4, 5, 6, 7, 8 and 9 which are on file under seal with the Court and incorporated herein.  Such claims by physicians also constitute false claims for procedures excluded from Medicare coverage for which the United States is entitled to recover under the False Claims Act.

153.    The damages calculations provided in Exhibits 1-9 also do not include false claims for ICD procedures excluded from coverage under the federal-state Medicaid programs, the federal TRICARE-CHAMPUS program, and Medicare managed care.

---

[27] *Id.*

**Each False Claim Represents the Absence of the Requisite Advance Beneficiary Notice to a Medicare Patient**

154.   The false claims at issue represent situations in which Medicare patients were not advised that the Medicare Program excludes coverage for such ICD procedures and the reasons for such exclusions. The laws and regulations addressing advance beneficiary notices ("ABN") to Medicare patients are based in part on the important policy of providing information to Medicare patients so that they can make an informed decision prior to the treatment or procedure which is not covered by the Medicare Program.

*155.*   The Medicare Claims Processing Manual Section 40.3 states, "The purpose of the ABN is to inform a Medicare beneficiary, before he or she receives specified items or services that otherwise might be paid for, that Medicare certainly or probably will not pay for them on that particular occasion." "The ABN also allows that beneficiary to make an informed consumer decision whether or not to receive the items or services for which he or she may have to pay out of pocket or through other insurance." *Id.* In addition, the ABN allows "the beneficiary to participate in his/her own health care treatment decisions by making informed consumer decisions." *Id.*

156.   In the presence of the governing National Coverage Determination, advance beneficiary notices to Medicare patients receiving ICD devices under these clinical conditions were mandatory. The Medicare Claims Processing Manual Section 40.3 states, "The provider, practitioner, or supplier must issue an ABN each time, and as soon as, it makes the assessment that Medicare payment certainly or probably will not be made." "A beneficiary must be notified far enough in advance of an event

about which a decision must be made by the beneficiary (e.g., receiving medical service) so that the beneficiary can make a rational, informed consumer decision without undue pressure." (Medicare Claims Processing Manual Section 40.3.3). If the provider has "some genuine doubt regarding the likelihood of Medicare payment," an ABN should be issued to the patient. (Medicare Claims Processing Manual Section 40.3.6.2). "The following are statutory provisions requiring delivery of the ABN…. §1862(a)(1) of the [Social Security] Act (not reasonable and necessary…" (Medicare Claims Processing Manual Section 50.3.1).

157.   The Medicare Claims Processing Manual confirms that the "ABN must specify the services and a genuine reason that denial by Medicare is expected." (Medicare Claims Processing Manual Section 40.3.6.1). "To be acceptable, the ABN must give the beneficiary a reasonable idea of why the notifier is predicting the likelihood of Medicare denial so that the beneficiary can make an informed consumer decision whether or not to receive the service and pay for it personally." (Medicare Claims Processing Manual Section 40.3.8).  On the ABN form, "notifiers must explain, in beneficiary friendly language, why they believe the items or services described in Blank (D) may not be covered by Medicare." (Medicare Claims Processing Manual Section 50.6.3).

158.   The Medicare Claims Processing Manual recognizes that the "[c]riteria for determining whether a provider had knowledge or should have had knowledge that services or items would be denied are in regulations at 42 C.F.R. § 411.406, which cites various forms and methods of notification that provide sufficient evidence that the provider knew or should have known that the services or items would be

denied." (Medicare Claims Processing Manual Section 40.1.2). That federal regulation states in pertinent part, **"It is clear that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage on the basis of the following…Federal Register publications containing notice of national coverage decisions or of other specifications regarding noncoverage of an item or service."** 42 C.F.R. § 411.406(e)(2) (emphasis added).

159.   A physician or hospital and patient may agree to implant an ICD in conditions under which Medicare excludes coverage. But the physician or hospital may not seek or collect payment from the Medicare Program for such procedures. Instead, the hospital or physician may receive payment from the patient if the hospital or physician has provided the patient with an ABN. If a physician or hospital wishes to implant an ICD in a situation excluded from Medicare coverage and if the physician or hospital wishes to be paid for such procedure by the patient, the physician or hospital must give the patient the requisite written Advance Beneficiary Notice as established in 42 C.F.R. § 411.408 (f)(1). If the physician or hospital does not provide such written notice, including "the physician's reasons for believing Medicare payment will be denied," then the physician or hospital must refund any payments collected from the patient or face sanctions under 42 C.F.R. § 411.408 (g).

### Defendants' Liability under the False Claims Act

160.   The False Claims Act establishes liability for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government

. . . a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A); "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B); or "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

161.   The False Claims Act defines "knowing" and "knowingly" as having "actual knowledge of the information," or acting in "deliberate ignorance of the truth or falsity of the information" or acting in "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

162.   Under the False Claims Act, "no proof of specific intent to defraud" is required. 31 U.S.C. § 3927(b)(1)(B).

163.   Under the False Claims Act, the term "claim…means any request or demand, whether under a contract or otherwise, for money or property…that is presented to an officer, employee or agent of the United States or…is made to a contractor, grantee or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded…" 31 U.S.C. § 3729 (b)(2)(A).

164.   The United States would not have paid the claims submitted by the respective Defendants if the Defendants had disclosed the fact that the ICD procedures at issue were not covered under Medicare's National Coverage Determinations.

165.   The Defendants' failure to disclose the non-covered charges on the UB-92 and UB-04 Forms and in the Cost Reports was factually false.

166.   The United States Supreme Court has confirmed that protection of the public treasury requires that those who seek public funds act with scrupulous regard for the requirements of law.

167.   In submitting their claims, the respective Defendants were obligated to seek payment only for "covered charges" or those procedures and services that were covered under the Medicare Program. In seeking and obtaining payments for ICD procedures that were excluded from coverage under the governing National Coverage Determination, the claims were legally false.

168.   With respect to each claim for an ICD procedure which was not covered by the National Coverage Determination, the respective Defendant responsible for such claim either (1) had actual knowledge of the information; or (2) acted in deliberate ignorance of the truth or falsity of the information; or (3) acted in reckless disregard of the truth or falsity of the information.

169.   A defendant who denies actual knowledge must claim ignorance. A defendant's denial of "actual knowledge" will not excuse it from liability under the False Claims Act.

170.   The National Coverage Determination governing ICDs was extensively publicized to hospitals participating in Medicare. For each of the relevant years CMS

organized and published the National Coverage Determinations into 4 Parts with the Table of Contents for each Part. On the first Table of Contents for Part 1, there is a section for "Cardiovascular System." Within that Section 20, there is only one NCD titled "Implantable Automatic Defibrillators" listed on the Table of Contents. That NCD is Section 20.4 in the current Medicare National Coverage Determinations Manual.

171.   For a hospital choosing to engage in the business of implanting ICDs in Medicare patients, there is only one National Coverage Determination to follow with respect to Medicare coverage and payment for such ICD procedures.

172.   The governing National Coverage Determination contains express and absolute conditions of coverage. The language in the NCD is "patients must not have" certain conditions. If such conditions exist, there is no Medicare coverage for an ICD procedure.

173.   Hospitals electing to participate in the Medicare Program are bound by law to comply with the National Coverage Determinations. Fiscal intermediaries may not authorize exceptions to the Medicare National Coverage Determination which govern the ICD procedures at issue in this case.[28] The Medicare Coverage Issues

---

[28] The Medicare Program Integrity Manual § 13.1.1 states: "The contractor shall apply NCDs when reviewing claims for services addressed by NCDs." "When making individual claim determinations, contractors have no authority to deviate from NCD if absolute words such as 'never' or 'only if' are used in the policy." (*See* Medicare Program Integrity Manual attached hereto as Ex. 5). The National Coverage Determination at issue uses such absolute words. **"Patients must not have...had a coronary artery bypass graft (CABG) or percutaneous transluminal coronary angioplasty (PTCA) within past 3 months." "Patients must not have...  had an enzyme-positive MI within the past 40 days." "Patients must not**

Manual Transmittal 173 states that the National Coverage Determinations are "binding on all carriers, intermediaries, peer review organizations, health maintenance organizations, competitive medical plans, and health care prepayment plans." "In addition, an Administrative Law Judge may not review an NCD." *Id.* As a matter of law, each hospital was required to know the contents of the binding National Coverage Determinations governing Medicare coverage and payments for ICD procedures.

174.   42 C.F.R. § 411.406 (e)(2) provides, **"It is clear that the provider, practitioner, or supplier could have been expected to have known that the services were excluded from coverage on the basis of the following…Federal Register publications containing notice of national coverage decisions or of other specifications regarding noncoverage of an item or service."** (Emphasis added). That federal regulation establishes criteria for determining that a provider knew that services were excluded from coverage as not reasonable and necessary. As a matter of federal law, providers are deemed to know the requirements of Medicare's National Coverage Determinations.  Ignorance is not an option.

175.   The respective Defendants have repeatedly submitted claims for federal payment of ICD procedures in contravention of the governing National Coverage Determination and have been paid for such claims by the Medicare Program. The respective Defendants have acted either with actual knowledge of such violations or in reckless disregard of compliance with the National Coverage Determination.

---

**have… clinical symptoms or findings that would make them a candidate for coronary revascularization."** (emphasis added).

### Each False Claim Represents Multiple False Statements and False Records Submitted to Federal Healthcare Programs

#### False Certifications in the UB-92 and UB-04 Claim Forms

176.   Each false claim at issue in this action represents multiple false submissions to the Medicare Program by the respective Defendants.

177.   As mentioned above, upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services provided to those beneficiaries during their hospital stays. *See* 42 C.F.R. §§ 413.1, 413.60, 413.64.   Hospitals submit patient-specific claims for interim payments electronically on a CMS Form UB-92 or the UB-04 Form which replaced the UB-92 Form in March of 2007.

178.   For each of the years in question, on the UB-92 and UB-04 forms there was a column bearing the heading "NON-COVERED CHARGES" in which the hospital is required to list charges not covered by Medicare.

179.   The respective hospitals failed to list the ICD procedures at issue as "non-covered charges" on the UB-92 and UB-04 Forms. They repeatedly sought and received payments for ICD procedures as "covered charges" when such procedures were not covered under the governing National Coverage Determination.

180.   Both the UB-92 and UB-04 Forms contain explicit certifications of accuracy. The UB-92 contains the following notice in bold capital letters: "ANYONE WHO

MISREPRESENTS OR FALSIFIES ESSENTIAL INFORMATION REQUESTED BY THIS FORM MAY UPON CONVICTION BE SUBJECT TO FINE AND IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW."

181. The UB-92 Form also requires the provider's representative to "certify the certifications on the reverse apply to this bill and are made a part hereof." Such certifications include the following:

- "This claim, to the best of my knowledge, is correct and complete and in conformance with the Civil Rights Act of 1964 as amended."

- "I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claim, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

- "For CHAMPUS purposes: This is to certify…the information submitted as part of this claim is true, accurate, and complete, and, the services shown on this form were medically indicated and necessary for the health of the patient."

182. The UB-04 Form contains the following notice in bold capital letters: "THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/PR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S)."

183.   The UB-04 Form requires the provider to certify the following:

- "Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

- "For Medicaid Purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws."

- "For TRICARE Purposes: The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically [sic] and appropriate for the health of the patient."

### False Certifications in the Annual Cost Reports

184.   As mentioned above, each hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator. For each of the years in question, the responsible officer or employee of each Defendant hospital was required to certify the following on the annual Cost Report:

> To the best of my knowledge and belief, it (the Hospital Cost Report) is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

> I further certify that I am familiar with the laws and regulations regarding

the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Form HCFA-2552-92.

185.   Each hospital cost report also contains the following notice: "Misrepresentations or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law."

186.   If a hospital wishes to contest charges which are non-covered, Medicare rules require the hospital to calculate the reimbursement impact (or "settlement" impact) of such non-covered charges separately on their annual Cost Reports and individually disclose such amounts on line 30 of worksheet E, Part A (inpatient) and Line 36 of E, Part B (outpatient) in accordance with CMS Pub. 15-II, section 115.2.

187.   "Non-covered" charges should not be included with "covered" charges in the Cost Report. There are multiple worksheets and columns on the Cost Report where inpatient and outpatient "covered" charges are required to be listed. The respective Defendants included non-covered charges for the ICD procedures at issue intermingled with covered charges on multiple Cost Report pages, thereby distorting various Cost Report calculations and settlements.

188.   The Medicare Program depends upon the truthfulness and accuracy of providers in submitting claims and completing their cost reports. Providers know this fact.

189.   The United States would not have paid the claims filed by Defendants if the Defendants had disclosed the fact that the ICD procedures at issue were not covered

under Medicare's National Coverage Determinations.

190.   The respective Defendants' failures to disclose the non-covered ICD procedures

on the UB-92 or UB-04 forms and in their annual Cost Reports submitted to CMS

constitute false claims and false certifications.

## This Action is Not Barred by the Public Disclosure Defense

## The Diagnoses and Procedure Codes Submitted by Hospitals to CMS Do Not Constitute Any of the Specific Sources of Potential Public Disclosure Enumerated in the False Claims Act

191.   Prior to March of 2010, the False Claims Act defined the "public disclosure"

defense as follows:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action in an original source of the information.

> 31 U.S.C. § 3730(e)(4)(A)(1994).

192.   On March 23, 2010, the President of the United States signed the Patient

Protection and Affordability Care Act, Pub. L. 111-148, 124 Stat. 119, which

broadened the reach of the False Claims Act. Under the amended False Claims Act,

the public disclosure defense is no longer a jurisdictional bar. Rather, it is a defense

that a defendant must raise affirmatively and that automatically fails if opposed by

the government.

193.   31 U.S.C. § 3730(e)(4), as amended in March of 2010, provides as follows,

> (4)(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in

a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

(iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

194.   As an initial requirement, the potential public disclosure at issue must occur through one of the specific sources enumerated in the statute.

195.   There are three groups of specific sources enumerated in 31 U.S.C. § 3730(e)(4)(A): (1) "a criminal, civil or administrative hearing,"(statutory language prior to March 23, 2010) or "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party," (current statutory language); (2) "the news media," and (3) "a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation" (statutory language prior to March 23, 2010) or "a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation" (current statutory language).

196.   Prior to Relators filing this action, the allegations at issue as to any Defendant were never publicly disclosed in any of the specific sources enumerated in the statute.

197.   The procedure and diagnoses codes submitted by hospitals to CMS do not fall within any of the three groups of specific sources enumerated in 31 U.S.C. § 3730(e)(4)(A).

198.   First, the procedure and diagnoses codes submitted by hospitals to CMS do not represent "a criminal, civil or administrative hearing" or "a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party." 31 U.S.C. § 3730 (e)(4)(A)(i).

199.   Second, the procedure and diagnoses codes submitted by hospitals to CMS do not represent "the news media." 31 U.S.C. § 3730 (e)(4)(A)(ii).

200.   Third, procedure and diagnoses codes submitted by hospitals to CMS are not "congressional," "administrative," "Government Accountability Office" or "other Federal" reports, hearings, audits or investigations. In exposing the false claims at issue, Relators did not use any report authored by the government.

201.   Diagnoses and procedure codes submitted by hospitals to CMS do not constitute any of the specific sources enumerated in the False Claims Act which are prerequisites to the public disclosure defense. The inquiry ends there without further need to examine whether the additional requirements of the "public disclosure" defense are satisfied.

202.   Further, Relators have not issued any request to the government under the Freedom of Information Act. In preparing this case, Relators have not received, used, or relied on any government response to any request under the Freedom of Information Act.

203.   Ms. Ford had restricted access, **which is not available to the public,** to the procedure and diagnoses codes submitted by hospitals to CMS.  CMS released such information to certain entities for certain specified purposes, subject to various regulations to prevent improper disclosure. Such regulations are the antithesis of public disclosure.

**Over Two Billion Numeric Codes in a Vast Database Did Not Alert the Government to the False Claims at Issue**

204.   Federal Circuit Courts, District Courts, and the United States Department of Justice have recognized that the function of "public disclosure" is to "alert" the government with "a clear and substantial indication of foul play" so as to "set the government squarely on the trail of the alleged fraud."

205.   The public disclosure bar does not apply when the government must comb through the myriad of transactions performed by the various industry defendants in search of false claims. Rather, as recognized by federal courts and the Department of Justice, a public disclosure must "set forth easily identifiable defendants engaged in clear methods of fraudulent activity."

206.   Each fiscal year the MedPAR file contains numeric codes submitted by Medicare providers with respect to approximately 12 million inpatient admissions for that year.  The full annual MedPAR data file typically has 14 million to 16 million lines of numeric codes submitted by Medicare providers for inpatient admissions. With up

to 6 diagnoses codes and 9 procedure codes for each admission,[29] there are up to approximately 180 million numeric codes within MedPAR each year signifying specific diagnoses and procedures for Medicare patients.  Buried within this massive database of millions of numeric codes are the diagnoses and procedure codes related to the ICD procedures at issue.

207.   Over the time period at issue in this case, there were over 2 billion numeric codes submitted by Medicare providers to CMS concerning inpatient admissions. None of the 2 billion codes contains any allegation of fraud or false claims. The numeric codes are innocuous numbers.

208.   The hundreds of millions of numeric codes submitted by Medicare providers each year did not sufficiently alert the government to false claims being submitted for implantable defibrillators.  To conclude otherwise would mean that the federal government is "alerted" to every false claim evidenced by any numeric code within a vast database of over 300 million codes submitted by Medicare providers each year to CMS.

209.   Unless there has been a public disclosure of allegations of false claims or fraudulent transactions through one of the specific channels enumerated in the False Claims Act, then the source and extent of Relators' knowledge are irrelevant and

---

[29] Fiscal year 2010 MedPAR expanded the 6 diagnoses codes to 25 codes and expanded the 9 procedure codes to 25 codes.  The diagnoses and procedure codes are only two categories of the multiple categories of codes in MedPAR. There are also codes for patient age group, sex and race, hospital provider number, length of stay, and 5 categories of accommodation charges.

there is no need to consider whether Relators satisfy the "original source" exception to the public disclosure defense.[30]

### First Cause of Action---Presentation of False Claims for Payment or Approval (31 U.S.C. § 3729(a)(1)(A))

210.   Relators repeat and reallege the foregoing paragraphs as if fully set forth herein.

211.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

212.   The respective Defendants knowingly presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

213.   By virtue of the false claims made by the respective Defendants to Federal Healthcare Programs, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Second Cause of Action---Making or Using False Record or Statement Material to False Claim (31 U.S.C. § 3729(a)(1)(B))

214.   Relators repeat and reallege the foregoing Paragraphs as if fully set forth herein.

215.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or

---

[30] The facts would satisfy the original source exception if it applied.

statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

216.   The respective Defendants knowingly made, used, or caused to be made or used false records or statements material to the false claims at issue. With respect to the ICD procedures at issue excluded from Medicare coverage, the respective Defendants submitted false records and made false statements when initially submitting the claims for interim payments to Federal Healthcare Programs and they submitted false records and false statements in their annual Cost Reports to CMS. The respective Defendants' conduct resulted in false claims being paid by the United States.

217.   By virtue of the false records or false statements made by the respective Defendants, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Third Cause of Action---Conspiring to Submit False Claims
### (31 U.S.C. § 3729(a)(1)(C))

218.   Relators repeat and reallege the foregoing Paragraphs as though fully set forth herein.

219.   In pertinent part, the False Claims Act establishes liability for "any person who....conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

220.   The John Doe Defendants include physicians and other individuals who participated in implanting and billing Federal Healthcare Programs for the ICDs at

issue in contravention of the National Coverage Determination. The Defendants and the John Doe Defendants acted in concert, by agreement, and in conspiracy to submit false claims to Federal Healthcare Programs for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(1)(C).

221.   By virtue of the conspiracy, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**Fourth Cause of Acton---Submission of Express and Implied False Certifications (31 U.S.C. § 3729(a)(1)(B))**

222.   Relators repeat and re-allege the foregoing Paragraphs as if fully set forth herein.

223.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

224.   The governing National Coverage Determination contains explicit conditions of coverage and payment for ICD procedures on Medicare patients. The National Coverage Determinations are binding on all providers participating in the Medicare Program.

225.   With respect to each false claim, the respective Defendants expressly represented and certified that the ICD procedure at issue should not be listed as "non-covered charges." With respect to each ICD procedure billed to the Medicare Program, the respective Defendants implicitly certified that the procedure complied with the express conditions of coverage and payment established in the binding National Coverage Determination. The express and implied certifications by the respective

70

Defendants were false.

226.   By virtue of the false claims made by Defendants, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Fifth Cause of Action---Knowingly Causing and Retaining Overpayments (31 U.S.C. § 3729(a)(1)(G))

227.   Relators repeat the allegations of the foregoing paragraphs as if fully stated herein.

228.   The False Claims Act also establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The term "obligation" is defined to include "an established duty, whether or not fixed, arising from…the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

229.   With respect to the ICD procedures at issue excluded from Medicare coverage, the respective Defendants have submitted false claims which caused overpayments from the Medicare Program and they have knowingly retained such overpayments in violation of the False Claims Act.

230.   By virtue of the respective Defendants' causing and retaining overpayments from the Medicare Program and other Federal Healthcare Programs, the United States

sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Prayers for Relief

231.   WHEREFORE, on behalf of the United States, Relators request and pray that judgment be entered against the respective Defendants under the False Claims Act in the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, for an appropriate relators' share as specified by 31 U.S.C. § 3730, for attorneys fees, costs and expenses as provided by 31 U.S.C. § 3730, and for all such further legal and equitable relief as may be just and proper.

### JURY TRIAL IS HEREBY DEMANDED.

Respectfully submitted, this 7th of February, 2013.

Theodore J. Leopold
Florida Bar No. 705608
Leopold Law, PA
2925 PGA Blvd
Suite 200
Palm Beach Gardens, Fl 33410
Telephone (561)935-4801
Fax (561)515-1401
tleopold@leopold-law.com

Bryan A. Vroon
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1718 Peachtree Street, Suite 1088
Atlanta, Georgia  30309
Telephone: (404) 441-9806

72

bryanvroon@gmail.com

Edward D. Robertson, Jr.
Anthony DeWitt
Bartimus, Frickleton, Robertson
& Gorny, PC
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454 (Voice)
573-659-4460 (Facsimile)
chiprob@earthlink.net
aldewitt@sprintmail.com

Counsel for Relators

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing **Relators'**

**Third Amended Complaint Under 31 U.S.C. §3729, Federal False Claims Act,** including

**Exhibit A to the Third Amended Complaint,** by certified mail, return receipt requested,

addressed as follows:

>Jeffrey W. Dickstein
>United States Attorney's Office for the
>Southern District of Florida
>Florida Bar No. 434892
>99 NE 4th Street, Suite 300
>Miami, Florida 33132
>Tel: (305) 961-9453
>Fax: (305) 536-4101
>
>Daniel R. Anderson
>Jamie Ann Yavelberg
>Amy L. Easton
>Attorneys, Civil Division
>U.S. Department of Justice
>P.O. Box 261, Ben Franklin Station
>Washington, D.C.  20044
>Tel: (202) 353-2685
>Fax: (202) 514-0280
>
>Counsel for the United States

This 7th day of February, 2013.

Ted Leopold

# EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| SYSTEM/HOSPITAL NAME | PROV ID | STREET | CITY | ST | ZIP |
|---|---|---|---|---|---|
| *ADVENTIST HEALTH SYSTEM - WINTER PARK, FL* | | | | | |
| ADVENTIST LA GRANGE MEMORIAL HOSPITAL | 140065 | 5101 S. WILLOW SPRINGS ROAD | LAGRANGE | IL | 60525 |
| FLORIDA HOSPITAL | 100007 | 601 EAST ROLLINS STREET | ORLANDO | FL | 32803 |
| FLORIDA HOSPITAL WATERMAN | 100057 | 1000 WATERMAN WAY | TAVARES | FL | 32778 |
| HINSDALE HOSPITAL | 140122 | 120 NORTH OAK STREET | HINSDALE | IL | 60521 |
| MEMORIAL HOSPITAL FLAGLER | 100118 | 60 MEMORIAL MEDICAL PARKWAY | PALM COST | FL | 32164 |
| MEMORIAL HOSPITAL ORMOND/PENNISULA | 100068 | 875 STERHAUS AVENUE | ORMOND BEACH | FL | 32174 |
| METROPLEX HOSPITAL | 450152 | 2201 SOUTH CLEAR CREEK ROAD | KILLEEN | TX | 76542 |
| SHAWNEE MISION MEDICAL CENTER | 170104 | 9100 WEST 74TH STREET | SHAWNEE MISSION | KS | 66204 |
| | | | | | |
| *ADVOCATE HEALTH CARE - OAK BROOK, IL* | | | | | |
| ADVOCATE LUTHERAN GENERAL HOSPITAL | 140223 | 1775 W. DEMPSTER STREET | PARK RIDGE | IL | 60068 |
| ADVOCATE NORTHSIDE HEALTH SYSTEM | 140182 | 4550 N. WINCHESTER | CHICAGO | IL | 60640 |
| BROMENN REGIONAL MEDICAL CENTER | 140127 | VIRGINIA AT FRANKLIN | NORMAL | IL | 61761- |
| CHRIST HOSPITAL | 140208 | 4440 WEST 95TH STREET | OAK LAWN | IL | 60453 |
| CONDELL MEDICAL CENTER | 140202 | 900 GARFIELD AVE | LIBERTYVILLE | IL | 60648 |
| GOOD SAMARITAN HOSPITAL | 140288 | 3815 HIGHLAND AVENUE | DOWNERS GROVE | IL | 60515 |
| GOOD SHEPHERD HOSPITAL | 140291 | 450 W. HIGHWAY 22 | BARRINGTON | IL | 60010 |
| SOUTH SUBURBAN HOSPITAL | 140250 | 178TH STREET AND KEDZIE AVE | HAZELCREST | IL | 60429 |
| | | | | | |
| *ALLINA HOSPITALS & CLINICS - MINNEAPOLIS, MN* | | | | | |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| ABBOTT NORTHWESTERN HOSPITAL | 240057 | 800 EAST 28TH STREET | MINNEAPOLIS | MN | 55407 |
| MERCY HOSPITAL | 240115 | 4050 COON RAPIDS BOULEVARD | COON RAPIDS | MN | 55433 |
| UNITED HOSPITAL | 240038 | 333 SMITH AVENUE NORTH | ST PAUL | MN | 55102 |
| UNITY HOSPITAL | 240132 | 550 OSBORNE ROAD | FRIDLEY | MN | 55432 |
| | | | | | |
| *ASCENSION HEALTH - SAINT LOUIS, MO* | | | | | |
| BAPTIST HOSPITAL | 440133 | 2000 CHURCH ST | NASHVILLE | TN | 37236 |
| BORGESS MEDICAL CENTER | 230117 | 1521 GULL ROAD | KALAMAZOO | MI | 49048-1640 |
| BRACKENRIDGE HOSPITAL | 450124 | 601 E. 15TH STREET | AUSTIN | TX | 78701 |
| CARONDELET ST. JOSEPH HOSPITAL | 030011 | 350 NORTH WILMOT ROAD | TUCSON | AZ | 85732 |
| COLUMBIA ST MARYS HOSPITAL MILWAUKEE | 520051 | 2323 NORTH LAKE DRIVE | MILWAUKEE | WI | 53211- |
| COLUMBIA ST. MARY S COLUMBIA CAMPUS | 520140 | 2025 E NEWPORT AVENUE | MILWAUKEE | WI | 53211- |
| COLUMBIA ST. MARYS OZAUKEE CAMPUS | 520027 | 13111 N. PORT WASHINGTON RD | MEQUON | WI | 53097- |
| DCHSA-D.B.A.-SETON MEDICAL CTR | 450056 | 1201 WEST 38TH STREET | AUSTIN | TX | 78705 |
| GENESYS REGIONAL MEDICAL CTR. | 230197 | 1 GENESYS PKWY | GRAND BLANC | MI | 48439-8065 |
| MEDICAL CENTER EAST | 010011 | 50 MEDICAL PARK DRIVE EAST | BIRMINGHAM | AL | 35235 |
| MOUNT ST. MARY S HOSPITAL | 330188 | 5300 MILITARY RD | LEWISTON | NY | 14092 |
| PROVIDENCE HEALTH CENTER | 450042 | 6901 MEDICAL PARKWAY | WACO | TX | 76712 |
| PROVIDENCE HOSPITAL | 010090 | 6801 AIRPORT BLVD | MOBILE | AL | 36608 |
| PROVIDENCE HOSPITAL | 090006 | 1150 VARNUM STREET | WASHINGTON | DC | 20017- |
| PROVIDENCE HOSPITAL | 230019 | 16001 WEST NINE MILE ROAD | SOUTHFIELD | MI | 48075 |
| SACRED HEART HOSPITAL | 100025 | 5151 NORTH 9TH AVENUE | PENSACOLA | FL | 32504 |
| SAINT THOMAS HOSPITAL | 440082 | 4220 HARDING ROAD | NASHVILLE | TN | 37202- |
| ST MARY S MEDICAL CENTER | 230077 | 800 S WASHINGTON | SAGINAW | MI | 48601 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| ST. AGNES HOSPITAL | 210011 | 900 CATON AVENUE | BALTIMORE | MD | 21229 |
| ST. JOHN HOSPITAL AND MEDICAL CENTER | 230165 | 22101 MOROSS | DETROIT | MI | 48236 |
| ST. JOHN MACOMB HOSPITAL | 230195 | 28000 DEQUINDRE | WARREN | MI | 48092 |
| ST. JOSEPH MEDICAL CENTER | 260085 | 1000 CARONDELET DR | KANSAS CITY | MO | 64119 |
| ST. MARY S MEDICAL CENTER | 150100 | 3700 WASHINGTON AVENUE | EVANSVILLE | IN | 47750 |
| ST. VINCENT HOSPITAL & HCC | 150084 | 2001 WEST 86TH STREET | INDIANAPOLIS | IN | 46260 |
| ST. VINCENT S HOSPITAL | 010056 | 810 ST. VINCENT S DRIVE | BIRMINGHAM | AL | 35205 |
| ST. VINCENT S MEDICAL CENTER | 070028 | 2800 MAIN STREET | BRIDGEPORT | CT | 6606 |
| ST. VINCENT S MEDICAL CENTER | 100040 | 1800 BARRS STREET | JACKSONVILLE | FL | 32204 |
| TUCSON HEART HOSPITAL | 030100 | 4888 NORTH STONE AVENUE | TUCSON | AZ | 85705 |
| | | | | | |
| *AURORA HEALTH CARE - MILWAUKEE, WI* | | | | | |
| AURORA BAYCARE MEDICAL CENTER | 520193 | 2845 GREENBRIAR ROAD | GREEN BAY | WI | 54311- |
| AURORA SINAI MEDICAL CENTER | 520064 | SINAI SAMARITAN MNEDICAL CENTER | MILWAUKEE | WI | 53201- |
| ST. LUKE S MEDICAL CENTER | 520138 | 2900 WEST OKLAHOMA AVENUE | MILWAUKEE | WI | 53215 |
| | | | | | |
| *BANNER HEALTH - PHOENIX, AZ* | | | | | |
| BANNER BAYWOOD HEART HOSPITAL | 030105 | 6750 EAST BAYWOOD AVENUE | MESA | AZ | 85206 |
| BANNER GOOD SAMARITAN MEDICAL CENTER | 030002 | 1111 EAST MCDOWELL ROAD | PHOENIX | AZ | 85006 |
| DESERT SAMARITAN MEDICAL CENTER | 030065 | 1400 SOUTH DOBSON ROAD | MESA | AZ | 85202 |
| MCKEE MEDICAL CENTER | 060030 | 2000 BOISE AVENUE | LOVELAND | CO | 80538 |
| NORTH COLORADO MEDICAL CENTER | 060001 | 1801 16TH STREET | GREELEY | CO | 80631 |
| THUNDERBIRD SAMARITAN MEDICAL CNT | 030089 | 5555 WEST THUNDERBIRD ROAD | GLENDALE | AZ | 85308 |
| WALTER O. BOSWELL MEMORIAL HOSPITAL | 030061 | 10401 THUNDERBIRD BLVD. | SUN CITY | AZ | 85351 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| **_BAPTIST HEALTH - MONTGOMERY, AL_** | | | | | |
| **BAPTIST MEDICAL CENTER SOUTH** | 010023 | **2105 EAST SOUTH BOULEVARD** | MONTGOMERY | **AL** | 36116 |
| | | | | | |
| **_BAPTIST HEALTHCARE SYSTEM - LOUISVILLE, KY_** | | | | | |
| **BAPTIST HOSPITAL EAST** | 180130 | **4000 KRESGE WAY** | LOUISVILLE | **KY** | 40207-4676 |
| **CENTRAL BAPTIST HOSPITAL** | 180103 | **1740 NICHOLASVILLE RD** | LEXINGTON | **KY** | 40503 |
| **WESTERN BAPTIST HOSPITAL** | 180104 | **2201 KENTUCKY AVENUE** | PADUCAH | **KY** | 42003 |
| | | | | | |
| **_BAPTIST MEMORIAL HEALTH CARE CORPORATION - MEMPHIS, TN_** | | | | | |
| **BAPTIST MEM HOSPITAL DESOTO** | 250141 | **7601 SOUTHCREST** | SOUTHAVEN | **MS** | 38671 |
| **BAPTIST MEM HOSPITAL MEMPHIS** | 440048 | **6019 WALNUT GROVE ROAD** | MEMPHIS | **TN** | 38120 |
| **BAPTIST MEM HOSPITAL NORTH MISS** | 250034 | **2301 SOUTH LAMAR BOULEVARD** | OXFORD | **MS** | 38655 |
| **BAPTIST MEM HOSPT-GOLDEN TRIANGLE** | 250100 | **2520 FIFTH STREET NORTH** | COLUMBUS | **MS** | 39701- |
| | | | | | |
| **_BAYLOR HEALTH CARE SYSTEM - DALLAS, TX_** | | | | | |
| **BAYLOR ALL SAINTS MEDICAL CENTER** | 450137 | **1400 8TH AVENUE** | FORT WORTH | **TX** | 76104 |
| **BAYLOR HEART AND VASCULAR** | 450851 | **621 NORTH HALL ST SUITE 150** | DALLAS | **TX** | 75246 |
| **BAYLOR MEDICAL CENTER AT IRVING** | 450079 | **1901 NORTH MACARTHUR BLVD** | IRVING | **TX** | 75061 |
| **BAYLOR REGIONAL MEDICAL CTR AT PLANO** | 450890 | **4700 ALLIANCE BLVD** | PLANO | **TX** | 75093 |
| **BAYLOR UNIVERSITY MEDICAL CTR** | 450021 | **3500 GASTON AVENUE** | DALLAS | **TX** | 75246 |
| | | | | | |
| **_BEAUMONT HOSPITALS - ROYAL OAK, MI_** | | | | | |
| **WILLIAM BEAUMONT HOSPITAL - ROYAL OA** | 230130 | **3601 WEST 13 MILE ROAD** | ROYAL OAK | **MI** | 48073-6769 |
| **WILLIAM BEAUMONT HOSPITAL - TROY** | 230269 | **44201 DEQUINDRE** | TROY | **MI** | 48098-1198 |

4

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| ***CATHOLIC HEALTH EAST - NEWTOWN SQUARE, PA*** | | | | | |
| HOLY CROSS HOSPITAL | 100073 | 4725 NORTH FEDERAL HIGHWAY | FORT LAUDERDALE | FL | 33308 |
| MERCY CATHOLIC MEDICAL CENTER | 390156 | LANSDOWNE AVE & BAILEY RD. | DARBY | PA | 19023 |
| MERCY HOSPITAL INC. | 100061 | 3663 S. MIAMI AVE. | MIAMI | FL | 33133 |
| NORTH RIDGE MEDICAL CENTER | 100237 | 5757 NORTH DIXIE HIGHWAY | FORT LAUDERDALE | FL | 33334 |
| OUR LADY OF LOURDES MED. CTR. | 310029 | 1600 HADDON AVENUE | CAMDEN | NJ | 8103 |
| ST. FRANCIS TRENTON NJ | 310021 | 601 HAMILTON AVE | TRENTON | NJ | 8629 |
| ST. FRANCIS WILMINGTON DE | 080003 | 7TH & CLAYTON STREETS | WILMINTON | DE | 19805 |
| ST. JOSEPH S HOSPITAL OF ATLANTA | 110082 | 5665 PEACHTREE DUNWOODY | ATLANTA | GA | 30542 |
| ST. MARY MEDICAL CENTER | 390258 | LANGHORNE-NEWTOWN ROAD | LANGHORNE | PA | 19047 |
| ST. MICHAELS MEDICAL CENTER | 310096 | 268 DR. M.L. KING JR. BLVD | NEWARK | NJ | 7102 |
| ST. PETER S HOSPITAL | 330057 | 315 SO. MANNING BLVD | ALBANY | NY | 12208 |
| THE MERCY HOSPITAL | 220066 | 271 CAREW STREET | SPRINGFIELD | MA | 1102 |
| ***CATHOLIC HEALTH INITIATIVES - DENVER, CO*** | | | | | |
| GOOD SAMARITAN HOSPITAL | 280009 | 10 EAST 31 STREET | KEARNEY | NE | 68848-1990 |
| MEMORIAL HOSPITAL | 440091 | 2525 DE SALES AVENUE | CHATTANOOGA | TN | 37404 |
| MERCY REGIONAL MEDICAL CENTER | 060013 | 1010 THREE SPRINGS BLVD. | DURANGO | CO | 81301 |
| SAINT ELIZABETH REGIONAL MEDICAL CTR | 280020 | 555 SOUTH 70TH STREET | LINCOLN | NE | 68510 |
| ST JOSEPH MEDICAL CENTER | 500108 | 1717 SOUTH J STREET | TACOMA | WA | 98402 |
| ST VINCENT INFIRMARY MEDICAL CENTER | 040007 | TWO ST VINCENT CIRCLE | LITTLE ROCK | AR | 72205- |
| ST. JOSEPH HOSPITAL-AMENDED | 180010 | ONE ST. JOSEPH DRIVE | LEXINGTON | KY | 40504 |
| ST. JOSEPH MEDICAL CENTER | 210007 | 7601 OSLER DRIVE | BALTIMORE | MD | 21204 |
| ST. JOSEPH MEDICAL CENTER | 390096 | 215 NORTH TWELFTH ST. | READING | PA | 19603-0316 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| *CATHOLIC HEALTHCARE PARTNERS - CINCINNATI, OH* | | | | | |
| BAPTIST HOSPITAL OF EAST TENNESSEE | 440019 | 137 BLOUNT AVENUE | KNOXVILLE | TN | 37920- |
| COMMUNITY HOSPITAL | 360187 | 2615 EAST HIGH STREET | SPRINGFIELD | OH | 45501 |
| JEWISH HOSPITAL OF CINCINNATI | 360016 | 3200 BURNET AVENUE | CINCINNATI | OH | 45229 |
| LOURDES HOSPITAL INC | 180102 | 1530 LONE OAK RD. | PADUCAH | KY | 42003 |
| MERCY HOSPITAL | 390237 | 746 JEFFERSON AVENUE | SCRANTON | PA | 18501 |
| MERCY HOSPITAL OF HAMILTON/FAIRFIELD | 360056 | 100 RIVERFRONT PLAZA | HAMILTON | OH | 45012 |
| MERCY MEDICAL CENTER | 360086 | 1343 N. FOUNTAIN BLVD. | SPRINGFIELD | OH | 45501 |
| ST. ELIZABETH HEALTH CENTER | 360064 | 1044 BELMONT AVENUE | YOUNGSTOWN | OH | 44501-1790 |
| ST. MARY S MEDICAL CENTER | 440120 | 900 OAK HILL AVENUE | KNOXVILLE | TN | 37917 |
| ST. RITA S MEDICAL CENTER | 360066 | 730 W. MARKET | LIMA | OH | 45801 |
| ST. VINCENT MEDICAL CENTER | 360112 | 2213 CHERRY STREET | TOLEDO | OH | 43608 |
| | | | | | |
| *CHARLESTON AREA MEDICAL CENTER HEALTH SYSTEM - CHARLESTON, WV* | | | | | |
| CHARLESTON AREA MEDICAL CENTER INC. | 510022 | 501 MORRIS STREET | CHARLESTON | WV | 25326 |
| | | | | | |
| *CHRISTIANA CARE HEALTH SYSTEM - NEWARK, DE* | | | | | |
| CHRISTIANA CARE HEALTH SERVICES | 080001 | 501 W. 14TH STREET | WILMINGTON | DE | 19899 |
| | | | | | |
| *CHRISTUS HEALTH - IRVING, TX* | | | | | |
| CHRISTUS HOSPITAL | 450034 | 2830 CALDER STREET | BEAUMONT | TX | 77702 |
| CHRISTUS SPOHN HOSP CORPUS CHRISTI | 450046 | 2606 HOSPITAL BOULEVARD | CORPUS CHRISTI | TX | 78405 |
| CHRISTUS ST. MICHAEL | 450801 | 2600 ST. MICHAEL DRIVE | TEXARKANA | TX | 75503 |
| SANTA ROSA HEALTH CARE CORP | 450237 | 519 WEST HOUSTON STREET | SAN ANTONIO | TX | 78207 |

# EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| SCHUMPERT MEDICAL CENTER | 190041 | ONE ST MARY PLACE | SHREVEPORT | LA | 71120 |
| ST. FRANCES CABRINI HOSPITAL | 190019 | 3330 MASONIC DRIVE | ALEXANDRIA | LA | 71301 |
| ST. MARY HOSPITAL | 450096 | 3600 GATES BLVD | PORT ARTHUR | TX | 77642 |
| ST. PATRICK HOSPITAL | 190027 | 524 S RYAN STREET | LAKE CHARLES | LA | 70602 |
| | | | | | |
| *CLEVELAND CLINIC HEALTH SYSTEM - CLEVELAND, OH* | | | | | |
| CLEVELAND CLINIC HOSPITAL | 100289 | 3100 WESTON ROAD | WESTON | FL | 33331 |
| CLEVELAND CLINIC HOSPITAL | 360180 | 9500 EUCLID AVENUE | CLEVELAND | OH | 44195 |
| FAIRVIEW HOSPITAL | 360077 | 18101 LORAIN AVE | CLEVELAND | OH | 44111 |
| HILLCREST HOSPITAL | 360230 | 6780 MAYFIELD ROAD | MAYFIELD HEIGHTS | OH | 44124 |
| LAKEWOOD HOSPITAL | 360212 | 14519 DETROIT AVENUE | LAKEWOOD | OH | 44107 |
| | | | | | |
| *COMMUNITY HEALTH SYSTEMS, INC. - BRENTWOOD, TN* | | | | | |
| BRANDYWINE HOSPITAL | 390076 | 200 REECEVILLE ROAD | COATSVILLE | PA | 19320 |
| CAROLINAS HOSPITAL SYSTEM | 420091 | 805 PAMPLICO HIGHWAY | FLORENCE | SC | 29505 |
| COLLEGE STATION MEDICAL CENTER | 450299 | 1604 ROCK PRAIRIE ROAD | COLLEGE STATION | TX | 77840 |
| CRESTWOOD MEDICAL CENTER | 010131 | ONE HOSPITAL DRIVE | HUNTSVILLE | AL | 35801- |
| DEACONESS HOSPITAL | 370032 | 5501 PORTLAND | OKLAHOMA CITY | OK | 73111-2209 |
| DEACONESS MEDICAL CENTER | 500044 | 800 WEST FIFTH AVENUE | SPOKANE | WA | 99210-0248 |
| EASTERN NEW MEXICO MEDICAL CENTER | 320006 | 405 W COUNTRY CLUB | ROSWELL | NM | 88201 |
| EASTON HOSPITAL | 390162 | 250 SOUTH 21ST STREET | EASTON | PA | 18042-4195 |
| FLOWERS HOSPITAL | 010055 | 4370 WEST MAIN STREET | DOTHAN | AL | 36302- |
| GADSDEN REGIONAL MEDICAL CENTER | 010040 | 1007 GOODYEAR AVENUE | GADSDEN | AL | 35999- |
| LAREDO MEDICAL CENTER | 450029 | 1700 EAST SAUNDERS | LAREDO | TX | 78041 |
| LONGVIEW REGIONAL MED CTR | 450702 | 2901 NORTH FOURTH ST | LONGVIEW | TX | 75601 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| LUTHERAN HOSPITAL OF INDIANA | 150017 | 7950 WEST JEFFERSON BLVD. | FORT WAYNE | IN | 46804 |
| MOUNTAIN VIEW REG MED CTR | 320085 | 4311 EAST LONHAM AVENUE | LAS CRUCES | NM | 88011 |
| NC-SCHI INC.DBA ABILENE REG MED CTR | 450558 | 6250 HWY 83/84 | ABILENE | TX | 79606 |
| NORTHWEST MEDICAL CENTER | 030085 | 6200 NORTH LA CHOLLA | TUCSON | AZ | 85741 |
| NORTHWEST MEDICAL CENTER OF WASHINGT | 040022 | 609 WEST MAPLE | SPRINGDALE | AR | 72764- |
| NW MEDICAL CENTER OF BENTON COUNTY | 040138 | 3000 MEDICAL CENTER PARKWAY | BENTONVILLE | AR | 72712- |
| PHOENIXVILLE HOSPITAL | 390127 | 140 NUTT ROAD | PHOENIXVILLE | PA | 19460 |
| PORTER MEMORIAL HOSPITAL | 150035 | 814 LAPORTE AVENUE | VALPARAISO | IN | 46383 |
| RIVER REGION MEDICAL CORP | 250031 | 2100 HIGHWAY 61 NORTH | VICKSBURG | MS | 39183- |
| SOUTHCREST HOSPITAL | 370202 | 8801 SOUTH 101ST EAST AVENUE | TULSA | OK | 74133 |
| SPRINGS MEMORIAL HOSPITAL | 420036 | 800 WEST MEETING STREET | LANCASTER | SC | 29720 |
| ST JOSEPH MEDICAL CENTER | 150047 | 700 BROADWAY STREET | FORT WAYNE | IN | 46802 |
| TRINITY MEDICAL CENTER | 010104 | 800 MONTCLAIR ROAD | BIRMINGHAM | AL | 35213- |
| VICTORY MEMORIAL HOSPITAL | 140084 | 1324 NORTH SHERIDAN ROAD | WAUKEGAN | IL | 60085 |
| WATSONVILLE COMMUNITY | 050194 | 75 NIELSON STREET | WATSONVILLE | CA | 95076 |
| WESLEY MEDICAL CENTER | 250094 | 5001 WEST HARDY ST | HATTIESBURG | MS | 39402- |
| WESTERN ARIZONA REGIONAL MEDICAL CEN | 030101 | 2735 SILVER CREEK ROAD | BULLHEAD CITY | AZ | 86442 |
| WOODLAND HEIGHTS MEDICAL CENTER | 450484 | 505 SOUTH JOHN REDDITT DR | LUFKIN | TX | 75904 |
| WVHCS-HOSPITAL | 390137 | NORTH RIVER AND AUBURN STREETS | WILKES BARRE | PA | 18764 |
| | | | | | |
| *DETROIT MEDICAL CENTER - DETROIT, MI (now part of VANGUARD HEALTH SYSTEM)* | | | | | |
| DETROIT RECEIVING HOSPITAL | 230273 | 4201 ST. ANTOINE | DETROIT | MI | 48201 |
| HARPER - HUTZEL HOSPITAL | 230104 | 3990 JOHN R | DETROIT | MI | 48201 |
| HURON VALLEY-SINAI HOSPITAL | 230277 | 1601 E. COMMERCE ROAD | COMMERCE TOWNSHIP | MI | 48382 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| SINAI-GRACE HOSPITAL | 230024 | 6071 W. OUTER DRIVE | DETROIT | MI | 48235 |
| | | | | | |
| *DIGNITY HEALTH F/K/A CATHOLIC HEALTHCARE WEST - SAN FRANCISCO, CA* | | | | | |
| CHANDLER REGIONAL HOSPITAL | 030036 | 475 SOUTH DOBSON ROAD | CHANDLER | AZ | 85224 |
| DOMINICAN HOSPITAL | 050242 | 1555 SOQUEL DRIVE | SANTA CRUZ | CA | 95065- |
| FRENCH HOSPITAL MEDICAL CENTER | 050232 | 1911 JOHNSON AVENUE | SAN LUIS OBISPO | CA | 93401 |
| GLENDALE MEMORIAL HOSPITAL & HLTH CT | 050058 | 1420 SOUTH CENTRAL AVE | GLENDALE | CA | 91204- |
| MARIAN MEDICAL CENTER | 050107 | 1400 E. CHURCH STREET | SANTA MARIA | CA | 93456 |
| MEMORIAL HOSPITAL | 050036 | 420 34TH STREET | BAKERSFIELD | CA | 93303 |
| MERCY GENERAL HOSPITAL | 050017 | 4001 J STREET | SACRAMENTO | CA | 95819 |
| MERCY MEDICAL CENTER REDDING | 050280 | 2175 | REDDING | CA | 96099-6009 |
| MERCY SAN JUAN MEDICAL CENTER | 050516 | 6501 COYLE AVENUE | CARMICHAEL | CA | 95608 |
| NORTHRIDGE MEDICAL CENTER - ROSCOE | 050116 | 18300 ROSCOE BLVD | NORTHRIDGE | CA | 91328 |
| SEQUOIA HEALTH SERVICES | 050197 | 170 ALAMEDA DE LAS PULGAS | REDWOOD CITY | CA | 94062- |
| ST. BERNARDINE MEDICAL CENTER | 050129 | 2101 N. WATERMAN AVE. | SAN BERNARDINO | CA | 92404 |
| ST. JOHN S REGIONAL MEDICAL CENTER | 050082 | ST. JOHN S REGIONAL MEDICA CENTER | OXNARD | CA | 93030 |
| ST. JOSEPH S HOSPITAL & MED CTR | 030024 | 350 WEST THOMAS ROAD | PHOENIX | AZ | 85013 |
| ST. JOSEPH S MEDICAL CENTER | 050084 | 1800 NORTH CALIFORNIA ST. | STOCKTOP | CA | 95204- |
| ST. MARY MEDICAL CENTER | 050191 | 1050 LINDEN AVENUE | LONG BEACH | CA | 90813 |
| ST. MARY S MEDICAL CENTER | 050457 | 450 STANYAN STREET | SAN FRANCISCO | CA | 94117- |
| ST. MARYS REGIONAL MEDICAL CENTER | 290009 | 235 WEST SIXTH STREET | RENO | NV | 89503-4548 |
| | | | | | |
| *EMORY HEALTHCARE - ATLANTA, GA* | | | | | |

9

# EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| EMORY CRAWFORD LONG HOSPITAL | 110078 | 550 PEACHTREE ST NE | ATLANTA | GA | 30308 |
| EMORY UNIVERSITY HOSPTIAL | 110010 | 1364 CLIFTON ROAD | ATLANTA | GA | 30032 |
| | | | | | |
| *FRANCISCAN MISSIONARIES OF OUR LADY HEALTH SYSTEM - BATON ROUGE, LA* | | | | | |
| OUR LADY OF LOURDES REG. MED. CTR. | 190102 | 611 ST. LANDRY STREET | LAFAYETTE | LA | 70506- |
| OUR LADY OF THE LAKE RMC | 190064 | 5000 HENNESSY BOULEVARD | BATON ROUGE | LA | 70808-4389 |
| ST. FRANCIS MEDICAL CENTER | 190125 | 309 JACKSON STREET | MONROE | LA | 71201 |
| ST. FRANCIS NORTH HOSPITAL | 190197 | 3421 MEDICAL PARK DRIVE | MONROE | LA | 71203 |
| | | | | | |
| *HOSPITAL CORPORATION OF AMERICA (HCA) AKA HCA HOLDINGS, INC.- NASHVILLE, TN* | | | | | |
| ALASKA REGIONAL HOSPITAL | 020017 | 2801 DEBAR ROAD | ANCHORAGE | AK | 99508 |
| AMENDED CORPUS CHRISTI MEDICAL CENTE | 450788 | 7101 SOUTH PADRE ISLAND DRIVE | CORPUS CHRISTI | TX | 78412 |
| AVENTURA HOSPITAL & MED CTR | 100131 | 2801 NE 209TH ST AT BISCAYNE BLVD | MIAMI | FL | 33180 |
| BAPTIST-LUTHERAN MEDICAL CENTER | 260107 | 6601 ROCKHILL ROAD | KANSAS CITY | MO | 64131 |
| BAYSHORE MEDICAL CENTER | 450097 | 4000 SPENCER HIGHWAY | PASADENA | TX | 77504 |
| BLAKE MEDICAL CENTER | 100213 | 2020 59TH STREET | BRADENTON | FL | 34209 |
| BRANDON REGIONAL MEDICAL CENTER | 100243 | 119 OAKFIELD DRIVE | BRANDON | FL | 33511 |
| CAPITAL REGIONAL MED CNTR-AMENDED | 100254 | 2626 CAPITAL MEDICAL BLVD | TALLAHASSEE | FL | 32308 |
| CENTENNIAL MEDICAL CENTER | 440161 | 2300 PATTERSON STREET | NASHVILLE | TN | 37203 |
| CENTRAL FLORIDA REGIONAL HOSPITAL | 100161 | 1401 W SEMINOLE BLVD | SANFORD | FL | 32771 |
| CJW MEDICAL CENTER | 490112 | 7101 JAHNKE ROAD | RICHMOND | VA | 23225 |
| CLEAR LAKE REG MED CTR | 450617 | 500 MEDICAL CENTER BLVD. | WEBSTER | TX | 77598 |
| CONROE REGIONAL MEDICAL CENTER | 450222 | 504 MEDICAL CENTER BLVD | CONROE | TX | 77304 |
| DEL SOL MEDICAL CENTER | 450646 | 10301 GATEWAY EAST | EL PASO | TX | 79925 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| DENTON REGIONAL MED CENTER | 450634 | 3535 SOUTH I-35E | DENTON | TX | 76210 |
| DOCTORS HOSPITAL OF SARASOTA | 100166 | 5731 BEE RIDGE RD | SARASOTA | FL | 34233 |
| FAIRVIEW PARK HOSPITAL | 110125 | 200 INDUSTRIAL BLVD | DUBLIN | GA | 31021 |
| FAWCETT MEMORIAL HOSPITAL | 100236 | 21298 OLEAN BLVD | PORT CHARLOTTE | FL | 33952 |
| FT. WALTON BEACH MEDICAL CENTER | 100223 | 1000 MAR-WALT DRIVE | FORT WALTON BEACH | FL | 32547 |
| GOOD SAMARITAN HOSPITAL | 050380 | 2425 SAMARITAN DRIVE | SAN JOSE | CA | 95124 |
| HENRICO DOCTORS HOSPITAL - AMENDED | 490118 | 1602 SKIPWITH ROAD | RICHMOND | VA | 23229 |
| INDEPENDENCE REG L HEALTH CENTER | 260095 | 1509 WEST TRUMAN ROAD | INDEPENDENCE | MO | 64050 |
| JFK MEDICAL CENTER | 100080 | 5301 SOUTH CONGRESS AVENUE | ATLANTIS | FL | 33462 |
| KENDALL REGIONAL MEDICAL CENTER | 100209 | 11750 BIRD ROAD | MIAMI | FL | 33175 |
| LAKEVIEW REGIONAL MEDICAL CENTER | 190177 | 95 EAST FAIRWAY DRIVE | COVINGTON | LA | 70433 |
| LARGO MEDICAL CENTER | 100248 | 201 14TH ST | LARGO | FL | 33770 |
| LEWIS GALE HOSPITAL | 490048 | 1900 ELECTRIC ROAD | SALEM | VA | 24153 |
| LOS ROBLES REGIONAL MEDICAL CENTER | 050549 | 215 WEST JANSS ROAD | THOUSAND OAKS | CA | 91360 |
| MEDICAL CENTER OF INDEPENDENCE | 260166 | 17203 EAST 23RD STREET | INDEPENDENCE | MO | 64057 |
| MEDICAL CENTER OF PLANO | 450651 | 3901 WEST 15TH STREET | PLANO | TX | 75074 |
| MEDICAL CENTER OF SW LOUISIANA | 190205 | 2810 AMBASSADOR CAFFERY PKWY | LAFAYETTE | LA | 70506 |
| MEDICAL CITY DALLAS HOSPITAL | 450647 | 7777 FOREST LANE | DALLAS | TX | 75230 |
| MEMORIAL HOSPITAL OF JACKSONVILLE | 100179 | 3625 UNIVERSITY BLVD SOUTH | JACKSONVILLE | FL | 32216 |
| MENORAH MEDICAL CENTER | 170182 | 5721 WEST 119TH STREET | OVERLAND PARK | KS | 66209 |
| METHODIST HOSPITAL | 450388 | 7700 FLOYD CURL DRIVE | SAN ANTONIO | TX | 78829 |
| MOUNTAINVIEW HOSPITAL | 290039 | 3100 N. TENAYA WAY | LAS VEGAS | NV | 89128 |
| NORTH FLORIDA REG MED CNTR | 100204 | 6500 NEWBERRY ROAD | GAINESVILLE | FL | 32605 |
| NORTHSIDE HOSPITAL & HEART INSTITUTE | 100238 | 6000 49TH STREET NORTH | ST PETERSBURG | FL | 33709 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| OCALA REGIONAL MEDICAL CENTER | 100212 | 1431 SW 1ST AVENUE | OCALA | FL | 34474 |
| OGDEN REG MED CTR | 460005 | 5475 SOUTH 500 EAST | OGDEN | UT | 84405 |
| OSCEOLA REGIONAL MEDICAL CENTER | 100110 | 700 WEST OAK STREET | KISSIMMEE | FL | 32742 |
| OU MEDICAL CENTER | 370093 | N.E. 13TH AT LINCOLN BLVD | OKLAHOMA CITY | OK | 73104 |
| OVERLAND PARK REGIONAL MEDICAL CTR | 170176 | 10500 QUIVIRA ROAD | OVERLAND PARK | KS | 66215 |
| PARKRIDGE MEDICAL CENTER | 440156 | 2333 MCCALLIE AVENUE | CHATTANOOGA | TN | 37404 |
| PLAZA MEDICAL CTR FT WORTH | 450672 | 900 EIGHTH AVENUE | FORT WORTH | TX | 76104 |
| PORTSMOUTH REGIONAL HOSPITAL | 300029 | 333 BORTHWICK AVENUE | PORTSMOUTH | NH | 3801 |
| RAPIDES REGIONAL MEDICAL CENTER | 190026 | 211 FOURTH STREET | ALEXANDRIA | LA | 71301 |
| REDMOND REGIONAL MEDICAL CENTER | 110168 | 501 REDMOND ROAD | ROME | GA | 30161 |
| REGIONAL MEDICAL CENTER BAYONET POIN | 100256 | 14000 FIVAY ROAD | HUDSON | FL | 34667 |
| REGIONAL MEDICAL CENTER OF SAN JOSE | 050125 | 225 NORTH JACKSON AVENUE | SAN JOSE | CA | 95116 |
| RESEARCH MEDICAL CENTER | 260027 | 2313 EAST MEYER BLVD | KANSAS CITY | MO | 64132 |
| RIO GRANDE REGIONAL HOSPITAL | 450711 | 101 EAST RIDGE ROAD | MCALLEN | TX | 78503 |
| RIVERSIDE COMMUNITY | 050022 | 4445 MAGNOLIA AVENUE | RIVERSIDE | CA | 92501 |
| SAVOY MEDICAL CENTER | 190025 | 801 POINCIANA AVENUE | MAMOU | LA | 70554 |
| ST. MARK S HOSPITAL | 460047 | 3900 SOUTH 1200 EAST | SALT LAKE CITY | UT | 82124 |
| SUNRISE HOSPITAL | 290003 | 3186 MARYLAND PARKWAY | LAS VEGAS | NV | 89109 |
| TERRE HAUTE REGIONAL HOSPITAL | 150046 | 3901 HOSPITAL LANE | TERRE HAUTE | IN | 47802 |
| TRIDENT REGIONAL MEDICAL CENTER | 420079 | 9330 MEDICAL PLAZA DRIVE | CHARLESTON | SC | 29418 |
| TULANE UNIVERSITY HOSPITAL & CLINICS | 190176 | 1415 TULANE AVENUE | NEW ORLEANS | LA | 70112 |
| VALLEY REGIONAL MEDICAL CENTER | 450662 | 100 ALTON GLOOR BLVD | BROWNSVILLE | TX | 78526 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| WESLEY MEDICAL CENTER | 170123 | 550 NORTH HILLSIDE | WICHITA | KS | 67214 |
| WEST FLORIDA HOSPITAL | 100231 | 8232 NORTH DAVIS HWY | PENSACOLA | FL | 32523 |
| WEST HILLS REG MEDICAL CENTER | 050481 | 7300 MEDICAL CENTER DRIVE | CANOGA PARK | CA | 91307 |
| WEST HOUSTON MEDICAL CENTER | 450644 | 12141 ROCHMOND AVE | HOUSTON | TX | 77082 |
| WESTSIDE REGIONAL MEDICAL CENTER | 100228 | 8201 WEST BROWARD BOULEVARD | PLANTATION | FL | 33324 |
| | | | | | |
| *HEALTH MANAGEMENT ASSOCIATES, INC. - NAPLES, FL* | | | | | |
| CENTRAL MISSISSIPPI MED. CTR. | 250072 | 1850 CHADWICK DRIVE | JACKSON | MS | 39204 |
| CHARLOTTE REGIONAL MEDICAL CENTER | 100047 | 809 E. MARION AVE | PUNTA GORDA | FL | 33950 |
| HARTON REGIONAL MEDICAL CENTER | 440144 | 1801 NORTH JACKSON STREET | TULLAHOMA | TN | 37388 |
| LANCASTER REGIONAL MEDICAL CENTER | 390061 | 250 COLLEGE AVENUE | LANCASTER | PA | 17603 |
| MEDICAL CENTER OF MESQUITE | 450031 | 1011 NORTH GALLOWAY AVENUE | MESQUITE | TX | 75149 |
| MIDWEST REGIONAL MEDICAL CENTER | 370094 | 2825 PARK | MIDWEST CITY | OK | 73130 |
| NORTHWEST MS REG. MED. CENTER | 250042 | 1970 HOSPITAL DRIVE | CLARKSDALE | MS | 38614 |
| RIVERVIEW REG L MEDICAL CENTER | 010046 | 600 SOUTH THIRD STREET | GADSDEN | AL | 35901 |
| SPARKS REGIONAL MEDICAL CENTER | 040055 | 1311 SOUTH I STREET | FORT SMITH | AR | 72916 |
| STRINGFELLOW MEMORIAL HOSPITAL | 010038 | 301 EAST 18TH STREET | ANNISTON | AL | 36207 |
| VENICE REG L MEDICAL CENTER | 100070 | 540 THE RIALTO | VENICE | FL | 34285 |
| YAKIMA REGIONAL MEDICAL & HEART CTR | 500012 | 110 SOUTH NINTH AVENUE | YAKIMA | WA | 98902 |
| | | | | | |
| *IASIS HEALTHCARE - FRANKLIN, TN* | | | | | |
| ALLIANCE HOSPITAL LTD | 450868 | 500 NORTH ADAMS | ODESSA | TX | 79761 |
| DAVIS HOSPITAL & MEDICAL CTR | 460041 | 1600 WEST ANTELOPE DRIVE | LAYTON | UT | 84041 |
| GLENWOOD REGIONAL MED. CTR. | 190160 | 503 MCMILLAN ROAD | WEST MONROE | LA | 71292 |

13

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| MESA GENERAL HOSPITAL | 030017 | 515 MESA DRIVE | MESA | AZ | 85201 |
| SALT LAKE REGIONAL MEDICAL CENTER | 460003 | 1050 EAST SOUTH TEMPLE | SALT LAKE CITY | UT | 84405 |
| SOUTHWEST GENERAL HOSPITAL | 450697 | 7400 BARLITE BLVD | SAN ANTONIO | TX | 78224 |
| ST. LUKE S MEDICAL CENTER | 030037 | 1800 EAST VAN BUREN | PHOENIX | AZ | 85006 |
| THE MEDICAL CENTER OF SOUTHEAST TEXA | 450518 | 2555 JIMMY JOHNSON BLVD | PORT ARTHUR | TX | 77640 |
| | | | | | |
| *INTERMOUNTAIN HEALTH CARE, INC - SALT LAKE CITY, UT* | | | | | |
| LDS HOSPITAL | 460010 | 8TH AVE & C STREET | SALT LAKE CITY | UT | 84143 |
| MCKAY-DEE HOSPITAL CENTER | 460004 | 4401 HARRISON BLVD | OGDEN | UT | 84403 |
| UTAH VALLEY REG. MED. CTR. | 460001 | 1034 NORTH 500 WEST | PROVO | UT | 84603 |
| | | | | | |
| *IOWA HEALTH SYSTEM - DES MOINES, IA* | | | | | |
| ALLEN MEMORIAL HOSPITAL | 160110 | 1825 LOGAN AVENUE | WATERLOO | IA | 50703 |
| IOWA LUTHERAN HOSPITAL | 160024 | 700 E UNIVERSITY AVENUE | DES MOINES | IA | 50316-2393 |
| IOWA METHODIST MEDICAL CENTER | 160082 | 1200 PLEASANT STREET | DES MOINES | IA | 50309 |
| ST. LUKE S METHODIST HOSPITAL | 160045 | 1026 A AVENUE N.E. | CEDAR RAPIDS | IA | 52406-3026 |
| TRINITY MED. CENTER ROCK ISLAND | 140280 | 2701 17TH STREET | ROCK ISLAND | IL | 61201 |
| | | | | | |
| *MAYO HEALTH SYSTEM - ROCHESTER, MN* | | | | | |
| IMMANUEL-ST. JOSEPH S-MAYO HLTH SYST | 240093 | 1025 MARSH STREET | MANKATO | MN | 56002-8673 |
| LUTHER HOSPITAL | 520070 | 1221 WHIPPLE STREET | EAU CLAIRE | WI | 54702 |
| MAYO CLINIC HOSPITAL | 030103 | 5777 EAST MAYO BOULEVARD | PHOENIX | AZ | 85054 |
| SAINT MARYS HOSPITAL | 240010 | 1216 2ND ST SW | ROCHESTER | MN | 55902 |
| ST. LUKE S HOSPITAL ASSOC | 100151 | 4201 BELFORT ROAD | JACKSONVILLE | FL | 32216 |
| | | | | | |

14

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| *MCLAREN HEALTH CARE - FLINT, MI* | | | | | |
| BAY REGIONAL MEDICAL CENTER | 230041 | 1900 COLUMBUS AVENUE | BAY CITY | MI | 48708 |
| INGHAM REGIONAL MEDICAL CENTER | 230167 | 401 WEST GREENLAWN AVE. | LANSING | MI | 48910 |
| MCLAREN REGIONAL MEDICAL CENTER | 230141 | 401 S. BALLENGER | FLINT | MI | 48532 |
| MOUNT CLEMENS GENERAL HOSPITAL | 230227 | 1000 HARRINGTON BLVD | MOUNT CLEMENS | MI | 48043-2992 |
| | | | | | |
| *MEDCATH CORPORATION - CHARLOTTE, NC* | | | | | |
| ARIZONA HEART HOSPITAL | 030102 | 1930 EAST THOMAS ROAD | PHOENIX | AZ | 85016-7711 |
| ARKANSAS HEART HOSPITAL | 040134 | 1701 S. SHACKELFORD ROAD | LITTLE ROCK | AR | 72211 |
| HARLINGEN MEDICAL CENTER | 450855 | 5510 SOUTH EXPRESSWAY 77 | HARLINGEN | TX | 78550 |
| HEART HOSPITAL OF AUSTIN | 450824 | \801 N. LAMAR BOULEVARD | AUSTIN | TX | 78756 |
| HEART HOSPITAL OF BAKERSFIELD | 050724 | 3001 SILLECT AVENUE | BAKERSFIELD | CA | 93308 |
| HEART HOSPITAL OF NEW MEXICO | 320083 | 504 ELM STREET NE | ALBUQUERQUE | NM | 87102 |
| LOUISIANA HEART HOSPITAL | 190250 | 64030 HIGHWAY 434 | LACOMBE | LA | 70445 |
| TEXSAN HEART HOSPITAL | 450878 | 6700 1-H 10 WEST | SAN ANTONIO | TX | 78201 |
| | | | | | |
| *MEDSTAR HEALTH - COLUMBIA, MD* | | | | | |
| FRANKLIN SQUARE HOSPITAL CENTER | 210015 | 9100 FRANKLIN SQUARE DRIVE | BALTIMORE | MD | 21237 |
| GEORGETOWN UNIVERSITY HOSPITAL | 090004 | 3800 RESERVIOR ROAD NW | WASHINGTON | DC | 20007 |
| THE GOOD SAMARITAN HOSPITAL | 210056 | 5601 LOCH RAVEN BLVD. | BALTIMORE | MD | 21239 |
| UNION MEMORIAL HOSPITAL | 210024 | 201 EAST UNIVERSITY PARKWAY | BALTIMORE | MD | 21218 |
| WASHINGTON HOSPITAL CENTER | 090011 | 110 IRVING STREET NW | WASHINGTON | DC | 20010 |
| | | | | | |
| *MEMORIAL HERMANN - HOUSTON, TX* | | | | | |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| HERMANN HOSPITAL | 450068 | 6411 FANNIN | HOUSTON | TX | 77030 |
| MEMORIAL HERMANN MEMORIAL CITY HOSPI | 450610 | 920 FROSTWOOD | HOUSTON | TX | 77024 |
| MEMORIAL HOSPITAL SYSTEM | 450184 | 7737 SOUTHWEST FREEWAY SUITE 250 | HOUSTON | TX | 77074 |
| | | | | | |
| *NEW YORK-PRESBYTERIAN HEALTHCARE SYSTEM - NEW YORK, NY* | | | | | |
| NEW YORK HOSPITAL OF QUEENS | 330055 | 56-45 MAIN STREET | FLUSHING | NY | 11355 |
| NEWYORK-PRESBYTERIAN HOSPITAL | 330101 | 525 EAST 68TH STREET | NEW YORK CITY | NY | 10021 |
| THE VALLEY HOSPITAL | 310012 | 223 N. VAN DIEN AVENUE | RIDGEWOOD | NJ | 7450 |
| WINTHROP UNIVERSITY HOSPITAL | 330167 | 259 FIRST STREET | MINEOLA | NY | 11501 |
| | | | | | |
| *NORTH MISSISSIPPI MEDICAL CENTER - TUPELO, MS* | | | | | |
| NORTH MISSISSIPPI MEDICAL CTR | 250004 | 830 SOUTH GLOSTER | TUPELO | MS | 38801 |
| | | | | | |
| *NORTH SHORE-LONG ISLAND JEWISH HEALTH SYSTEM - GREAT NECK, NY* | | | | | |
| HUNTINGTON HOSPITAL | 330045 | 270 PARK AVENUE | HUNTINGTON | NY | 11743 |
| LONG ISLAND JEWISH MEDICAL CENTER | 330195 | 270-05 76 AVE | NEW HYDE PARK | NY | 11040 |
| NORTH SHORE UNIVERSITY HOSPITAL | 330106 | 300 COMMUNITY DRIVE | MANHASSET | NY | 11030 |
| SOUTHSIDE HOSPITAL | 330043 | 301 EAST MAIN STREET | BAY SHORE | NY | 11706-8458 |
| STATEN ISLAND UNIVERSITY HOSPITAL | 330160 | 475 SEAVIEW AVENUE | STATEN ISLAND | NY | 10305 |
| | | | | | |
| *OHIO STATE UNIVERSITY MEDICAL CENTER - COLUMBUS, OH* | | | | | |
| OHIO STATE UNIVERSITY HOSPITALS EAST | 360062 | 1492 BROAD STREET | COLUMBUS | OH | 43205 |
| THE OHIO STATE UNIVERSITY HOSPITAL | 360085 | 1375 PERRY STREET 2ND FLOOR | COLUMBUS | OH | 43201 |
| | | | | | |
| *PROVIDENCE HEALTH SYSTEM - SEATTLE, WA* | | | | | |

# EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| LITTLE COMPANY OF MARY HOSPITAL | 050353 | 4101 TORRANCE BLVD. | TORRANCE | CA | 90503 |
| PROVIDENCE ALASKA MEDICAL CENTER | 020001 | 3200 PROVIDENCE DRIVE | ANCHORAGE | AK | 99519-6604 |
| PROVIDENCE GENERAL MEDICAL CENTER | 500014 | PACIFIC AND COLBY CAMPUS | EVERETT | WA | 98296 |
| PROVIDENCE HOLY CROSS MED. CENTER | 050278 | 15031 RINALDI STREET | MISSION HILLS | CA | 91345 |
| PROVIDENCE PORTLAND MEDICAL CENTER | 380061 | 4805 NE GLISAN | PORTLAND | OR | 97213 |
| PROVIDENCE SAINT JOSEPH MED. CENTER | 050235 | 501 SOUTH BUENA VISTA STREET | BURBANK | CA | 91505-4866 |
| PROVIDENCE ST. PETER HOSPITAL | 500024 | 413 LILLY ROAD NE | OLYMPIA | WA | 98506 |
| SACRED HEART MEDICAL CENTER | 500054 | 101 W. 8TH AVE. | SPOKANE | WA | 99220-2555 |
| ST. PATRICK HOSPITAL | 270014 | 500 W. BROADWAY | MISSOULA | MT | 59802 |
| ST. VINCENT HOSPITAL MED CTR | 380004 | 9205 SW BARNES ROAD | PORTLAND | OR | 97225 |
| TARZANA ENCINO REGIONAL MED CTR | 050601 | 18321 CLARK STREET | TARZANA | CA | 91356 |
| | | | | | |
| *ROBERT WOOD JOHNSON HEALTH NETWORK - NEW BRUNSWICK, NJ* | | | | | |
| ROBERT WOOD JOHNSON UNIVERSITY HOSP | 310038 | ONE ROBERT WOOD JOHNSON PLACE | NEW BRUNSWICK | NJ | 8903 |
| | | | | | |
| *SAINT JOSEPH HEALTH SYSTEM - ORANGE, CA* | | | | | |
| COVENANT HEALTH SYSTEM | 450040 | 4000 24TH STREET | LUBBOCK | TX | 79410 |
| MISSION REGIONAL HOSP MED CENTER | 050567 | 27700 MEDICAL CENTER ROAD | MISSION VIEJO | CA | 92691 |
| QUEEN OF THE VALLEY HOSPITAL | 050009 | 1000 TRANCAS STREET | NAPA | CA | 94558 |
| SANTA ROSA MEMORIAL HOSPITAL | 050174 | 1165 MONTGOMERY DRIVE | SANTA ROSA | CA | 95405 |
| ST. JOSEPH HOSPITAL - EUREKA | 050006 | 2700 DOLBEER | EUREKA | CA | 95501 |
| ST. JOSEPH HOSPITAL OF ORANGE | 050069 | 1100 WEST STEWART DRIVE | ORANGE | CA | 92863-5600 |
| ST. JUDE HOSPITAL - FULLERTON | 050168 | 101 EAST VALENCIA MESA DRIVE | FULLERTON | CA | 92835 |
| ST. MARY REGIONAL MEDICAL CENTER | 050300 | 18300 HIGHWAY 18 | APPLE VALLEY | CA | 92307 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| **_SAINT LUKE'S EPISCOPAL HEALTH SYSTEM - HOUSTON, TX_** | | | | | |
| ST. LUKE S EPISCOPAL HOSPITAL | 450193 | **6720 BERTNER** | HOUSTON | **TX** | 77030 |
| | | | | | |
| **_SCRIPPS HEALTH - SAN DIEGO, CA_** | | | | | |
| SCRIPPS GREEN HOSPITAL | 050424 | **10666 NORTH TORREY PINES ROAD** | LA JOLLA | **CA** | 92037- |
| SCRIPPS MEM HOSPITAL-ENCINITAS | 050503 | **354 SANTA FE DRIVE** | ENCINITAS | **CA** | 92023- |
| SCRIPPS MEM HOSPITAL-LA JOLLA | 050324 | **9888 GENESEE AVENUE** | LA JOLLA | **CA** | 92037- |
| SCRIPPS MERCY HOSPITAL | 050077 | **4077 FIFTH AVENUE** | SAN DIEGO | **CA** | 92103- |
| SMH - CHULA VISTA | 050270 | **435 H STREET** | CHULA VISTA | **CA** | 91912-1537 |
| | | | | | |
| **_SENTARA HEALTHCARE - NORFOLK, VA_** | | | | | |
| SENTARA LEIGH HOSPITAL | 490046 | **830 KEMPSVILLE ROAD** | NORFOLK | **VA** | 23501 |
| SENTARA NORFOLK GENERAL HOSPITAL | 490007 | **600 GRESHAM ROAD** | NORFOLK | **VA** | 23507 |
| SENTARA OBICI HOSPITAL | 490044 | **2800 GODWIN BOULEVARD** | SUFFOLK | **VA** | 23434 |
| SENTARA VA. BEACH GENERAL HOSPITAL | 490057 | **1060 FIRST COLONIAL ROAD** | VIRGINIA BEACH | **VA** | 23454 |
| | | | | | |
| **_SISTERS OF CHARITY OF LEAVENWORTH HEALTH SYSTEM - LENEXA, KS_** | | | | | |
| PROVIDENCE MEDICAL CENTER | 170146 | **8929 PARALLEL PARKWAY** | KANSAS CITY | **KS** | 66112 |
| SAINT JOHN S HOSPITAL | 050290 | **1328 22ND STREET** | SANTA MONICA | **CA** | 90404 |
| SAINT VINCENT HEALTHCARE | 270049 | **1233 NORTH 30TH STREET** | BILLINGS | **MT** | 59107-5200 |
| ST. MARY S HOSPITAL & MEDICAL CENTER | 060023 | **7TH AND PATTERSON** | GRAND JUNCTION | **CO** | 81502-1628 |
| ST.FRANCIS HEALTH CENTER | 170016 | **1700 S.W. 7TH** | TOPEKA | **KS** | 66606-1690 |
| | | | | | |
| **_SISTERS OF MERCY HEALTH SYSTEM - CHESTERFIELD, MO_** | | | | | |
| MERCY HEALTH CENTER | 370013 | **#N/A** | #N/A | **#N/A** | #N/A |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| ST MARY S HOSPITAL | 040010 | 1200 WEST WALNUT | ROGERS | AR | 72756-3599 |
| ST. EDWARD MERCY MEDICAL CENTER | 040062 | 7301 ROGERS AVENUE | FORT SMITH | AR | 72917-7000 |
| ST. JOHN S MERCY MEDICAL CENTER | 260020 | 615 S. NEW BALLAS ROAD | ST LOUIS | MO | 63141 |
| ST. JOHN S REGIONAL HEALTH CENTER | 260065 | 1235 EAST CHEROKEE | SPRINGFIELD | MO | 65804 |
| ST. JOHN S REGIONAL MEDICAL CENTER | 260001 | 2727 MCCLELLAND BLVD | JOPLIN | MO | 64804 |
| ST. JOSEPH S MERCY HEALTH CENTER | 040026 | 300 WERNER STREET | HOT SPRINGS | AR | 71913- |
| | | | | | |
| *SISTERS OF SAINT FRANCIS HEALTH SERVICES, INC. - MISHAWAKA, IN* | | | | | |
| OLYMPIA FIELDS OSTEOPATHIC HOSPITAL | 140172 | 20201 SOUTH CRAWFORD AVE | OLYMPIA FIELDS | IL | 60461 |
| ST. ANTHONY MEDICAL CENTER | 150126 | 1201 SOUTH MAIN STREET | CROWN POINT | IN | 46307-8483 |
| ST. ELIZABETH MEDICAL CENTER | 150003 | 1501 HARTFORD ST. | LAFAYETTE | IN | 47904 |
| ST. FRANCIS HOSPITAL & HEALTH CENTER | 150033 | 1600 ALBANY STREET | BEECH GROVE | IN | 46107 |
| ST. MARGARET MERCY HEALTHCARE- NORTH | 150004 | 5454 HOMAN AVENUE | HAMMOND | IN | 46320 |
| ST. MARGARET MERCY HEALTHCARE-SOUTH | 150090 | 24 JOLIET STREET | DYER | IN | 46311 |
| | | | | | |
| *SSM HEALTH CARE - SAINT LOUIS, MO* | | | | | |
| GOOD SAMARITAN REGIONAL HEALTH CTR. | 140046 | 605 NORTH 12TH STREET | MT VERNON | IL | 62864 |
| HOSPITAL | 260104 | 12303 DEPAUL DRIVE | BRIDGETON | MO | 63044 |
| ST JOSEPH HOSPITAL | 260081 | 525 COUCH AVE | KIRKWOOD | MO | 63122 |
| ST. ANTHONY HOSPITAL | 370037 | 1000 N. LEE BLVD. | OKLAHOMA CITY | OK | 73101 |
| ST. JOSEPH HEALTH CENTER | 260005 | 300 FIRST CAPITOL DRVIE | ST CHARLES | MO | 63301 |
| ST. MARY S HEALTH CENTER | 260091 | 6420 CLAYTON ROAD | ST LOUIS | MO | 63117 |
| ST. MARY S HOSPITAL | 140034 | 400 NORTH PLEASANT AVENUE | CENTRALIA | IL | 62801 |

19

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| ST. MARYS HOSPITAL MED CTR MADISON | 520083 | 707 SOUTH MILLS STREET | MADISON | WI | 53715-0450 |
| | | | | | |
| **SUTTER HEALTH - SACRAMENTO, CA** | | | | | |
| ALTA BATES MEDICAL CENTER | 050305 | 2450 ASHBY AVENUE | BERKELEY | CA | 94705- |
| CALIFORNIA PACIFIC MEDICAL CENTER | 050047 | BUCHANAN AND CLAY STREETS | SAN FRANCISCO | CA | 94120 |
| MARIN GENERAL HOSPITAL | 050360 | 250 BON AIR ROAD | GREENBRAE | CA | 94904- |
| MEMORIAL HOSPITAL MODESTO | 050557 | 1700 COFFEE ROAD | MODESTO | CA | 95355- |
| MILLS PENINSULA MEDICAL CENTER | 050007 | 1783 EL CAMINO REAL | BURLINGAME | CA | 94010- |
| SUMMIT MEDICAL CENTER | 050043 | 350 HAWTHORNE AVENUE | OAKLAND | CA | 94609- |
| SUTTER MEDICAL CENTER OF SANTA ROSA | 050291 | 3325 CHANATE ROAD | SANTA ROSA | CA | 95404 |
| SUTTER MEDICAL CENTER-SACRAMENTO | 050108 | 2801 L STREET | SACRAMENTO | CA | 95816-5680 |
| SUTTER ROSEVILLE MEDICAL CENTER | 050309 | ONE MEDICAL PLAZA | ROSEVILLE | CA | 95661- |
| | | | | | |
| **TENET HEALTHCARE - DALLAS, TX** | | | | | |
| ATLANTA MEDICAL CENTER | 110115 | 303 PARKWAY DRIVE | ATLANTA | GA | 30312 |
| BROOKWOOD MEDICAL CENTER | 010139 | 2010 BROOKWOOD MEDICAL CENTER DRIVE | BIRMINGHAM | AL | 35209 |
| CENTENNIAL MEDICAL CENTER | 450885 | 12505 LEBANON ROAD | FRISCO | TX | 75035 |
| CORAL GABLES HOSPITAL | 100183 | 3100 DOUGLAS ROAD | CORAL GABLES | FL | 33134 |
| CREIGHTON UNIVERSITY MEDICAL CENTER | 280030 | 601 NORTH 30TH STREET | OMAHA | NE | 68131 |
| DELRAY MEDICAL CENTER | 100258 | 5352 LINTON BLVD. | DELRAY BEACH | FL | 33484 |
| DES PERES MEDICAL CENTER | 260176 | 2345 DOUGHERTY FERRY | ST LOUIS | MO | 63122 |
| DESERT HOSPITAL | 050243 | 1150 N. INDIAN AVE | PALM SPRINGS | CA | 92263 |
| DOCTORS HOSPITAL OF DALLAS | 450678 | 9440 POPPY DRIVE | DALLAS | TX | 75218 |
| DOCTORS MEDICAL CENTER OF MODESTO | 050464 | 1441 FLORIDA AVENUE | MODESTO | CA | 95350 |

20

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| FLORIDA MEDICAL CENTER | 100210 | 5000 WEST OAKLAND PARK BLVD | LAUDERDALE LAKES | FL | 33313 |
| FOUNTAIN VALLEY REG MEDICAL CENTER | 050570 | 17100 EUCLID AT WARNER | FOUNTAIN VALLEY | CA | 92708 |
| FRYE REGIONAL MEDICAL CENTER | 340116 | 420 NORTH CENTER STREET | HICKORY | NC | 28601 |
| HAHNEMANN UNIVERSITY HOSPITAL | 390290 | BROAD & VINE | PHILADELPHIA | PA | 19102 |
| HIALEAH HOSPITAL | 100053 | 651 EAST 25TH STREET | HIALEAH | FL | 33013 |
| HILTON HEAD HOSPITAL | 420080 | 35 BILL FRIES DRIVE | HILTON HEAD ISLAND | SC | 29928 |
| HOUSTON NORTHWEST MEDICAL CENTER | 450638 | 710 FM 1960 WEST | HOUSTON | TX | 77090 |
| LINDY BOGGS MEDICAL CENTER | 190260 | 301 NORTH JEFFERSON DAVIS PKWY | NEW ORLEANS | LA | 70119 |
| NORTH SHORE MEDICAL CENTER | 100029 | 1100 N.W. 95 ST | MIAMI | FL | 33150-2098 |
| NORTHSHORE REG. MEDICAL CENTER | 190204 | 100 MEDICAL CENTER DR. | SLIDELL | LA | 70461 |
| PALM BEACH GARDENS | 100176 | 3360 BURNS ROAD | PALM BEACH GARDENS | FL | 33410 |
| PALMETTO GENERAL HOSPITAL | 100187 | 2001 W. 68TH STREET | HIALEAH | FL | 33016 |
| PIEDMONT MEDICAL CENTER | 420002 | 222 SOUTH HERLONG AVENUE | ROCK HILL | SC | 29732 |
| PROVIDENCE MEMORIAL HOSPITAL | 450002 | 2001 NORTH OREGAN | EL PASO | TX | 79902 |
| SAINT LOUIS UNIVERSITY HOSPITAL | 260105 | 3635 VISTA AT GRAND BLVD | ST LOUIS | MO | 63110 |
| SAN RAMON REG. MEDICAL CENTER | 050689 | 6001 NORRIS CANYON RD | SAN RAMON | CA | 94583 |
| SIERRA MEDICAL CENTER | 450668 | 1625 MEDICAL CTR. DR. | EL PASO | TX | 79902 |
| SIERRA VISTA REGIONAL MED CTR | 050506 | 1010 MURRAY AVENUE | SAN LUIS OBISPO | CA | 93401 |
| ST. FRANCIS HOSPITAL | 440183 | 5959 PARK AVENUE | MEMPHIS | TN | 38119 |
| *TEXAS HEALTH RESOURCES - ARLINGTON, TX* | | | | | |
| HARRIS METHODIST FORT WORTH | 450135 | 1301 PENNSYLVANIA AVENUE | FORT WORTH | TX | 76104 |

21

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| PRESBYTERIAN HOSPITAL OF DALLAS | 450462 | 8200 WALNUT HILL LANE | DALLAS | TX | 75231 |
| PRESBYTERIAN HOSPITAL OF DENTON | 450743 | 207 NORTH BONNIE BRAE | DENTON | TX | 76201 |
| PRESBYTERIAN HOSPITAL OF PLANO | 450771 | 6200 WEST PARKER ROAD | PLANO | TX | 75093 |
| | | | | | |
| *TRINITY HEALTH - NOVI, MI* | | | | | |
| HOLY CROSS HOSPITAL OF SILVER SPRING | 210004 | 1500 FOREST GLEN ROAD | SILVER SPRING | MD | 20910 |
| MERCY GENERAL HEALTH PARTNER | 230004 | 1500 E. SHERMAN BLVD. | MUSKEGON | MI | 49443- |
| MOUNT CARMEL HEALTH | 360035 | 793 WEST STATE STREET | COLUMBUS | OH | 43222 |
| SAINT AGNES MEDICAL CENTER | 050093 | 1303 E. HERNDON AVENUE | FRESNO | CA | 93720 |
| SAINT ALPHONSUS REGIONAL MED CENTER | 130007 | 1055 N CURTIS ROAD | BOISE | ID | 83706 |
| SAINT MARY S MEDICAL CENTER | 230059 | 200 JEFFERSON SE | GRAND RAPIDS | MI | 49503- |
| ST JOSEPH REG MED CTR - SB CAMPUS | 150012 | 801 EAST LASALLE | SOUTH BEND | IN | 46617 |
| ST. ANN S HOSPITAL | 360012 | 500 S.CLEVELAND AVE | WESTERVILLE | OH | 43081 |
| ST. JOSEPH MERCY HOSPITAL | 230156 | 5301 E. HURON RIVER DR. | ANN ARBOR | MI | 48106 |
| ST. JOSEPH MERCY-OAKLAND | 230029 | 44405 WOODWARD AVE. | PONTIAC | MI | 48341 |
| ST. MARY MERCY HOSPITAL | 230002 | 36476 FIVE MILE ROAD | LIVONIA | MI | 48154 |
| | | | | | |
| *UNIVERSAL HEALTH SERVICES, INC. - KING OF PRUSSIA, PA* | | | | | |
| AIKEN REGIONAL MEDICAL CENTER | 420082 | 202 UNIVERSITY PARKWAY | AIKEN | SC | 29801 |
| DESERT SPIRNG HOSPITAL | 290022 | 2075 E. FALAMINGO ROAD | LAS VEGAS | NV | 89119 |
| EDINBURG REGIONAL MEDICAL CENTER | 450119 | 1102 W. TRENTON ROAD | EDINBURG | TX | 78539 |
| GEORGE WASHINGTON UNIV HOSPITAL | 090001 | 900 23RD STREET | WASHINGTON | DC | 20037-2377 |
| LANCASTER COMMUNITY HOSPITAL | 050204 | 43830 NORTH 10TH STREET WEST | LANCASTER | CA | 93534 |
| MANATEE MEMORIAL HOSPITAL | 100035 | 206 SECOND STREET EAST | BRADENTON | FL | 34208 |

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| MCALLEN MEDICAL HEART HOSPITAL | 450811 | 301 W. EXPRESSWAY 83 | MCALLEN | TX | 78503 |
| NORTHWEST TEXAS HOSPITAL | 450209 | 1501 S. COULTER AVENUE | AMARILLO | TX | 79106-1770 |
| SOUTHWEST HEALTHCARE SYSTEM | 050701 | 36485 INLAND VALLEY DRIVE | WILDOMAR | CA | 92595 |
| ST MARY S REG L MEDICAL CENTER | 370026 | 305 SOUTH FIFTH STREET | ENID | OK | 73701 |
| SUMMERLIN HOSPITAL MEDICAL CTR | 290041 | 657 TOWN CENTER DRIVE | LAS VEGAS | NV | 89144 |
| TEXOMA MEDICAL CENTER | 450324 | 1000 MEMORIAL DRIVE | DENISON | TX | 75021 |
| VALLEY HOSPITAL MEDICAL CENTER | 290021 | 620 SHADOW LANE | LAS VEGAS | NV | 89106 |
| | | | | | |
| *UNIVERSITY OF PITTSBURGH MEDICAL CENTER - PITTSBURGH, PA* | | | | | |
| HAMOT MEDICAL CENTER | 390063 | 201 STATE STREET | ERIE | PA | 16550 |
| THE MERCY HOSPITAL OF PITTSBURGH | 390028 | 1400 LOCUST STREET | PITTSBURGH | PA | 15219- |
| UPMC PASSAVANT | 390107 | 9100 BABCOCK BLVD. | PITTSBURGH | PA | 15237 |
| UPMC PRESBYTERIAN SHADYSIDE | 390164 | 200 LOTHROP STREET | PITTSBURGH | PA | 15213 |
| | | | | | |
| *VANGUARD HEALTH SYSTEM - NASHVILLE, TN* | | | | | |
| ARROWHEAD COMMUNITY HOSPITAL | 030094 | 10701 NORTH 67TH. STREE | GLENDALE | AZ | 85308 |
| BAPTIST HEALTH SYSTEM | 450058 | 111 DALLAS STREET | SAN ANTONIO | TX | 78205 |
| MACNEAL HOSPITAL | 140054 | 3249 SOUTH OAK PARK AVENUE | BERWYN | IL | 60402- |
| METROWEST MEDICAL CENTER | 220089 | 67 UNION STREET | NATICK | MA | 1760 |
| PHOENIX BAPTIST HOSPITAL | 030030 | 2000 WEST BETHANY ROAD | PHOENIX | AZ | 85015 |
| SAINT VINCENT HOSPITAL | 220028 | 20 WORCESTER CENTER BLVD. | WORCESTER | MA | 1608 |
| SAINT VINCENT HOSPITAL | 220176 | 123 SUMMER STREET | WORCESTER | MA | 1608 |
| WEST VALLEY HOSPITAL MEDICAL CENTER | 030110 | 13677 WEST MCDOWELL ROAD | GOODYEAR | AZ | 85338 |
| | | | | | |
| *WAKEMED - RALEIGH, NC* | | | | | |

23

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| WAKEMED RALEIGH CAMPUS | 340069 | 300 NEW BERN AVENUE | RALEIGH | NC | 27620 |
| | | | | | |
| *NO SYSTEM AFFILIATION* | | | | | |
| BAPTIST ST. ANTHONY S HOSPITAL | 450231 | 1600 WALLACE BLVD. | AMARILLO | TX | 79106 |
| BRYAN LGH MEDICAL CENTER | 280003 | 1600 SOUTH 48 TH STREET | LINCOLN | NE | 68506 |
| COOPER HEALTH SYSTEM a/k/a COOPER UNIVERSITY HOSPITAL | 310014 | ONE COOPER PLAZA | CAMDEN | NJ | 8103 |
| DEBORAH HEART & LUNG CENTER | 310031 | 200 TRENTON ROAD | BROWNS MILLS | NJ | 08015- |
| HACKENSACK UNIVERSITY MEDICAL CENTER | 310001 | 30 PROSPECT AVE | HACKENSACK | NJ | 07601- |
| INDIANA HEART HOSPITAL LLC | 150154 | 8075 NORTH SHADELAND AVENUE | INDIANAPOLIS | IN | 46256 |
| KING S DAUGHTERS MEDICAL CENTER | 180009 | 2201 LEXINGTON AVENUE | ASHLAND | KY | 41101-0151 |
| MARQUETTE GENERAL HOSPITAL | 230054 | 420 W. MAGNETIC STREET | MARQUETTE | MI | 49855 |
| MEDICAL CENTER HOSPITAL | 450132 | 500 WEST 4TH STREET | ODESSA | TX | 79761 |
| MEDICAL CENTER OF CENTRAL GEORGIA | 110107 | 777 HEMLOCK STREET | MACON | GA | 31208 |
| MEMORIAL MEDICAL CENTER | 140148 | 701 NORTH FIRST STREET | SPRINGFIELD | IL | 62781 |
| MONONGALIA GENERAL HOSPITAL | 510024 | 1200 JD ANDERSON DRIVE | MORGANTOWN | WV | 26505 |
| MT. SINAI MEDICAL CENTER | 100034 | 4300 ALTON ROAD | MIAMI BEACH | FL | 33140 |
| NACOGDOCHES MEMORIAL HOSPITAL | 450508 | 1204 NORTH MOUND STREET | NACOGDOCHES | TX | 75961 |
| NEBRASKA HEART INSTITUTE HEART HOSP | 280128 | 7500 S 91ST STREET | LINCOLN | NE | 68526 |
| NORTHERN MICHIGAN HOSPITAL | 230105 | 416 CONNABLE AVENUE | PETOSKEY | MI | 49770 |
| OKLAHOMA HEART HOSPITAL | 370215 | 4050 W MEMORIAL ROAD | OKLAHOMA CITY | OK | 73120- |
| PENINSULA REGIONAL MEDICAL CENTER | 210019 | 100 EAST CARROLL STREET | SALISBURY | MD | 21801 |
| SAINT VINCENT HEALTH CENTER | 390009 | 232 WEST 25TH STREET | ERIE | PA | 16544 |
| ST BERNARDS MEDICAL CENTER | 040020 | 225 EAST JACKSON | JONESBORO | AR | 72401-3156 |

24

## EXHIBIT A TO THIRD AMENDED COMPLAINT---LIST OF
## REMAINING DEFENDANTS

| | | | | | |
|---|---|---|---|---|---|
| TAMPA GENERAL HOSPITAL | 100128 | 2 COLUMBIA DR | TAMPA | FL | 33606-3508 |
| THE METHODIST HOSPITAL | 450358 | 6565 FANNIN STREET | HOUSTON | TX | 77030 |
| THE QUEEN S MEDICAL CENTER | 120001 | 1301 PUNCHBOWL STREET | HONOLULU | HI | 96813 |